**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Geraldine E. Ponto
Jonathan Barr
Jimmy Fokas

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-_____ (BRL) |
| FRANK J. AVELLINO, individually, and as Trustee for FRANK J. AVELLINO REVOCABLE TRUST NUMBER ONE AS AMENDED AND RESTATED JANUARY 26, 1990; FRANK J. | |

AVELLINO GRANTOR RETAINED ANNUITY
TRUST UNDER AGREEMENT DATED JUNE
24, 1992; FRANK J. AVELLINO GRANTOR
RETAINED ANNUITY TRUST AGREEMENT
NUMBER 2 UNDER AGREEMENT DATED
JUNE 24, 1992; FRANK J. AVELLINO
REVOCABLE TRUST NUMBER ONE UNDER
DECLARATION OF TRUST NUMBER ONE
DATED JUNE 10, 1988; HEATHER CARROLL
LOWLES TRUST U/A DATED JUNE 29, 1990;
TIFFANY JOY LOWLES TRUST U/A DATED
JUNE 29, 1990; MELANIE ANN LOWLES
TRUST U/A DATED JUNE 29, 1990; TAYLOR
ASHLEY MCEVOY TRUST U/A DATED JUNE
24, 1992; MADISON ALYSSA MCEVOY TRUST
U/A DATED JUNE 29, 1990; REDACTED
REDACTED GRANTOR RETAINED ANNUITY
TRUST; REDACTED GRANTOR
RETAINED ANNUITY TRUST; REDACTED
REDACTED GRANTOR RETAINED ANNUITY
TRUST; AVELLINO FAMILY TRUST;
AVELLINO & BIENES PENSION PLAN &
TRUST

MICHAEL S. BIENES, individually, and as
Trustee for GLENN J. DYDO IRREVOCABLE
TRUST U/A AUGUST 12, 1988; AVELLINO &
BIENES PENSION PLAN & TRUST

NANCY C. AVELLINO, individually, and as
Trustee for NANCY CARROLL AVELLINO
REVOCABLE TRUST UNDER TRUST
AGREEMENT DATED MAY 18, 1992; THE
RACHEL ANNE ROSENTHAL TRUST U/A
DATED JUNE 29, 1990; THE RACHEL
ROSENTHAL TRUST #3; THE RACHEL
ROSENTHAL TRUST #2 U/A DATED JUNE 24,
1992; HEATHER CARROLL LOWLES TRUST
U/A DATED JUNE 29, 1990; TIFFANY JOY
LOWLES TRUST U/A DATED JUNE 29, 1990;
MELANIE ANN LOWLES TRUST U/A DATED
JUNE 29, 1990; TAYLOR ASHLEY MCEVOY
TRUST U/A DATED JUNE 24, 1992; MADISON
ALYSSA MCEVOY TRUST U/A DATED JUNE
29, 1990;

DIANNE K. BIENES, individually, and as Trustee

for DIANNE K. BIENES GRANTOR RETAINED
ANNUITY TRUST 10/31/1997; REDACTED
REDACTED        TRUST;

THOMAS G. AVELLINO; AVELLINO &
BIENES; AVELLINO FAMILY TRUST;
AVELLINO & BIENES PENSION PLAN &
TRUST; GROSVENOR PARTNERS, LTD.;
MAYFAIR VENTURES, G.P.; ASTER
ASSOCIATES; ST. JAMES ASSOCIATES;
STRATTHAM PARTNERS; ASCENT, INC.;
KENN JORDAN ASSOCIATES; MAYFAIR
BOOKKEEPING SERVICES, INC.; 27 CLIFF,
LLC; GLENN J. DYDO; SANDRA DYDO;
REDACTED        JOSEPH
AVELLINO; MICHAEL MCEVOY; LORRAINE
MCEVOY; THE AVELLINO FAMILY
FOUNDATION, INC.; OPTUS SOFTWARE,
INC.; RACHEL A. ROSENTHAL; HEATHER C.
LOWLES; TIFFANY J. LOWLES; MELANIE A.
LOWLES; TAYLOR A. MCEVOY; MADISON
A MCEVOY; REDACTED
REDACTED        DEVON
PAXSON; ROSLYCK PAXSON; FRANK J.
AVELLINO REVOCABLE TRUST NUMBER
ONE AS AMENDED AND RESTATED
JANUARY 26, 1990; FRANK J. AVELLINO
GRANTOR RETAINED ANNUITY TRUST
UNDER AGREEMENT DATED JUNE 24, 1992;
FRANK J. AVELLINO GRANTOR RETAINED
ANNUITY TRUST AGREEMENT NUMBER 2
UNDER AGREEMENT DATED JUNE 24, 1992;
FRANK J. AVELLINO REVOCABLE TRUST
NUMBER ONE UNDER DECLARATION OF
TRUST NUMBER ONE DATED JUNE 10, 1988;
NANCY CARROLL AVELLINO REVOCABLE
TRUST UNDER TRUST AGREEMENT DATED
MAY 18, 1992; THE RACHEL ANNE
ROSENTHAL TRUST U/A DATED JUNE 29,
1990; THE RACHEL ROSENTHAL TRUST #3;
THE RACHEL ROSENTHAL TRUST #2 U/A
DATED JUNE 24, 1992; GLENN J. DYDO
IRREVOCABLE TRUST U/A AUGUST 12, 1988;
DIANNE K. BIENES GRANTOR RETAINED
ANNUITY TRUST 10/31/1997; REDACTED
REDACTED        TRUST; HEATHER
CARROLL LOWLES TRUST U/A DATED JUNE

29, 1990; TIFFANY JOY LOWLES TRUST U/A
DATED JUNE 29, 1990; MELANIE ANN
LOWLES TRUST U/A DATED JUNE 29, 1990;
TAYLOR ASHLEY MCEVOY TRUST U/A
DATED JUNE 24, 1992; MADISON ALYSSA
MCEVOY TRUST U/A DATED JUNE 29, 1990;
REDACTED                GRANTOR RETAINED
ANNUITY TRUST;            REDACTED
GRANTOR RETAINED ANNUITY TRUST;
REDACTED                GRANTOR RETAINED
ANNUITY TRUST,

Defendants.

# TABLE OF CONTENTS

**Page**

COMPLAINT ..................................................................................................................1

NATURE OF THE PROCEEDING ...............................................................................1

JURISDICTION AND VENUE .....................................................................................6

THE DEFENDANTS.......................................................................................................6

BACKGROUND, THE TRUSTEE AND STANDING................................................26

THE PONZI SCHEME...................................................................................................30

AVELLINO, LATER JOINED BY BIENES, OPERATE THE  FIRST MADOFF
        FEEDER FUND..................................................................................................35

AVELLINO AND BIENES CONCEAL A SHORTAGE IN THEIR MADOFF IA
        ACCOUNTS AND LIE TO THE SEC..............................................................38

AVELLINO AND BIENES KNEW THAT MADOFF PRODUCED OTHER
        FRAUDULENT BLMIS ACCOUNT STATEMENTS TO THE
        RECEIVER AND SEC ......................................................................................44

SEC OBTAINS AN INJUNCTION AGAINST AVELLINO, BIENES, AND
        A&B ....................................................................................................................46

AVELLINO AND BIENES ATTEMPT TO FIND "FRONT MEN" AND USE
        NEW PARTNERSHIPS TO CONTINUE TO FUNNEL MONEY TO
        BLMIS .................................................................................................................47

MADOFF AGREES TO PAY AVELLINO AND BIENES GUARANTEED
        RATES OF RETURN AND FRAUDULENT SIDE PAYMENTS FOR
        FUNDS FORMER A&B INVESTORS REINVESTED WITH BLMIS ...........51

THE "SCHUPT" PROCESS ..........................................................................................54

THOMAS AVELLINO PROFITS FROM THE BLMIS FRAUD THROUGH
        STRATTHAM PARTNERS................................................................................60

DEFENDANTS IGNORE OTHER INDICIA OF FRAUD..........................................64

AFTER REVELATION OF MADOFF'S FRAUD, BIENES LIES IN A
        TELEVISION INTERVIEW ..............................................................................65

# TABLE OF CONTENTS
## *(continued)*

Page

AVELLINO'S, BIENES' AND THOMAS AVELLINO'S KNOWLEDGE OF
    THE FICTITIOUS ACCOUNTS, FRAUDULENT SIDE PAYMENTS
    AND OTHER RED FLAGS SHOULD BE IMPUTED TO NANCY
    AVELLINO, DIANNE BIENES, AND TO THE ENTITY
    DEFENDANTS ...............................................................................................69

THE TRANSFERS .........................................................................................................71

CUSTOMER CLAIMS....................................................................................................85

COUNT ONE: FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A),
    550(a), AND 551 ................................................................................86

COUNT TWO: FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B),
    550(a), AND 551 ................................................................................87

COUNT THREE: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
    544, 550(a), AND 551 .........................................................................88

COUNT FOUR: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 273, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
    550(a), AND 551 ................................................................................89

COUNT FIVE: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§
    550(a), AND 551 ................................................................................90

COUNT SIX: FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
    550(a), AND 551 ................................................................................91

COUNT SEVEN: RECOVERY OF FULL HISTORY FRAUDULENT
    TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES
    203(g) AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW
    §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a) AND
    551...................................................................................................92

COUNT EIGHT: PREFERENTIAL TRANSFERS – 11 U.S.C. §§ 547(b), 550,
    AND 551 ...........................................................................................93

COUNT NINE: RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK
    CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), NEW
    YORK DEBTOR AND CREDITOR LAW §§ 273–279, AND 11 U.S.C.
    §§ 544, 547, 548, 550(a), AND 551 ......................................................95

## TABLE OF CONTENTS
### *(continued)*

**Page**

COUNT TEN: DISALLOWANCE OF CUSTOMER CLAIMS ...................................................96

COUNT ELEVEN: EQUITABLE SUBORDINATION................................................................96

COUNT TWELVE: CONVERSION ...........................................................................................97

COUNT THIRTEEN: UNJUST ENRICHMENT ........................................................................98

COUNT FOURTEEN: MONEY HAD AND RECEIVED ...........................................................99

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities, LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his Complaint,

states as follows:

## NATURE OF THE PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme masterminded

by Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at

BLMIS.  In early December 2008, BLMIS generated client account statements for its

approximately 4,900 open client accounts at BLMIS.  When added together, these statements

purportedly show that clients of BLMIS had approximately $65 billion invested with BLMIS.  In

reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009,

Madoff admitted to the fraudulent scheme, pleaded guilty to 11 felony counts, and was sentenced

on June 29, 2009 to 150 years in prison.

2.      Frank Avellino ("Avellino"), Michael Bienes ("Bienes"), their family members,

and entities, which Avellino, Bienes, and their family members dominated and controlled,

perpetuated and benefited from the successful operation of Madoff's Ponzi scheme for decades.

Although Avellino and Bienes now claim to be victims of that scheme, their denial flies in the

face of facts uncovered by the Trustee.  They operated BLMIS's first feeder fund, a partnership

known as Avellino & Bienes ("A&B"), which fueled the growth of the Ponzi scheme for

decades.  Throughout those many years, A&B, Avellino, Bienes, Nancy Avellino ("Mrs.

Avellino"), and Dianne Bienes ("Mrs. Bienes") lined their pockets with millions of dollars of

other people's money and enabled the Ponzi scheme to prosper by providing it with a consistent

source of money.  Prior to its forced liquidation by the Securities and Exchange Commission (the "SEC") in 1992, A&B was BLMIS's source of hundreds of millions of dollars of investor funds. Even after the SEC shut down A&B through a federal court injunction, Avellino, Bienes, Mrs. Avellino , Mrs. Bienes, and Avellino's son, Thomas Avellino, continued to funnel millions of dollars of investment funds to BLMIS to enrich themselves from Madoff's fraud.

3.      Avellino, Bienes, their wives, and Thomas Avellino depended on Madoff to fund their lavish lifestyles through the fictitious profits they received from his Ponzi scheme.  For example, Avellino and Mrs. Avellino owned multi-million dollar homes in exclusive areas in Manhattan, Nantucket, and Palm Beach, some of which were adorned with valuable artwork from famous artists and sculptors, such as Pablo Picasso, Edgar Degas, and Giacomo Manzu. Thomas Avellino, who had no significant employment history and little or no experience as an investment professional, received millions of dollars for directing investors' money to Madoff's Ponzi scheme.  He owned a Florida penthouse and a million dollar home in Monmouth, New Jersey.  The Bieneses owned homes in California, New York, Florida, and London.  Their more than 6,000 square foot Florida mansion included a separate 10,000 square foot party pavilion and a cold storage compartment to store Mrs. Bienes' furs.

4.      Avellino and Bienes pretended for years not to know that Madoff was operating a fraud from which they received millions of dollars of fictitious profits, when they knew or should have known that BLMIS was acting fraudulently.  They consistently and falsely represented to investors that their money was safely invested with a legitimate investment professional.  Even after the public collapse of BLMIS in December 2008, Bienes proclaimed on national television in an interview with the Public Broadcasting Service's *Frontline* that he and Mrs. Bienes believed they had received millions of dollars from BLMIS because "God gave us this."  Bienes

further falsely denied having any warning that anything was amiss at BLMIS stating:  "[a]s God as my only judge, on my mother's grave, not an inkling, not a tickle, nothing.  May [H]e strike me dead."

5.      In reality, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes and Thomas Avellino knew or should have known that Madoff and BLMIS were operating a fraudulent investment advisory business, and that the entities, which they controlled and had created, were benefiting from the fraudulent scheme.  As described in greater detail below, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes and Thomas Avellino observed blatant and obvious red flags which would have put a reasonable person, let alone licensed Certified Public Accountants ("CPAs") such as Avellino and Bienes, on clear notice that BLMIS was operating fraudulently and manufacturing fictitious trading activity reflected on its customer account statements.  Upon information and belief, as early as June 1992, while embroiled in an SEC investigation, Avellino and Bienes knew that BLMIS had created a false A&B customer account with backdated account statements detailing fabricated trades.  The backdated account statements created over $65.9 million in fictitious value in an effort to assist Avellino and Bienes in deceiving government investigators.  The purpose of this phony account was to cover a shortfall of at least $29.8 million between money owed by A&B to its investors and the balances reflected in the BLMIS customer statements for the A&B accounts.  Having been confronted with a backdated account containing fictitious trades, Avellino and Bienes knew or should have known that their investment adviser was committing fraud.  Rather than expose the creation of this fraudulent account, Avellino and Bienes lied under oath in SEC testimony.  Avellino and Bienes knew or should have known they were participating in a fraud but chose to play along with Madoff, so they could enrich themselves at the expense of others and continue living the lavish lifestyle they had come to

expect.  Furthermore, Avellino's and Bienes' knowledge and bad faith should be imputed to Mrs.

Avellino and Mrs. Bienes who also profited greatly from their spouses' misconduct.

6.    After lying to the SEC to conceal their illegal conduct, and following the

consequent liquidation of A&B in November 1992, Avellino and Bienes and several of their

business associates negotiated to receive disguised compensation for recently created investment

advisory ("IA") accounts under their control.  Specifically, they requested guaranteed annual

rates of return of 17% on certain IA accounts at BLMIS they controlled, and also negotiated to

receive fraudulent side payments based upon amounts that former A&B investors had reinvested

with BLMIS by March 31, 1993.

7.    From 1994 through 2007, BLMIS provided accounts controlled by Avellino and

Bienes with more than $59 million in fraudulent side payments and additional profits to meet the

guaranteed rates of return Madoff had promised to Avellino and Bienes.  This disguised

compensation was not paid by conventional means such as checks or credits to an account.

Rather, Madoff furnished Avellino and Bienes with the fraudulent side payments by inserting

fictitious, highly profitable, non-hedged options transactions[1] into the customer account

statements for certain IA accounts approximating the value of the promised compensation.

Despite their knowledge that fraudulent side payments were being made in the manner described

above, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes and Thomas Avellino pretended to

outsiders that nothing untoward was occurring at BLMIS.  They did so to continue to profit at

others' expense.

8.    The charade is over, and they can pretend no longer.  When compelled this past

fall to explain their actions to the Trustee in investigative examinations pursuant to Bankruptcy

---

[1] Non-hedged options transactions refer to options transactions that are inconsistent with the split-strike strategy
Madoff purported to follow.

Rule 2004, Avellino, Bienes, Mrs. Bienes, and Thomas Avellino all asserted their Fifth

Amendment rights against self-incrimination and refused to answer any questions about Madoff,

BLMIS or their conduct relating to their IA accounts at BLMIS.

9.      Avellino and Bienes spent the vast majority of their professional careers investing

and funneling money to Madoff so they could profit for decades from implausibly steady and

guaranteed returns from BLMIS.  Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas

Avellino and entities they controlled, knew or should have known, that the uninterrupted returns

they enjoyed for decades, and the blatantly fictitious trades reflected in their BLMIS IA

accounts, were the product of fraud.

10.     As of the date of this Complaint, the Trustee has identified at least $904,515,689

of customer funds collectively received from BLMIS, directly or indirectly, by defendants

Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas Avellino, A&B, Avellino Family Trust

("Avellino Family Trust"), Avellino & Bienes Pension Plan & Trust ("A&B Pension Plan")

Grosvenor Partners, Ltd. ("Grosvenor Partners"), Aster Associates ("Aster"), St. James

Associates ("St. James"), Mayfair Ventures, G.P. ("Mayfair Ventures"), Kenn Jordan Associates

("KJA") and Strattham Partners ("Strattham") from April 1981 through December 11, 2008.

Many of these funds were transferred to other entities controlled by these defendants or to other

family members, some of whom are named herein as subsequent transferees.

11.     This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and

78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 510(c), 544, 547, 548(a), 550(a) and 551 of title

11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance

Act (New York Debtor & Creditor Law section 270 *et seq*. (McKinney 2001) ("DCL")), CPLR

sections 203(g) and 213(8) (McKinney 2001) and other applicable law for avoidance and

recovery of preferences, fraudulent conveyances, subsequent transfer of such preferences and

fraudulent conveyances, unjust enrichment, conversion, money had and received, consequential

and punitive damages, the Trustee's disallowance of the customer claims in connection with

certain transfers of property by BLMIS to or for the benefit of certain defendants, and equitable

subordination.  The Trustee seeks to avoid such transfers and preserve and recover the property

for the benefit of the BLMIS estate and BLMIS's defrauded customers.

## JURISDICTION AND VENUE

12.    This is an adversary proceeding commenced before the same Court before which

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and sections 78eee(b)(2)(A), (b)(4) of SIPA.

13.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and

(O).

14.    Venue in this district is proper under 28 U.S.C. § 1409.

## THE DEFENDANTS

### Individual Defendants (the "Individual Defendants")

15.    **Frank J. Avellino** (defined earlier as "Avellino"), age 74, resides in Palm Beach,

Florida.  He is a CPA and was a partner in the accounting firm of Avellino & Bienes.  Avellino

began his career at the accounting firm of Alpern & Heller in or around 1958.  Saul Alpern, one

of the two named partners at the firm, was Madoff's father-in-law.  In or around the 1960s,

Avellino became a partner of this accounting firm, and it was renamed Alpern & Avellino.  In or around 1974, sometime after Bienes joined the firm and upon the retirement of Saul Alpern, the accounting firm became known as Avellino & Bienes.  Upon information and belief, Avellino began investing with Madoff in or around 1962, and thereafter spent the majority of his professional career investing with and, funneling other people's money into Madoff's Ponzi scheme.  Avellino profited exorbitantly from those efforts through withdrawals from BLMIS IA accounts, the payment of management and professional fees, and other compensation by or through entities he owned and controlled.  Avellino's involvement with these entities includes:

a.      With Bienes, and the later involvement of Mrs. Bienes, Avellino created, controlled, and was a general partner of A&B;

b.      Upon information and belief, Avellino created, controlled, and was the Trustee of Avellino Family Trust;

c.      Upon information and belief, with Bienes, Avellino created, controlled, was a Trustee and a beneficiary of A&B Pension Plan;

d.      With Bienes, Mrs. Bienes and Mrs. Avellino, Avellino (either individually and/or through one or more trusts for which he was the beneficiary, grantor and/or trustee) created, controlled and was a limited partner of Grosvenor Partners;

e.      With Bienes, Mrs. Bienes and Mrs. Avellino, Avellino (either individually and/or through one or more trusts for which he was the beneficiary, grantor and/or trustee) created, controlled and was a general partner and the co-managing partner of Mayfair Ventures, the general partner of Grosvenor Partners;

f.     With Mrs. Avellino, Avellino (either individually and/or through one or more trusts for which he was the beneficiary, grantor and/or trustee) created, controlled and was a general partner of Aster;

g.     From at least 1998 forward, Avellino controlled and functioned as the principal of KJA; and

h.     With Bienes, Avellino created, controlled and was a director and the president of Mayfair Bookkeeping Services, Inc. ("Mayfair Bookkeeping"), the sponsor of the Mayfair Pension Plan ("Mayfair Pension Plan") of which Avellino was a beneficiary.

16.     Avellino controlled and benefited from at least the following BLMIS accounts held in the names of A&B, Avellino Family Trust, A&B Pension Plan, Frank J. Avellino Trustee, the Avellino Group, Grosvenor Partners, Mayfair Ventures, Aster, Mayfair Bookkeeping, and KJA.

17.     **Michael S. Bienes** (defined earlier as "Bienes"), age 74, resides in Fort Lauderdale, Florida.  Bienes was a CPA who joined the accounting firm of Alpern & Avellino in 1968.  In or around the early 1970's, upon information and belief, Bienes became a junior partner in the firm and it became known as Alpern, Avellino & Bienes.  By in or around 1974, upon the retirement of Saul Alpern, the firm was renamed Avellino & Bienes.  Bienes spent the majority of his professional career investing in, and referring investors to, Madoff's Ponzi scheme.  Through the time of the exposure of the Ponzi scheme in December 2008, Bienes profited exorbitantly from these efforts through withdrawals from IA accounts and other compensation received by or through entities he owned and controlled.  Bienes' involvement with these entities includes:

a.      With Avellino, and the later involvement of Mrs. Bienes, Bienes created, controlled and was a general partner of A&B;

b.      Upon information and belief, with Avellino, Avellino created, controlled, and was a Trustee and a beneficiary of A&B Pension Plan;

c.      With Avellino, Mrs. Bienes and Mrs. Avellino, Bienes (either individually and through one or more trusts for which he was the beneficiary, grantor and/or trustee) created, controlled and was a limited partner of Grosvenor Partners until in or around 2005;

d.      With Avellino, Mrs. Bienes and Mrs. Avellino, Bienes created, controlled and was a general partner of Mayfair Ventures, the general partner of Grosvenor Partners;

e.      With Mrs. Bienes, Bienes (either individually and/or through one or more trusts for which he was the beneficiary, grantor and/or trustee) created, controlled and was a general partner of St. James; and

f.      With Avellino, Bienes created and controlled Mayfair Bookkeeping, the sponsor of Mayfair Pension Plan, of which Bienes was a beneficiary.  Bienes was a director, the secretary and the treasurer of Mayfair Bookkeeping.

18.      Bienes controlled and benefited from at least BLMIS accounts held in the names of A&B, A&B Pension Plan, Grosvenor Partners, Mrs. Bienes, Mayfair Ventures, St. James and Mayfair Bookkeeping.

19.      **Nancy Carroll Avellino** (defined earlier as "Mrs. Avellino"), age 64, resides in Palm Beach, Florida, and is the wife of Avellino.  She has profited exorbitantly from investments with, and her husband's referral of investors' money to, Madoff's Ponzi scheme through withdrawals from IA accounts held by entities controlled by her and/or her husband.  These

entities consistently received guaranteed rates of return and received fraudulent side payments from BLMIS.  Mrs. Avellino's involvement with these entities includes:

    a.    With Avellino, Bienes and Mrs. Bienes, Mrs. Avellino participated in the creation of Grosvenor Partners by signing the required entity documents and (either individually and/or through one or more trusts for which she was the beneficiary, grantor and/or trustee) controlled and was a limited partner of Grosvenor Partners;

    b.    With Avellino, Bienes and Mrs. Bienes, Mrs. Avellino participated in the creation of Mayfair Ventures by signing the required entity documents and (either individually and/or through one or more trusts for which she was the beneficiary, grantor and/or trustee) controlled and was a general partner of Mayfair Ventures, the general partner of Grosvenor Partners;

    c.    With Avellino, upon information and belief, Mrs. Avellino participated in the creation of Aster by signing the required entity documents and (either individually and/or through one or more trusts for which she was the beneficiary, grantor and/or trustee) controlled and was a general partner of Aster; and

    d.    Mrs. Avellino was a beneficiary of Mayfair Pension Plan.

20.    Mrs. Avellino benefited from her and/or her husband's ownership and control of BLMIS accounts held in the names of A&B, Grosvenor Partners, Mayfair Ventures, Aster and Mayfair Bookkeeping.  Mrs. Avellino also held BLMIS account number 1ZW009 in the name of "NTC & CO., FBO Nancy W Carroll (xxxxx)," with the account address reported as P.O. Box 173859, Denver, Colorado, 80217.  This account was opened on or about December 9, 1992.

21.    **Dianne K. Bienes** (defined earlier as "Mrs. Bienes"), age 68, resides in Fort Lauderdale, Florida and is the wife of Bienes.  She has profited exorbitantly from investments

with, and her husband's referral of investors' money to, Madoff's Ponzi scheme from at least

1968 forward. She profited through withdrawals from IA accounts held by entities controlled by

her and/or her husband, which consistently received guaranteed rates of returns and received

fraudulent side payments from Madoff. Mrs. Bienes' involvement with these entities includes:

a.     With Avellino and Bienes, since at least January 1988, Mrs. Bienes

controlled and was a general partner of A&B;

b.     Upon information and belief, with Avellino and Bienes, since at least

January 1988, Mrs. Bienes controlled and was a beneficiary of A&B Pension Plan;

c.     With Avellino, Bienes and Mrs. Avellino, Mrs. Bienes participated in the

creation of Grosvenor Partners by signing the required entity documents and (either individually

and/or through one or more trusts for which she was the beneficiary, grantor and/or trustee)

controlled and was a limited partner of Grosvenor Partners until in or around 2005;

d.     With Avellino, Bienes and Mrs. Avellino, Mrs. Bienes participated in the

creation of Mayfair Ventures by signing the required entity documents and controlled and was a

general partner and the co-managing partner of Mayfair Ventures, the general partner of

Grosvenor Partners;

e.     With Bienes, upon information and belief, Mrs. Bienes participated in the

creation of St. James by signing the required entity documents and (either individually and/or

through one or more trusts for which she was the beneficiary, grantor and/or trustee) controlled

and was a general partner of St. James; and

f.     Mrs. Bienes was a beneficiary of Mayfair Pension Plan.

22.     Mrs. Bienes benefited from her and/or her husband's ownership and control of

BLMIS accounts held in the names of A&B, A&B Pension Plan, Grosvenor Partners, Mayfair

Ventures, St. James and Mayfair Bookkeeping.  Mrs. Bienes also owned, controlled and benefited from BLMIS account number 1B0018 in the name of "Diane [sic] K Bienes," with the account address reported in Fort Lauderdale, Florida.

23.    **Thomas G. Avellino** (defined earlier as "Thomas Avellino"), age 45, resides in Holmdel, New Jersey and is the son of Avellino.  Like his father, Thomas Avellino spent the majority of his professional career referring money to Madoff's Ponzi scheme and profiting exorbitantly from those efforts through withdrawals from IA accounts                    REDACTED

Thomas Avellino's involvement with entities relevant to this Complaint includes:

        a.    Thomas Avellino created, controlled and was a general partner of Strattham;

        b.    Thomas Avellino created, controlled and was the president and, upon information and belief, the sole officer and director of Ascent,            REDACTED


        c.    Thomas Avellino was a limited partner of Grosvenor Partners; and

        d.    Thomas Avellino was a general partner of    REDACTED

24.    Thomas Avellino controlled and benefited from the IA account held in the name of Strattham.  In addition, Thomas Avellino received subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster).

25.    Thomas Avellino is the guardian of a minor with the initials S.A.

**Entity Defendants (the "Entity Defendants")**

26.    **Avellino & Bienes** (defined earlier as "A&B") was a partnership registered under the laws of the State of Florida.  Upon information and belief, until in or about 1984, A&B

functioned as both an accounting firm and an entity which raised money from investors to pool

these funds for investment with BLMIS.  By 1984, A&B ceased operating as an accounting firm

to focus exclusively on profiting from its business as a feeder fund for BLMIS.  A&B was

liquidated in 1992 as the result of an enforcement action brought by the SEC concerning its

investments with BLMIS.  During its existence, A&B maintained at least six IA accounts in its

name at BLMIS from which it withdrew at least $446,035,308 in fictitious profits from April

1981 through January 1993.  These accounts included the 1A0053 account which was

fraudulently created with backdated account statements during the SEC's investigation.  From in

or around 1974, Avellino, Bienes, and later Mrs. Bienes, were the only partners of A&B.

27.    **Avellino Family Trust** (defined earlier as "Avellino Family Trust") was, upon

information and belief, a Trust with an address in Palm Beach, Florida.  A&B Pension Plan held

BLMIS account number 100126 in the name of "Avellino Family Trust C/O Frank Avellino."

Upon information and belief, Avellino was the Trustee of Avellino Family Trust.  Avellino

Family Trust, upon information and belief, received avoidable transfers from BLMIS account

100126.

28.    **Avellino & Bienes Pension Plan & Trust** (defined earlier as "A&B Pension

Plan") was, upon information and belief, a Trust with an address in Palm Beach, Florida.  Upon

information and belief, Avellino and Bienes were the Trustees of A&B Pension Plan.  Upon

information and belief, A&B Pension Plan was the predecessor of the Avellino & Bienes Profit

Sharing Plan and Trust and Mayfair Pension Plan, which were profit sharing plans established

for the benefit of Avellino, Bienes, Mrs. Bienes, and later Mrs. Avellino, as discussed below.

A&B Pension Plan held BLMIS account number 1A0046 in the name of "Avellino & Bienes

Pension Plan & Trust C/O Frank Avellino," with the account address reported in Fort

Lauderdale, Florida.  A&B Pension Plan, upon information and belief, received avoidable

transfers from BLMIS account 1A0046.

29.    **Grosvenor Partners, Ltd.** (defined earlier as "Grosvenor Partners") was a

limited partnership formed under the laws of the State of Florida with its principal place of

business in Palm Beach, Florida.  Avellino, Bienes, Mrs. Avellino and Mrs. Bienes created and

controlled the current general partner of Grosvenor Partners, Mayfair Ventures, as well as

predecessor general partners of this entity.  Grosvenor Partners held BLMIS account number

1ZB046 in the name of "Grosvenor Partners Ltd," with the account address reported in Palm

Beach, Florida.  This account was opened on or around February 25, 1993.  In addition to

receiving avoidable transfers from BLMIS account 1ZB046, Grosvenor Partners received

subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB509 (Aster),

1ZA879 (KJA) and 1ZB262 (Strattham).

30.    **Mayfair Ventures, G.P.** (defined earlier as "Mayfair Ventures") was a general

partnership formed under the laws of the State of Florida with its principal place of business in

Palm Beach, Florida.  Mayfair Ventures held BLMIS account number 1ZB032 in the name of

"Mayfair Ventures," with the account address reported in Palm Beach, Florida.  This account

was opened on or around February 11, 1993.  Mayfair Ventures was the general partner of

Grosvenor Partners.  In addition to receiving avoidable transfers from BLMIS account 1ZB032,

Mayfair Ventures received subsequent transfers of avoidable transfers from at least BLMIS

account 1ZB046 (Grosvenor Partners).

31.    **Aster Associates** (defined earlier as "Aster") was, upon information and belief, a

general partnership formed under the laws of the State of Florida with its principal place of

business in Palm Beach, Florida.  Aster held BLMIS account number 1ZB509 in the name of

"Aster Associates, Frank Avellino, Nancy Carroll Avellino General Partners," with the account address reported in Palm Beach, Florida.  This account was opened in or around June 23, 2004, with a transfer of $5 million from BLMIS account 1ZB046 (Grosvenor Partners).  In addition to receiving avoidable transfers from BLMIS account 1ZB509, Aster received subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners), 1ZA879 (KJA) and 1ZB032 (Mayfair Ventures).

32.    **St. James Associates** (defined earlier as "St. James") was, upon information and belief, a general partnership formed under the laws of the State of Florida with its principal place of business in Fort Lauderdale, Florida.  St. James held BLMIS account number 1ZB510 in the name of "St. James Associates, Michael Bienes, Diane [sic] Bienes General Partners," with the account address reported in Fort Lauderdale, Florida.  This account was opened in or around June 23, 2004, with a transfer of $5 million from BLMIS account 1ZB046 (Grosvenor Partners).

33.    **Strattham Partners** (defined earlier as "Strattham") was a general partnership formed under the laws of the State of Florida with its principal place of business in Miami, Florida.  Strattham held BLMIS account number 1ZB262 in the name of "Strattham, C/O Thomas G. Avellino," with the account address reported in Miami, Florida.  This account was opened in or around August 15, 1995.  In addition to receiving avoidable transfers from BLMIS account 1ZB262, Strattham received subsequent transfers of avoidable transfers from at least BLMIS account 1ZB046 (Grosvenor Partners).

34.    **Kenn Jordan Associates** (defined earlier as "KJA") was a general partnership formed under the laws of the State of Florida with its principal place of business in Palm Beach, Florida.  From at least 1998, Avellino controlled and functioned as the principal of KJA.  KJA held BLMIS account number 1ZA879 in the name of "Kenn Jordan Associates, C/O Frank

15

Avellino," with the account address reported in Palm Beach, Florida.  This account was opened

in or around February 10, 1993.  In addition to receiving avoidable transfers from BLMIS

account 1ZA879, KJA received subsequent transfers of avoidable transfers from at least BLMIS

accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster).

**Certain Subsequent Transferee Defendants**

35.    **Ascent, Inc.** (defined earlier as "Ascent") was a corporation organized under the

laws of the State of Florida with its principal place of business in Miami, Florida.  REDACTED

Upon information and belief, Thomas

Avellino was the sole director and officer of Ascent.  Ascent received subsequent transfers of

avoidable transfers from at least BLMIS accounts 1ZB262 (Strattham) and 1ZA879 (KJA).

36.    **Mayfair Bookkeeping Services, Inc.** (defined earlier as "Mayfair Bookkeeping")

was a corporation formed under the laws of the State of Florida with its principal place of

business in Palm Beach, Florida.  Prior to changing its name to Mayfair Bookkeeping Services,

Inc., Mayfair Bookkeeping was known as Avellino & Bienes Accounting Services, Inc. ("A&B

Accounting Services").  Upon information and belief, Mayfair Bookkeeping was the sponsor for

the defunct Mayfair Pension Plan, a profit sharing plan originally known as the Avellino &

Bienes Profit Sharing Plan and Trust, which was established for the benefit of Avellino, Bienes,

Mrs. Avellino and Mrs. Bienes.  Avellino and Bienes created, controlled and were officers and

directors of Mayfair Bookkeeping and its predecessor, A&B Accounting Services.  Mayfair

Bookkeeping held BLMIS account number 1ZB249 in the name of "Mayfair Bookkeeping

Services Inc., Mayfair Pension Plan, C/O Frank Avellino," with the account address reported in

Palm Beach, Florida.  In addition, Mayfair Bookkeeping and its predecessor, A&B Accounting

Services, received subsequent transfers of avoidable transfers from at least BLMIS accounts

1ZB046 (Grosvenor Partners) and 1ZB032 (Mayfair Ventures).

37.    **Dianne K. Bienes Grantor Retained Annuity Trust 10/31/1997** ("Dianne

Biennes GRAT")
                                              REDACTED

38.    **Frank J. Avellino Revocable Trust Number One as amended and restated**

**January 26, 1990** ("FJA Revocable Trust Number One 1990") was, upon information and

belief, a Trust with an address in Palm Beach, Florida that held a general partnership interest in

Mayfair Ventures.  Avellino was the Trustee for FJA Revocable Trust Number One 1990.

                                              REDACTED

39.    **Frank J. Avellino Grantor Retained Annuity Trust under Agreement dated**

**June 24, 1992**
                                              REDACTED

40.    **Frank J. Avellino Grantor Retained Annuity Trust Agreement Number 2**

**Under Agreement dated June 24, 1992** ("FJA GRAT Two 1992") was, upon information and

belief, a Trust with an address in Palm Beach, Florida that held a general partnership interest in

Mayfair Ventures.  Avellino was the Trustee for FJA GRAT Two 1992.   REDACTED

41.    **Frank J. Avellino Revocable Trust Number One under Declaration of Trust**

**Number One dated June 10, 1988** ("FJA Revocable Trust Number One 1988") was, upon

information and belief, a Trust with an address in Palm Beach, Florida that held a general

partnership interest in Mayfair Ventures.  Avellino was the Trustee for FJA Revocable Trust

Number One 1988.  Upon information and belief, FJA Revocable Trust Number One 1988

received subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046

(Grosvenor Partners), 1ZB032 (Mayfair Ventures) and   REDACTED

42.    **Nancy Carroll Avellino Revocable Trust under Trust Agreement dated May**

**18, 1992** ("Nancy Avellino GRAT 1992") was, upon information and belief, a Trust with an

address in Palm Beach, Florida that held a general partnership interest in Mayfair Ventures.  Mrs.

Avellino was the Trustee for Nancy Avellino GRAT 1992.  Upon information and belief, Nancy

Avellino GRAT 1992 received subsequent transfers of avoidable transfers from at least BLMIS

accounts 1ZB046 (Grosvenor Partners), 1ZB032 (Mayfair Ventures) and   REDACTED

43.    **Joseph Avellino** ("Joseph Avellino") resides in Long Valley, New Jersey, and is

Avellino's son.  Joseph Avellino is the guardian of two minors with the initials N.A. and St. A.

Joseph Avellino was a limited partner in Grosvenor Partners   REDACTED

Upon

information and belief, Joseph Avellino received subsequent transfers of avoidable transfers

from at least BLMIS accounts 1ZB046 (Grosvenor Partners), 1ZB509 (Aster) and 1ZA879

(KJA).

44.     **27 Cliff, LLC** ("27 Cliff") was a limited liability company formed under the laws

of the State of Florida with its principal place of business in Palm Beach, Florida.  The managers

of 27 Cliff were Avellino and Mrs. Avellino.                    REDACTED

45.     **Glenn and Sandra Dydo** (individually, "Glenn Dydo" and "Sandra Dydo")

reside in Fort Lauderdale, Florida.  Upon information and belief, Glenn Dydo is Mrs. Bienes'

brother and Sandra Dydo's husband.  Glenn Dydo and Sandra Dydo are the guardians of a minor

with the initials T. C. D.  Upon information and belief, Glenn Dydo was a beneficiary of the

Glenn J. Dydo Irrevocable Trust U/A August 12, 1988,                    REDACTED

46.     **Glenn J. Dydo Irrevocable Trust U/A August 12, 1988** ("Glenn Dydo Trust")

was, upon information and belief, a Trust with an address in Fort Lauderdale, Florida that held a

limited partnership interest in Grosvenor Partners.  Upon information and belief, the Trustee for

Glenn Dydo Trust was Bienes.                    REDACTED

47.    **A minor with the initials T. C. D.** ("T. C. D.") resides in Fort Lauderdale,

Florida.  Upon information and belief, T. C. D. is the nephew of Mrs. Bienes.  Upon information

and belief, T. C. D. was the beneficiary of the T. C. D. Trust          REDACTED


48.    **T. C. D. Trust** ("T. C. D. Trust") was, upon information and belief, a Trust with

an address in Fort Lauderdale, Florida that, upon information and belief, held a limited

partnership interest in Grosvenor Partners          REDACTED          Upon information and

belief, the Trustee for T. C. D. Trust was Mrs. Bienes.          REDACTED


49.    **Lorraine and Michael McEvoy** (individually, "Lorraine McEvoy" and "Michael

McEvoy") reside in Fairhaven, New Jersey.  Lorraine McEvoy is Avellino's daughter and

Michael McEvoy's wife.  Lorraine McEvoy and Michael McEvoy were limited partners of

Grosvenor Partners          REDACTED          Lorraine McEvoy and Michael McEvoy

received subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046

(Grosvenor Partners) and 1ZB509 (Aster).

50.    **The Avellino Family Foundation, Inc.** ("AFF") was a corporation organized

under the laws of the State of Florida with its principal place of business in Palm Beach, Florida.

The officers of AFF were Avellino, Joseph Avellino, Lorraine McEvoy, Mrs. Avellino, Thomas

Avellino and Rachel Rosenthal.  AFF          REDACTED          and received

subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor

Partners) and 1ZB509 (Aster).

51.     **Rachel Rosenthal** ("Rachel Rosenthal"), also known as Rachel Liersch, is associated with an address in Palm Beach, Florida.  Rachel Rosenthal is Mrs. Avellino's daughter from a previous marriage.  She was                REDACTED                a general partner of Aster and an officer of AFF.  Rachel Rosenthal received subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster).  Upon information and belief, Rachel Rosenthal was also a beneficiary of the Rachel Anne Rosenthal Trust U/A dated June 29, 1990 and the Rachel Rosenthal Trust #3 and was the beneficiary of subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster), and the trusts.

52.     **The Rachel Anne Rosenthal Trust U/A dated June 29, 1990**, also known as the Rachel Anne Rosenthal Trust ("Rachel Rosenthal Trust"), was a Trust with an address in Palm Beach, Florida.  Upon information and belief, the Trustee for Rachel Rosenthal Trust was Mrs. Avellino.  Rachel Rosenthal Trust held a limited partnership interest in Grosvenor Partners,

REDACTED

53.     **The Rachel Rosenthal Trust #3**, upon information and belief, also known as the Rachel Rosenthal Trust #2 U/A dated June 24, 1992 ("Rachel Rosenthal Trust #3"), was a Trust with an address in Palm Beach, Florida.  Upon information and belief, the Trustee for Rachel Rosenthal Trust #3 was Mrs. Avellino.  Rachel Rosenthal Trust #3 held a limited partnership interest in Grosvenor, a general partnership interest in Aster and received subsequent transfers of avoidable transfers from at least BLMIS accounts                REDACTED                and 1ZB509 (Aster).

54.     **Heather C. Lowles** ("Heather Lowles"), upon information and belief, resides in San Jose, California, and is Mrs. Avellino's niece.  Upon information and belief, Heather Lowles was the beneficiary of the Heather Carroll Lowles Trust U/A dated June 29, 1990 and received and was the beneficiary of subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster), and the trust.

55.     **Heather Carroll Lowles Trust U/A dated June 29, 1990**, also known as the Heather Lowles Trust ("Heather Lowles Trust"), was a Trust with an address in Palm Beach, Florida.  Upon information and belief the Trustees for Heather Lowles Trust were Avellino and Mrs. Avellino.  Upon information and belief, Heather Lowles Trust held a limited partnership interest in Grosvenor Partners, a general partnership interest in Aster    REDACTED

56.     **Tiffany J. Lowles** ("Tiffany Lowles"), upon information and belief, resides in Hendersonville, North Carolina, and is Mrs. Avellino's niece.  Upon information and belief, Tiffany Lowles was the beneficiary of the Tiffany Joy Lowles Trust U/A dated June 29, 1990 and received and was the beneficiary of subsequent transfers of avoidable transfers from at least BLMIS accounts 1ZB046 (Grosvenor Partners) and 1ZB509 (Aster), and the trust.

57.     **Tiffany Joy Lowles Trust U/A dated June 29, 1990**, also known as the Tiffany Lowles Trust ("Tiffany Lowles Trust"), was a Trust with an address in Palm Beach, Florida. Upon information and belief, the Trustees for Tiffany Lowles Trust were Avellino and Mrs. Avellino.  Upon information and belief, Tiffany Lowles Trust held a limited partnership interest in Grosvenor Partners, a general partnership interest in Aster    REDACTED

REDACTED

58.    **Melanie A. Lowles** ("Melanie Lowles"), also known as Melanie Flowers, upon information and belief, resides in Wake Forest, North Carolina, and is Mrs. Avellino's niece. Upon information and belief, Melanie Lowles was the beneficiary of the Melanie Lowles Trust and received and was the beneficiary of subsequent transfers of avoidable transfers made from at least BLMIS accounts        REDACTED        and 1ZB509 (Aster), and the trust.

59.    **Melanie Ann Lowles Trust U/A dated June 29, 1990**, also known as the Melanie Lowles Trust ("Melanie Lowles Trust"), was a Trust with an address in Palm Beach, Florida.  Upon information and belief, the Trustees for Melanie Lowles Trust were Avellino and Mrs. Avellino.  Upon information and belief, Melanie Lowles Trust held a limited partnership interest in Grosvenor Partners, a general partnership interest in Aster        REDACTED

60.    **Taylor McEvoy** ("Taylor McEvoy") resides in Fairhaven, New Jersey, is Lorraine McEvoy and Michael McEvoy's daughter, and is Avellino and Mrs. Avellino's granddaughter.  Upon information and belief, Taylor McEvoy was the beneficiary of the Taylor Ashley McEvoy Trust U/A dated June 24, 1992        REDACTED

61.    **Taylor Ashley McEvoy Trust U/A dated June 24, 1992**, also known as the Taylor McEvoy Trust ("Taylor McEvoy Trust"), was a Trust with an address in Palm Beach, Florida.  Upon information and belief, the Trustees for Taylor McEvoy Trust were Avellino and

Mrs. Avellino.  The Taylor McEvoy Trust held a limited partnership interest in Grosvenor

Partners, a general partnership interest in Aster                REDACTED

62.    **Madison McEvoy** ("Madison McEvoy") resides in Fairhaven, New Jersey, is

Lorraine McEvoy and Michael McEvoy's daughter, and is Avellino and Mrs. Avellino's

granddaughter.  Upon information and belief, Madison McEvoy was the beneficiary of the

Madison Alyssa McEvoy Trust U/A dated June 29, 1990 and received and was the beneficiary of

subsequent transfers of avoidable transfers made from at least BLMIS accounts REDACTED

REDACTED  and 1ZB509 (Aster), and the trust.

63.    **Madison Alyssa McEvoy Trust U/A dated June 29, 1990**, also known as the

Madison McEvoy Trust ("Madison McEvoy Trust"), was a Trust with an address in Palm Beach,

Florida.  Upon information and belief, the Trustees for Madison McEvoy Trust were Avellino

and Mrs. Avellino.  Madison McEvoy Trust held a limited partnership interest in Grosvenor

Partners, a general partnership interest in Aster                REDACTED

64.    **A minor with the initials S. A.** ("S. A.") resides in Holmdel, New Jersey, is

Thomas Avellino's son, and Avellino and Mrs. Avellino's grandson.  Upon information and

belief, S. A. was the beneficiary of the S. A. Grantor Retained Annuity Trust REDACTED

65.    **S. A. Grantor Retained Annuity Trust** ("S. A. GRAT") was, upon information

and belief, a Trust with an address of Palm Beach, Florida that was also known as the S. A.

Trust.  Upon information and belief, the Trustee for S. A. GRAT was Avellino.    REDACTED

REDACTED

66.     **A minor with the initials N. A.** ("N. A.") resides in Long Valley, New Jersey, is Joseph Avellino's son, and Avellino and Mrs. Avellino's grandson.  Upon information and belief, N. A. was the beneficiary of the N. A. Grantor Retained Annuity Trust REDACTED

67.     **N. A. Grantor Retained Annuity Trust** ("N. A. GRAT") was, upon information and belief, a Trust with an address in Palm Beach, Florida that was also known as the N. A. Trust.  Upon information and belief, the Trustee for N. A. GRAT was Avellino.

REDACTED

68.     **A minor with the initials St. A.** ("St. A.") resides in Long Valley, New Jersey, is Joseph Avellino's son, and Avellino and Mrs. Avellino's grandson.  Upon information and belief, St. A. was the beneficiary of the St. A. Grantor Retained Annuity Trust REDACTED

69.     **St. A. Grantor Retained Annuity Trust** ("St. A. GRAT") was a Trust with an address in Palm Beach, Florida that was also known as the St. A. Trust.  Upon information and belief, the Trustee for St. A. GRAT was Avellino.         REDACTED

REDACTED

70.     **Optus Software, Inc.** ("Optus") was a corporation formed under the laws of the State of New Jersey with its principal place of business in Somerset, New Jersey.  Upon information and belief, Optus was operated by Joseph Avellino and received subsequent transfers of avoidable transfers from at least BLMIS account IZB046 (Grosvenor Partners).

71.     **Devon Paxson** ("Devon Paxson") resides in Palm Beach Gardens, Florida. Devon Paxson                    REDACTED                    received subsequent transfers of avoidable transfers from at least BLMIS account 1ZB262 (Strattham).

72.     **Roslyck Paxson** ("Roslyck Paxson") resides in Palm Beach Gardens, Florida. Roslyck Paxson                    REDACTED                    received subsequent transfers of avoidable transfers from at least BLMIS account 1ZB262 (Strattham).

## BACKGROUND, THE TRUSTEE AND STANDING

73.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending in the District Court.  The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B).  Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

74.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS.

75.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

76.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

        a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

        b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

        c.      removed the case to this Bankruptcy Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

77.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

78.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]." *See T'script of Plea Allocution of Bernard L. Madoff* at 23, *United*

*States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).

Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was]

wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

79.     On August 11, 2009, a former BLMIS employee, Frank DiPascali ("DiPascali"),

pleaded guilty to participating and conspiring to perpetuate the Ponzi scheme.  At a plea hearing

on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS),

DiPascali pleaded guilty to a ten-count criminal information.  Among other things, DiPascali

admitted that the fraudulent scheme had begun at BLMIS since at least the 1980s. *See T'script*

*of Plea Allocution of Frank DiPascali* at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS)

(S.D.N.Y. August 11, 2009) (Docket No. 11).

80.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and

paying out customer property to BLMIS's customers, assessing claims, and liquidating any other

assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of

marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  However,

such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars

that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority

under SIPA and the Bankruptcy Code to pursue recovery from customers who received

preferences and/or payouts of fictitious profits to the detriment of other defrauded customers

whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the

Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA

section 78fff-2(c)(1).

81.    Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a

bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by

SIPA pursuant to section 78fff-1(b).  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the

Bankruptcy Code are applicable to this case to the extent consistent with SIPA.

82.    The Trustee has standing to bring these claims pursuant to section 78fff-1 of SIPA

and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other

reasons:

a.    defendants received "customer property" as defined in section 78*lll*(4) of

SIPA;

b.    BLMIS incurred losses as a result of the claims set forth herein;

c.    BLMIS's customers were injured as a result of the conduct detailed

herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all

customers for all of their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of customer property, can sue on behalf of customer

bailors;

g.    the Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express

unconditional assignments of the applicable Accountholders' causes of action, which actions

29

could have been asserted against the defendants and Subsequent Transferee Defendants (defined below).  As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.  The Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew; and

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds.

## THE PONZI SCHEME

83.    Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed a New York limited liability company wholly owned by Madoff.  Since in or about 1987, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  By that registration, BLMIS is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA Business"), market making, and proprietary trading.

84.    Upon information and belief, from the inception of the fraud until 1998, BLMIS also purported to use a convertible arbitrage investment strategy in many of its customers' accounts, including the customer accounts of certain defendants named herein.  This strategy involved the purported purchase of convertible instruments, such as preferred securities, that could be converted to shares of the corporation's common stock, coupled with the short sale of

30

the corporation's common stock, thereby locking in the gains in the transaction.  After a predetermined number of weeks, BLMIS purportedly converted the convertible instruments into shares of common stock and used those shares to cover the short sale positions.  These paired transactions were entered at purported prices which yielded a predetermined profit and, as a result, customers who were invested in this strategy often received identical rates of return in nearly every purported paired "arbitrage" transaction.  Each paired arbitrage transaction would then be used across numerous accounts, without regard to the actual trading volume of the convertible instruments or common shares in the market.

85.     For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses.  For example, the strategy was executed by either purporting to purchase small groups of securities transactions near lows and then purporting to sell those same securities near highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

86.     For other accounts, Madoff described the IA Business' investment strategy as a "split-strike conversion" strategy.  Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies.  The basket of stocks would be intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds.  The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase and sell S&P 100 Index

option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

87.     Clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time.  Different purported trading strategies would be reflected in different sub-accounts within the customers' accounts.  No matter which purported trading strategy was used, however, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his plea hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.  *See* Madoff Plea Allocution, at 25.  Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients not named herein, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

88.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired hundreds of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.  In fact, MSIL wired hundreds of millions of dollars back into the bank

accounts of BLMIS's proprietary trading and market making business in an attempt to create a record of revenues purportedly related to trades in Europe.

89.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased.

90.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay, or defraud other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including the defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

91.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud.  The payments were necessary to validate the false account statements, to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

92.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistently with the statements they had been

receiving.  Some of those investors later reinvested part or all of those withdrawn payments with

BLMIS.

93.     When payments were made to or on behalf of these investors, including the

defendants, the falsified monthly statements of accounts reported that the accounts of such

investors included substantial gains.  In reality, BLMIS had not invested the investors' principal

as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby

hinder, delay, or defraud other current and prospective investors, BLMIS paid to or on behalf of

certain investors, such as defendants, the inflated amounts reflected in the falsified financial

statements, including principal and/or fictitious profits.

94.     BLMIS used the funds deposited from new investments to continue operations

and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due

to the siphoning and diversion of new investments to fund redemptions requested by other

investors, BLMIS did not have the funds to pay investors on account of their new investments.

BLMIS was able to stay afloat only by using the principal invested by some clients to pay other

investors or their designees.

95.     In an effort to hinder, delay, or defraud authorities from detecting the fraud,

BLMIS did not register as an Investment Adviser until August 2006.

96.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform

Application for Investment Adviser Registration.  The application represented, *inter alia*, that

BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.

In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported

value of approximately $68 billion under management.

97.    Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York.  Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

98.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities, (ii) it could not meet its obligations as they came due, and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

99.    Avellino and Bienes provided the investment capital to enable the Ponzi scheme to grow, lied to the regulators to conceal the fraudulent trading activity in their IA accounts, and continued to receive fraudulent side payments and disguised fees comprised of stolen customer money from BLMIS.  Much of this occurred after they were decisively sanctioned by the SEC in 1993 and on clear notice that BLMIS was fabricating trading activity that had never occurred and gains that had never been realized.

## AVELLINO, LATER JOINED BY BIENES, OPERATE THE FIRST MADOFF FEEDER FUND

100.    In or about 1960, Madoff began operating a brokerage firm named "Bernard L. Madoff" from the offices of his father-in-law Saul Alpern's ("Alpern") accounting firm, Alpern & Heller, where Avellino worked as an accountant.  Upon information and belief, in order to assist his son-in-law's business, Alpern encouraged people to entrust funds with Madoff for purported investment.  In or about 1961, Madoff moved his brokerage business out of Alpern & Heller, but Alpern continued to encourage people to entrust funds with Madoff.

101.    Upon information and belief, in the 1960s, in addition to operating an accounting business, Alpern & Avellino began operating the first feeder fund to provide capital to Madoff

for purported discretionary investment in securities.  Alpern & Avellino operated the feeder fund

to pool money from their customers for investment with BLMIS to profit from the investment of

other people's money as well as their own.  This feeder fund initially operated under the name of

their firm, Alpern & Avellino.  In the early 1970s, Bienes became a partner in the accounting

firm.  Upon the retirement of Alpern in or around 1974, the accounting firm was renamed

Avellino & Bienes, and Avellino and Bienes operated the firm and the Madoff feeder fund as

partners.

102.    For decades, Avellino, and later Avellino and Bienes, utilized A&B to raise

hundreds of millions of dollars of funds for investment with BLMIS, while retaining tens of

millions of dollars as profits for pooling and investing other people's money with Madoff's

Ponzi scheme.  To attract new investors, A&B collected money from individuals and entities by

promising a guaranteed rate of return that generally ranged from approximately 13%–18% of the

original investment.  In an attempt to avoid scrutiny from securities regulators, A&B termed

these investments "loans" and issued letters to investors that specified the rate of return for each

purported loan.

103.    As the operators of one of Madoff's first and oldest source of funds for his Ponzi

scheme, Avellino and Bienes enjoyed special access and privileges not available to other

investors in BLMIS.  To keep the money flowing and the Ponzi scheme operating, Madoff

guaranteed significant returns to Avellino, Bienes, Mrs. Bienes, and A&B.  In turn, A&B

retained the difference between the returns promised by Madoff and the returns they had

guaranteed to their underlying investors.  For example, there were certain periods where Madoff

promised A&B annual returns of 20%.  A&B would thereafter promise 18% or less to its

underlying investors, retaining the difference as profits to enrich themselves at the expense of

their investors. By 1984, the profits from the A&B feeder fund had far eclipsed any revenue from its accounting practice, which ceased operating at that time so Avellino and Bienes could focus exclusively on profiting from the recruitment of funds for investment with BLMIS.

104.    A&B investor money included, among other investors, money pooled together by entities known as Telfran Associates, Ltd., Merlin Associates and Enhancement Group. Telfran Associates was owned and controlled by Stephen Mendelow, Edward Glantz, and Joel Levey, while Merlin Associates and Enhancement Group was owned and controlled by Richard Glantz (collectively, the "A&B Business Associates"). The sole purpose of these entities was to pool investor money for investment with A&B and ultimately with Madoff.

105.    The A&B Business Associates were friends of Avellino and Bienes. Upon information and belief, Avellino and Bienes encouraged them to collect money for pooled investments in A&B. A&B paid the A&B Business Associates a guaranteed rate of return slightly less than it was receiving from its BLMIS IA accounts. The A&B Business Associates utilized the same model Avellino and Bienes followed and provided a slightly lower return to their individual investors in order to retain the difference as profits for themselves.

106.    A&B and its predecessors operated as a significant feeder fund for BLMIS uninterrupted from the early 1960s until 1992, when the SEC commenced an investigation of A&B, Avellino, Bienes, and the A&B Business Associates, which ultimately led to A&B's liquidation.

107.    At the time of the SEC's investigation of A&B in 1992, records reflect that A&B had obtained hundreds of millions of dollars from at least a thousand individuals and entities throughout the United States and deposited those funds with BLMIS. A&B's records reflect that as of June 18, 1992, it owed these individuals and entities more than $399 million dollars.

108.    Prior to the liquidation of A&B, Avellino, Bienes and Mrs. Bienes also utilized

personal IA accounts to profit from investments in the BLMIS fraudulent scheme, separate and

apart from the A&B IA accounts that received A&B investor funds.  For example, Bienes and his

wife utilized IA account number 1B0018 in the name of Mrs. Bienes to extract fictitious profits

from BLMIS.  Avellino similarly used the following personal IA accounts to withdraw millions

of dollars of fictitious profits: (i) "Avelinno [sic] Family Trust C/O Avellino & Bienes" (account

number 100126), (ii) "Avelinno [sic] Group C/O Frank Avellino" (account number 100127), and

(iii) "Frank J. Avellino Trustee" (account number 1A0051).

109.    In addition, Avellino, Bienes, and Mrs. Bienes each benefited from A&B account

number 1A0046, which was established as a purported A&B pension plan account that withdrew

fictitious profits from the BLMIS scheme.

## AVELLINO AND BIENES CONCEAL A SHORTAGE
## IN THEIR MADOFF IA ACCOUNTS AND LIE TO THE SEC

110.    On or before June 1992, the SEC commenced an inquiry into whether A&B,

Avellino, Bienes and the A&B Business Associates were unlawfully selling unregistered

securities to the public and acting as an unregistered investment adviser in connection with

hundreds of millions of dollars they had received from more than a thousand investors

throughout the United States.  This investigation concerned the funds that were ultimately

invested with BLMIS by Avellino, Bienes, and A&B.

111.    At the time, A&B maintained IA accounts with BLMIS with the following

account numbers: 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, and 1A0050 (the "Existing

A&B IA Accounts").[3]  A&B used these accounts to invest money it had collected and pooled

from investors.  In addition, A&B used an account or accounts at Chemical Bank (the "Chemical

---

[3] As reference above, account number 1A0046 was in the name of A&B Pension Plan.

Bank Account") to facilitate the pooling of funds for investment in the Existing A&B IA

Accounts and to make payments to underlying investors who requested withdrawals. A&B

investor money was exclusively invested in these Existing A&B IA Accounts at BLMIS. A&B

account number 1A0053 (the "Phony A&B IA Account"), did not exist until after its fraudulent

creation by BLMIS on or after June 23, 1992, as described in greater detail below. At all

relevant times, Avellino and Bienes closely monitored and controlled the Existing A&B IA

Accounts, the Chemical Bank Account, and the deposits and withdrawals made therefrom.

112.    Avellino and Bienes provided the SEC with a list representing that as of June 18,

1992, A&B owed its investors $399,819,455, all of which they claimed was invested with

BLMIS. As of June 30, 1992, however, BLMIS's records and account statements reflected a

total equity balance of approximately $364 million purportedly held by BLMIS on behalf of

A&B in the Existing A&B IA Accounts. The collective total amount reflected in the Existing

A&B IA Accounts was approximately $35.8 million less than Avellino and Bienes had

represented to the SEC they owed to their underlying investors just two weeks earlier.

113.    Avellino and Bienes jointly testified under oath before the SEC on July 7, 1992.

At the time of their testimony before the SEC, Avellino and Bienes knew or should have known

from the customer account statements provided to them by BLMIS that the Existing A&B IA

Accounts had a purported aggregate equity balance of $364,001,674, approximately $35.8

million less than what A&B records showed was owed to A&B underlying investors.

114.    Avellino and Bienes also knew or should have known that cash held in the

Chemical Bank Account was inadequate in itself to close this shortfall. Avellino and Bienes

testified that A&B utilized the Chemical Bank Account to handle A&B investor funds and that

this account typically maintained an average balance of $2 million to $3 million and never

maintained a balance of more than $6 million.  *See T'script of SEC Testimony, Avellino and*

*Bienes,* dated July 7, 1992, at 50–52 (hereinafter "SEC Tr.").  Accordingly, even assuming the

Chemical Bank Account had a maximum balance of $6 million as of the date Avellino and

Bienes testified before the SEC, they knew or should have known that there was at least an

approximate $29.8 ($35.8 – $6) million shortfall between what A&B owed to investors and the

balances A&B maintained at BLMIS and in the Chemical Bank Account.

115.    Upon information and belief, this approximate shortfall of at least $29.8 million

existed because Avellino and Bienes converted A&B investor funds to their own benefit or were

in effect operating their own fraudulent scheme.

116.    The existence of this shortfall was inconsistent with false assurances Avellino

gave to the SEC during sworn testimony on July 7, 1992 that:

> [W]e examine [the account statements] and do our due diligence on a monthly
> basis, we look at our fair market value of all of these securities that are being held
> at Bernard L. Madoff on behalf of Avellino & Bienes.  We determine the fair
> market value at the end of each month and we make sure, and this is where we are
> very positive, we make sure that the value is always in ***excess*** of the loans
> payable.

SEC Tr. at 77 (emphasis added).

117.    Avellino further testified that "[i]f you look at the $400 million that we owe to

lenders and you looked at my portfolio and, by the way, all of the $400 million plus is with

Bernard L. Madoff, every single dollar, it is invested in long-term Fortune 500 securities, it is, to

use the word 'protected' with hedges of Standard & Poor's index. . . . And I can honestly say

over and over again that we always have a cushion or, by experience, have always had a cushion

of about 20 percent . . ."  SEC Tr. at 77–78.

118.    Bienes also testified to the SEC that the money invested with Madoff was

protected by a 20% "cushion" and that the total amount invested with BLMIS was therefore

valued at approximately $440 million.  This amount consisted of purported gains made on the

amounts invested on behalf of A&B and personal funds Avellino and Bienes had invested with

Madoff:

> We owe, say, 400 million.  The value of our investment with the broker [Madoff]
> is 440-some-odd million.  We always have approximately 20 percent more with
> the broker than what we owe, it could be even bigger than that.

SEC Tr. at 84–85.

119.    When confronted with the obvious fact that $40 million was not a 20% cushion

for the $400 million owed to investors, Bienes explained:

> Well no.  I'll tell you why.  A lot of it is in Treasuries right now.  It's not in the
> market.  That's why we have the – about close to 100 million is in Treasuries, so
> even with any loss, we would still have approximately 20 percent above and
> beyond what we owe, which is part of our capital. We usually always will be
> covered by 20 percent more than what we owe lenders.  In addition to that we
> have our own personal funds which are also invested in the same type of
> discretionary account with the same broker.

SEC Tr. at 84–85.

120.    Avellino and Bienes carefully reviewed their account statements.  At the time of

their SEC testimony, they knew or should have known that the aggregate balance in the Existing

A&B IA Accounts did not correspond to the amount of money A&B owed to its investors.

Avellino and Bienes also knew or should have known that the account statements for the

Existing A&B IA Accounts at BLMIS did not reflect the extra $40 million cushion they claimed

they had in excess of this amount.

121.    Avellino and Bienes felt confident making the above misrepresentations under

oath because they knew in late June 1992, just prior to their testimony, BLMIS had created the

Phony A&B IA Account.  The sole purpose for creating this account was to mislead the

regulators and create the appearance that A&B accounts at BLMIS held securities and cash

positions sufficient to cover the amounts owed to A&B investors and to reflect a cushion.

41

Avellino and Bienes knew that if the SEC learned of the shortfall in their BLMIS accounts the fraud would be revealed. Madoff shared a similar interest in avoiding regulatory scrutiny and the exposure of his fraud. With the knowledge of Avellino and Bienes, Madoff directed his employees to manufacture and record fictitious holdings in the newly created Phony A&B IA Account. The creation of the Phony A&B IA Account increased the purported total equity balance of the A&B customer accounts to a value sufficient to conceal the $29.8 million shortfall.

122. In and after late June 1992, at Madoff's direction, BLMIS employees scrambled to create the Phony A&B IA Account with a large enough equity balance to cover the shortfall in the Existing A&B IA Accounts and to provide a purported cushion. BLMIS generated fictitious and backdated customer account statements for the Phony A&B IA Account going back to at least November 1989. BLMIS filled these fraudulent account statements with dozens of fictitious transactions designed to show realized and unrealized gains from securities and options transactions totaling approximately $65.9 million, the amount necessary to hide the shortfall and provide a cushion.

123. For example, some of the backdated statements for the Phony A&B IA Account contained the following fictitious transactions:

a. the backdated January 1991 statement reflects the purchase of 5,950 "S&P 100 Index – April 335 Call" contracts which were thereafter reported on the April 1991 statement to have been sold for an approximate gain of $18,019,575;

b. the backdated December 1991 statement reflects purchases on December 12, 1991 of 3,500 "S&P 100 Index – January 355 Call" contracts and 3,000 "S&P 100 Index –

January 360 Call" contracts.  The January 1992 statement reflected the purported sale of these

same call contracts for approximate gains of $10,480,750 and $8,458,500 respectively; and

        c.      the backdated December 1991 statement also reflected the purchase of

550,000 shares of Ford stock, all on margin for approximately $13,181,250.  On June 30, 1992,

the 550,000 shares had a fair market value of $25,231,250 translating into an unrealized gain of

$12,050,000.

      124.    Significantly, a version of the June 30, 1992 account statement recovered from

BLMIS reflects that each of the transactions described above were entered into the BLMIS

systems that generated these phony statements on or around June 23, 1992, long after the dates

on which the transactions purportedly occurred.

      125.    Other forensic evidence and documents recovered from BLMIS corroborate the

fact that unlike the Existing A&B IA Accounts which had been in existence for several years, the

Phony A&B IA Account was created on or after June 23, 1992, no more than two weeks prior to

Avellino and Bienes' testimony before the SEC.

      126.    Avellino and Bienes knew that they had neither opened, nor contributed a dime of

A&B investor money to fund the Phony A&B IA Account prior to June 1992.  Because the

Phony A&B IA Account was not created until June 1992, Avellino and Bienes did not and could

not have received contemporaneous monthly statements for the account from November 1989

(the date of the first backdated statement) through May 1992.

      127.    When they eventually received the backdated customer account statements for the

Phony A&B IA Account from BLMIS, Avellino and Bienes knew or should have known that

BLMIS had fraudulently created the statements to reflect transactions which never occurred and

an account balance that did not exist.  Avellino and Bienes, confronted with backdated account

statements reflecting more than a $65.9 million equity balance that appeared out of thin air knew

or should have known that Madoff and BLMIS were acting fraudulently and falsifying securities

transactions.  Instead of alerting regulators and their investors, Avellino and Bienes testified

falsely to the SEC so they could continue to profit from Madoff's fraud.

128.    Notwithstanding their knowledge that the customer account statements for the

Phony A&B IA Account were fabricated, upon information and belief, Avellino and Bienes

produced the backdated account statements to the court appointed receiver assigned to liquidate

A&B (the "Receiver") as if they were legitimate so that Madoff's fraud and the shortfall in the

A&B BLMIS accounts would go undetected.

129.    To avoid further scrutiny from government regulators, Avellino and Bienes went

along with Madoff's subterfuge so that they could conceal the shortfall and continue to profit

from the Ponzi scheme.

### AVELLINO AND BIENES KNEW THAT MADOFF PRODUCED OTHER FRAUDULENT BLMIS ACCOUNT STATEMENTS TO THE RECEIVER AND SEC

130.    Upon information and belief, as the SEC investigation of A&B, Avellino and

Bienes progressed, Madoff became concerned about what might happen if BLMIS or A&B were

compelled to produce the historical account statements for the Existing A&B IA Accounts to the

SEC.  Because of this concern, BLMIS began an additional effort in or about June 1992 to alter

certain previously issued account statements for the Existing A&B IA Accounts to eliminate

certain entries and replace them with other fictitious transactions.

131.    For example, BLMIS altered the December 1989 account statement for A&B

account number 1-00125-3 (which later became account 1A0045) to eliminate an entry in the

customer account statement that reflected a December 14, 1989 transfer of $145,318.34 from an

IA account held in the name of "Alpern & Avellino," with account number 1-00124-1.  To

conceal the alterations, BLMIS also altered the November 1989 account statement for A&B

account number 1-00125-3 to add an entry that indicated the account had received a dividend

payment from General Motors in the amount of $145,318.34, the exact amount that had been

removed from the December 1989 statement.  BLMIS performed additional alterations of

numerous other account statements for this account and account number 1-00125-7.

132.    Avellino and Bienes, who claimed in SEC testimony to have diligently reviewed

A&B account statements, received and reviewed the original account statement for A&B account

number 1-00125-3 for November and December 1989.  BLMIS could not alter A&B account

statements for production to the SEC by either BLMIS or A&B without notifying Avellino and

Bienes of the alterations and providing them with a copy to ensure that there would be no

discrepancies or differences in the documents they produced.

133.    Having received these fraudulently altered account statements from BLMIS,

Avellino and Bienes also knew or should have known that BLMIS was placing fictitious

transactions on account statements to obstruct the SEC investigation.  When Avellino and Bienes

learned that BLMIS was fraudulently altering prior account statements before they were

produced to a regulator and/or the Receiver, they knew or should have known that BLMIS and

Madoff were committing fraud.

134.    In addition to altering previously issued A&B account statements, Madoff,

BLMIS, Avellino and Bienes made after-the-fact efforts to "paper" the files for the A&B

accounts.  Despite having accounts for many years at BLMIS, on or about July 17, 1992, after

Avellino and Bienes testified to the SEC, a BLMIS employee faxed blank partnership account

agreements, trading authorizations, customer agreements, margin agreements, option agreements

and other account opening documents to Avellino for signature.  On the same day, BLMIS

similarly provided Bienes and Mrs. Bienes with blank account forms for signature. Avellino, Bienes, and Mrs. Bienes thereafter each signed the forms in blank, and sent them back to BLMIS so that it would appear that the proper account documentation existed for the accounts in the event the SEC reviewed these materials as part of their investigation.

### SEC OBTAINS AN
### INJUNCTION AGAINST AVELLINO, BIENES, AND A&B

135.    On November 17, 1992, the SEC filed a Complaint for Preliminary and Permanent Injunctive and Other Equitable Relief against A&B, Avellino and Bienes alleging that from 1962 until at least July 1992, Avellino and Bienes had unlawfully operated A&B as an unregistered investment company and engaged in the unlawful sale of unregistered securities.

136.    On November 18, 1992, the District Court entered a Preliminary Injunction and appointed a receiver to oversee the liquidation of A&B. The Preliminary Injunction ordered that Avellino, Bienes and A&B not commit any additional violations of the securities laws and required the receiver to perform a liquidation of A&B in which all owed funds would be returned to A&B investors by November 24, 1992. Upon information and belief, employees at BLMIS scrambled to secure sufficient funds to meet the court ordered redemption. In order to provide funds for this purpose, in or about November 1992, Madoff obtained securities and cash from at least two other IA customers and used those securities as collateral for loans. Some of the loan proceeds were transferred to BLMIS bank accounts and were used to pay off a portion of the balance due to the A&B investors.

137.    On or about November 18 to November 24, 1992, redemptions totaling approximately $329 million were made to A&B investors. Almost a quarter of a billion of dollars of these proceeds appear on BLMIS account statements to have been withdrawn from the

Phony A&B IA Account.  This distribution was in addition to the distribution of funds totaling

$113 million that A&B had made in November 1992.

138.   On September 7, 1993, the U.S. District Court issued a Final Judgment of

Permanent Injunction and Other Equitable Relief By Consent Against A&B, Avellino and

Bienes ordering, among other things, that they be enjoined from violating section 5(a) and (c) of

the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c), by selling unregistered securities and

section 7 of the Investment Company Act of 1940, 15 U.S.C. § 80a-7, by operating an

unregistered investment advisory company.

### AVELLINO AND BIENES ATTEMPT TO FIND "FRONT MEN" AND USE NEW PARTNERSHIPS TO CONTINUE TO FUNNEL MONEY TO BLMIS

139.   Avellino and Bienes did not let the restrictions of the preliminary and permanent

injunctions or the ongoing litigation with the SEC get in the way of their insatiable thirst for

continued profits from Madoff's Ponzi scheme.

140.   In or about late 1992 or early 1993, despite the requirements of the Preliminary

Injunction, the ongoing litigation with the SEC and their clear knowledge that their prior

investment activities were prohibited, Avellino and Bienes attempted to find people willing to act

as "front men" to operate partnerships so that they could continue to raise and pool money from

others to invest with BLMIS but avoid the scrutiny of the regulators.  Specifically, Avellino and

Bienes met with certain individuals and requested that they operate such investment partnerships

for the benefit of Avellino and Bienes.  When these individuals refused to act as "front men,"

Avellino and Bienes instead negotiated an arrangement whereby, in return for referring people to

invest in their entities, S&P and P&S, for ultimate investment with BLMIS, the partnerships

would pay Avellino and Bienes annual fees in the amount of 10% of the annual returns received

by the clients they referred.

141.     The arrangement Avellino and Bienes made with S&P and P&S allowed them to continue to profit significantly from referring investors, now indirectly, to BLMIS.  For example, upon information and belief, P&S and S&P paid management fees of approximately $112,500 for the benefit of Avellino and Bienes for the years 2000–2002.  In addition, upon information and belief, for the years 2003–2007, P&S and S&P paid management fees totaling approximately $599,190.  A portion of the fees allocated to Avellino were paid to another individual or entity at Avellino's direction.

142.     In February 1993, a little more than two months after the issuance of the Preliminary Injunction against them and during ongoing litigation with the SEC, Avellino, Bienes, and their wives remained undeterred and created Grosvenor Partners.  Grosvenor Partners opened an IA account at BLMIS, which was used by Avellino, Bienes and their wives to funnel their money and money collected from friends and family so they could continue to profit from the Ponzi scheme and the investment of other peoples' money.

143.     Avellino and Bienes were also the equitable and beneficial owners of other entities that received fees for ostensibly "managing" or providing "services" to Grosvenor Partners, and thereby continued to extract substantial profits from Madoff's Ponzi scheme.  For example, a Mayfair Ventures tax return reflects that in 1996 Grosvenor Partners paid a "management fee" of $776,188 to Mayfair Ventures, an entity owned by Avellino, Bienes and their respective wives.                     REDACTED

A&B Accounting Services, which later became Mayfair Bookkeeping, was also an entity owned and controlled by Avellino and Bienes and created for the benefit of them and their wives.

144.     In addition to these so-called "management fees" and the principal invested in this account, Grosvenor Partners withdrew $58.2 million more from BLMIS than it invested over the life of its IA account.  Millions of dollars of these withdrawals were to or for the benefit of Avellino, Bienes, their wives, and the entities they owned and controlled.

145.     In February 1993, also only months after the Preliminary Injunction, Avellino and Bienes established an IA account at BLMIS in the name of Mayfair Ventures, so they could continue to profit from Madoff's Ponzi scheme.  During the lifetime of the Mayfair Ventures account, Mayfair Ventures withdrew in excess of $4.3 million more than it had invested, all for the benefit of Avellino, Bienes, and their wives.

146.     On or about January 27, 1995, Avellino and Bienes established yet another IA account at BLMIS so they could profit from Madoff's Ponzi scheme, this time in the name of Mayfair Bookkeeping, for the Mayfair Pension Plan.  This account was utilized to receive a portion of the fraudulent side payments from BLMIS as discussed below.

147.     In or about February 1993, just after the issuance of the Preliminary Injunction, Kenneth Jordan, a close friend of Avellino and also a former A&B investor, established an IA account at BLMIS in the name of KJA.  The KJA IA account was utilized to invest funds with BLMIS that had been pooled from numerous investors, who were given limited partnership interests in KJA.  In or about January 1998, Avellino became a general partner of KJA and took operating control of the entity and its BLMIS IA account.     REDACTED

148.                         REDACTED

149.    In or about June 2004, Bienes and Mrs. Bienes established an IA account at

BLMIS in the name of St. James so they could continue to profit from Madoff's Ponzi scheme.

The St. James account was primarily funded with $45.8 million in transfers from the Grosvenor

Partners BLMIS account in which Bienes and Mrs. Bienes were investors.  During the lifetime of

the St. James IA account, St. James withdrew in excess of $17.4 million more than it invested

with BLMIS.  Upon information and belief, all of the withdrawals were for the benefit of

Bienes, Mrs. Bienes          REDACTED

150.    In or about June 2004, Avellino and Mrs. Avellino established an IA account at

BLMIS in the name of Aster so they could continue to profit from Madoff's Ponzi scheme

                            REDACTED

                            The amount transferred from the Grosvenor

Partners BLMIS account to fund Aster's account was more than $21.4 million.  During the

lifetime of the Aster BLMIS account, Aster withdrew at least $7 million more than it invested

with BLMIS.

151.    Upon information and belief, Avellino and Bienes opened BLMIS accounts in the

names of Grosvenor Partners, Mayfair Ventures, St. James, and Aster rather than in their own

names in an attempt to avoid further scrutiny by securities regulators and in an attempt to conceal

their involvement with entities that continued to pool money for investment in BLMIS

notwithstanding the SEC injunction.

### MADOFF AGREES TO PAY AVELLINO AND
### BIENES GUARANTEED RATES OF RETURN AND FRAUDULENT SIDE
### PAYMENTS FOR FUNDS FORMER A&B INVESTORS REINVESTED WITH BLMIS

152.    Upon information and belief, in or about 1992 and 1993, Madoff desperately
wanted former A&B investors to reinvest the funds they received from the forced liquidation of
A&B.  In addition, Madoff did not want Avellino and Bienes to reveal to regulators what they
knew regarding the backdated statements, alteration of previously issued statements or the
creation of the Phony A&B IA Account.  Upon information and belief, to encourage former
A&B investors to invest with BLMIS directly, Avellino, Bienes, and certain A&B Business
Associates demanded from Madoff that new IA accounts under their control receive guaranteed
annual rates of return of 17%.  Avellino, Bienes and the A&B Business Associates also
requested that they receive fraudulent side payments based on a percentage of the amount that
former A&B investors reinvested directly with BLMIS after A&B's liquidation.  Desperate to
keep the Ponzi scheme afloat and avoid its collapse, Madoff agreed to these demands.

153.    Specifically, Madoff, Avellino, and Bienes agreed that the fraudulent side
payments would be based on the amount A&B investors reinvested with BLMIS by March 31,
1993 (approximately $372 million), decreased by the $36 million invested by Grosvenor Partners
and Mayfair Ventures.  Pursuant to their agreement, BLMIS would pay Avellino and Bienes an
annual payment equal to 2% of $336 million minus the amount of fraudulent side payments that
was also to be paid to the A&B Business Associates.  The A&B Business Associates received
the fraudulent side payments to compensate them for $72 million that had been reinvested by
their former customers, which was included in the original $372 million that was reinvested
directly with BLMIS.

154.    Although Madoff, Avellino, and Bienes agreed that fraudulent side payments
would include the year 1993, upon information and belief, the payments did not begin until 1994,

and the agreed upon amounts were not always timely paid on an annual basis. As set forth

below, the payments were often based upon rounded numbers instead of exact calculations. As a

result, BLMIS frequently made "after the fact" payments in later years to correct underpayments

from earlier years. There were other adjustments to the fraudulent side payment calculation

made during those later years. For example, upon information and belief, for the years 1993

through 1997, the calculated amounts of the fraudulent side payments were adjusted downward

for instances where Avellino and Bienes-controlled IA accounts received purported rates of

return from fictitious trading activity in excess of the promised 17%. Similarly, in years when

Avellino and Bienes-controlled IA accounts fell short of the agreed upon guaranteed rate of

return during the months of January through November, BLMIS employees increased the

fraudulent side payments generally in December to make up the difference and deliver the

promised returns.

155.    In 2000, BLMIS slightly altered the manner of calculating the fraudulent side

payments to the Avellino and Bienes-controlled accounts. BLMIS began using a base figure of

$264 million, which did not include the $72 million that had been reinvested by former

customers of the A&B Business Associates. This allowed BLMIS to avoid making any

additional adjustments for the fraudulent side payments made to the A&B Business Associates.

156.    Upon information and belief, as the pressure to make redemptions increased

during the last few years of the Ponzi scheme, Madoff unilaterally made periodic reductions to

the multiplier used to calculate the fraudulent side payments and also to the guaranteed rate of

return, which are reflected in the chart below:

| Year | Multiplier | Guaranteed Rate of Return |
|---|---|---|
| 1993–2001 | 2% | 17% |
| 2002 | 1% | 14% |
| 2003 | 1% | 11% |
| 2004–2007 | .5% | 11% |

157.    BLMIS did not pay the annual fraudulent side payments to Avellino, Bienes and their wives by conventional means such as checks or credits to their accounts.  Rather, BLMIS provided the fraudulent side payments by crediting IA accounts controlled and/or owned by Avellino, Bienes, and their wives with blatantly fictitious and highly profitable, non-hedged options transactions.  None of these options trades were ever executed by BLMIS.  In total, BLMIS recorded these fictitious options trades to provide Avellino and Bienes with at least $59 million of fictitious gains that were immediately available for withdrawal from their IA accounts. In reality, these fictitious gains, when withdrawn, were nothing more than customer property stolen from other investors.

158.    Avellino closely monitored the IA accounts for which he, Bienes, their wives and families were equitable and/or beneficial owners and directed Madoff and others at BLMIS to place the fictitious options transactions in certain accounts on an annual basis.  As set forth below, BLMIS recorded those fictitious, non-hedged options transactions in the following accounts controlled by Avellino, Bienes (or Thomas Avellino in the case of Strattham), and/or their wives:

| Year | Mayfair Ventures | Grosvenor Partners | Mayfair Bookkeeping | Aster | St. James | Strattham | KJA | Total |
|---|---|---|---|---|---|---|---|---|
| 1993 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1994 | $2,297,700 | $1,357,575 | 0 | 0 | 0 | 0 | 0 | $3,655,275 |
| 1995 | $486,500 | $164,400 | 0 | 0 | 0 | 0 | 0 | $650,900 |
| 1996 | 0 | $5,577,228 | 0 | 0 | 0 | 0 | 0 | $5,577,228 |
| 1997 | $428,670 | $1,948,500 | $2,922,750 | 0 | 0 | 0 | 0 | $5,299,920 |
| 1998 | $500,220 | $6,272,600 | $1,198,940 | 0 | 0 | 0 | 0 | $7,971,760 |
| 1999 | $1,005,875 | $2,011,750 | $2,518,120 | 0 | 0 | 0 | 0 | $5,535,745 |
| 2000 | $5,372,000 | $1,074,400 | $537,200 | 0 | 0 | 0 | 0 | $6,983,600 |
| 2001 | $8,172,800 | 0 | 0 | 0 | 0 | 0 | 0 | $8,172,800 |
| 2002 | $2,164,320 | $1,743,480 | 0 | 0 | 0 | 0 | 0 | $3,907,800 |
| 2003 | $3,202,760 | 0 | 0 | 0 | 0 | 0 | 0 | $3,202,760 |
| 2004 | $1,785,810 | $66,516 | $270,402 | $41,934 | $41,934 | $26,028 | $20,244 | $2,252,868 |
| 2005 | $108,640 | $2,266,242 | $146,664 | $353,080 | $282,464 | $179,256 | $57,036 | $3,393,382 |
| 2006 | $1,679,230 | 0 | 0 | 0 | 0 | 0 | 0 | $1,679,230 |
| 2007 | $1,685,480 | 0 | 0 | 0 | 0 | 0 | 0 | $1,685,480 |
| Total | $28,890,005 | $22,482,691 | $7,594,076 | $395,014 | $324,398 | $205,284 | $77,280 | $59,968,748 |

159.    Payment of the fraudulent side payments in the manner described above should

have been an obvious red flag to Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas

Avellino, Grosvenor Partners, Strattham, Mayfair Ventures, Mayfair Bookkeeping, Aster, St.

James, and KJA – yet another indication to them that Madoff was operating a fraud.

160.    Similarly, Avellino, Bienes, their wives, Thomas Avellino, Grosvenor Partners,

Strattham, Mayfair Ventures, Aster, St. James, and KJA knew or should have known that it was

not possible for Madoff to guarantee and consistently deliver a predetermined rate of return.

These defendants also knew or should have known that the clearly fictitious options trades

reported in their accounts to meet promised gains could not be the result of legitimate trading

activity.  These defendants had been on notice of fraud at BLMIS for years, and nevertheless

continued to direct desired profits and payments for their benefit and to ignore the clear evidence

of fraudulent conduct.

## THE "SCHUPT" PROCESS

161.    Because Madoff promised guaranteed rates of return and made fraudulent side

payments to dozens of specially favored customers, BLMIS employees created an internal

process to identify, track and reconcile accounts whose performance did not meet the guaranteed rate of return or who were due to be paid the fraudulent side payments. This process relied upon handwritten reconciliations to determine the amount of non-hedged options trades that would need to appear on account statements to compensate these investors, including Avellino, Bienes, and the entities controlled by them.

162. The process for determining the amounts owed to these customers was referred to internally at BLMIS as calculating either the "Shupt," "Schupt," or "Bingo" number (hereinafter, "Schupt"). Upon information and belief, the term Schupt was intended to be the word "Schtup," a derogatory Yiddish term. Payments made pursuant to this process were referred to internally at BLMIS as Schupt payments.

163. Once the amount owed to a particular specially favored customer was determined, the money was paid to specific IA accounts through the fictitious purchase and sale of options transactions engineered to deliver the predetermined dollar amount needed to pay the guaranteed rate of return and/or the fraudulent side payment.

164. In addition to calculating the amount owed, the handwritten Schupt schedules also indicated the type and amount of options contracts that would be "executed" to make up the total payment. These numbers were arrived at with the benefit of hindsight by selecting specifically priced historical option contracts that would create a particular gain and dividing that gain by the dollar amount owed to each account to determine the number of contracts to be purchased in each account. An account statement was then generated to reflect the purported transactions and the proceeds generated therefrom. The balance within these accounts was then available for immediate withdrawal by the accountholder.

165.     The Schupt schedules and non-hedged options transactions reflected on the

December 2002 account statements for BLMIS accounts in the names of Mayfair Ventures and

Grosvenor Partners demonstrate how the Schupt process typically worked.

166.     In or around December 2002, the handwritten Schupt schedules prepared by

BLMIS employees contained entries for IA accounts held by Mayfair Ventures and Grosvenor

Partners indicating that these accounts were owed a total of $2.6 million for the fraudulent side

payments and $1,296,000 in fictitious gains to meet the guaranteed rate of return of 14% then in

effect.  Of the $1,296,000 of fictitious gains owed, $1,231,000 was owed to the Grosvenor

Partners account to bring that account's return to 14%.  Specifically, the Schupt schedule

indicated "Brings to 14[%] 1231" for Grosvenor Partners per the "WHY" column on the

schedule.

167.     Upon information and belief, Avellino, with the knowledge of Bienes, directed

that the Grosvenor Partners account be allocated $500,000 of the $2.6 million fraudulent side

payment for a total Schupt payment of $1,731,000 ($1,231,000 in additional return plus

$500,000 for the fraudulent side payment).  The Mayfair Ventures account was owed $65,000 to

bring the account's performance to 14% and was allocated, upon information and belief, at the

direction of Avellino, with the knowledge of Bienes, $2.1 million, which represented the

remaining portion of the fraudulent side payment for a total payment of $2,165,000.

168.     The December 2002 account statement for the Grosvenor Partners IA account

reflects the purchase and sale of 870 "S&P 100 Index – December 465 Put" and 1,740 "S&P 100

Index – December 460 Put" option contracts generating $1,743,480 in gains, slightly more than

what the Schupt schedule indicated was owed for the fraudulent side payment and guaranteed

return to this account.  Likewise, the December 2002 account statement for the Mayfair Ventures

IA account reflects the purchase and sale of 1,080 "S&P 100 Index – December 465 Put" and

2,160 "S&P 100 Index – December 460 Put" option contracts.  As intended, these transactions

generated $2,164,320 in proceeds, slightly less than what the Schupt schedule indicated was

owed for the side payment and guaranteed return.

169.    The Aster and St. James IA accounts were also recipients of blatantly fictitious

options transactions engineered to deliver the predetermined dollar amount needed to pay the

guaranteed rate of return Madoff had promised.  Similar to the Mayfair Ventures and Grosvenor

Partners accounts detailed above, the Schupt schedule also indicated the number of options

contracts that would be "executed" to provide the fictitious gains in the Aster and St. James

accounts.  These numbers were arrived at with the benefit of hindsight by selecting pricing for

option contracts that created a particular gain and dividing that gain by the dollar amount owed

to each account to determine the number of contracts to be purchased in each account.

170.    For example, in or around December 2004, the Schupt schedule contains entries

for IA accounts held by Aster and St. James indicating that these accounts were each, owed

$42,000 in fictitious gains to bring the accounts to the promised rate of return of 11% then in

effect.  Specifically, the Schupt schedule indicated that the "$ NEEDED" for Aster and St. James

were "42,000" each and both were to have "29 Unit[s]" executed in their respective accounts.

Upon information and belief, "Unit" represented one executed option contract.  The December

2004 account statement for the Aster IA account reflects the "purchase" and "sale" of 29 "S&P

100 Index – January 575 Call" and 29 "S&P 100 Index – January 565 Put" option contracts

generating $41,934, slightly less than what the Schupt schedule indicated was owed for the

guaranteed return.  The December 2004 account statement for the St. James IA account also

reflects the "purchase" and "sale" of 29 "S&P 100 Index – January 575 Call" and 29 "S&P 100

Index – January 565 Put" option contracts generating $41,934, also slightly less than what the Schupt schedule indicated was owed for the guaranteed return.

171.    The Schupt schedule created in or around December 2005 indicates that IA accounts held by Aster and St. James were owed $356,000 and $284,000, respectively, in fictitious gains to bring the accounts to the promised rate of return of 11% then in effect.  Once again, Madoff and his employees performed the impossible, all under the watchful eyes of Avellino and Bienes.  Specifically, the Schupt schedule indicated that the "$ NEED[ED]" for Aster and St. James were "356" and "284" and that there should be "260 Units" and "208 Units" executed in their respective accounts.  The December 2005 account statement for the Aster IA account reflects the "purchase" and "sale" of 260 "S&P 100 Index – January 565 Call," 520 "S&P 100 Index – January 585 Call," and 780 "S&P 100 Index – January 565 Put" option contracts generating $353,080, slightly less than what the Schupt schedule indicated was owed for the guaranteed return.  The December 2005 account statement for the St. James IA account reflects the purchase and sale of 208 "S&P 100 Index – January 565 Call," 416 "S&P 100 Index – January 585 Call," and 624 "S&P 100 Index – January 565 Put" option contracts generating $282,464, also slightly less than what the Schupt schedule indicated was owed for the guaranteed return.

172.    The Schupt process was regularly followed to create the fraudulent side payments via highly profitable, wholly fictitious, non-hedged options trades to accounts controlled by Avellino, Bienes and their wives from 1994 through 2007.  Only the exposure of Madoff's Ponzi scheme in early December 2008 prevented the execution of the Schupt process for 2008.

173.    These purported options transactions never occurred, and could not have occurred in the amounts required to make the Schupt number without the benefit of hindsight, backdating

and fraud.  Even cursory analysis of the account statements containing these non-hedged options

transactions should have alerted CPAs like Avellino and Bienes of fraudulent activity by

BLMIS.

174.    Avellino and Bienes closely monitored their IA accounts to ensure that the

performance reflected therein was equal to the guaranteed rate of return and the full amount of

the fraudulent side payment.  On at least an annual basis, Avellino, and upon information and

belief Bienes, performed reconciliations of the various IA accounts they controlled to determine

if the rate of return equaled what Madoff had promised.  If the account showed a rate of return

less than the promised rate, Avellino, with Bienes' knowledge, communicated this to Madoff and

DiPascali, so that Schupt number could be increased for the accounts to make up the difference.

Upon information and belief, Avellino, with Bienes' knowledge, would also direct into which IA

accounts the undisclosed fraudulent payments were to be paid.

175.    For example, in May 1996, Avellino sent a letter to DiPascali with a detailed

spreadsheet responding to DiPascali's calculation of the fraudulent side payment and guaranteed

rate of return that was owed to accounts controlled by Avellino and Bienes.  Avellino's

spreadsheet set forth in detail the amount of money owed for the guaranteed rate of return and

the fraudulent side payment for the years 1993 through 1995.  Avellino's spreadsheet analysis

and the letter attached thereto, in which he wrote the following, confirms that he carefully

tracked activity in his IA accounts and closely monitored the rate of return and amount of

fraudulent side payments owed:

> I checked the information you sent me.  The only correction I have is the
> adjustment for the distribution of $1,216,000 for 1993 and $1,016,000 for 1994
> and thereafter for [the] "OTHERS."[4]  The net affect on the computation shows a
> difference of $434,000 in my favor.

---

[4] The term "others" refers to the A&B Business Associates.

176.    Similarly, in December 1998, Avellino sent a letter to DiPascali that further demonstrated his involvement in the annual process of ensuring the fraudulent side payments were provided through fictitious "trades" in accounts designated by he and Bienes.  In this letter Avellino wrote:

> ***Yes, it's that time of year again.***  Just a note to touch base about the accounts. Please make necessary trades in <u>all</u> of the accounts:  (1) Grosvenor Partners, Ltd. (2) Mayfair Ventures and (3) Mayfair Ventures Pension Plan.  I believe the total base of the three accounts will be enough to even-up the balance due.  My calculations show that BLM was <u>short</u> (for 12/31/97) approx. <u>$2,500,000</u>.  Please send me a copy of the calcs you have for 1997 and 1998.  (bold emphasis added).

177.    As a result of Avellino's letter, fictitious option trades were reflected on the December 1998 account statements for the IA accounts for Mayfair Ventures, Grosvenor Partners, and Mayfair Pension Plan totaling approximately $7.9 million.  This amount represented the amount of the fraudulent side payment and the guaranteed rate of return.  Yet again, Avellino and Bienes knew or should have known that the trading activity reflected on the account statements they carefully scrutinized could not have occurred and was the product of fraud.

178.    Year in and year out, Madoff waved his magic wand and the fictitious gains found their way into Avellino and Bienes' IA accounts and ultimately their pockets.  Accordingly, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Thomas Avellino, Grosvenor Partners, Strattham, Mayfair Ventures, Mayfair Bookkeeping, Aster, and St. James knew or should have known that the purported trading reflected on their account statements could not have taken place and that Madoff and BLMIS engaged in fraudulent activity.

## THOMAS AVELLINO PROFITS FROM THE BLMIS FRAUD THROUGH STRATTHAM PARTNERS

179.    In or around 1995, Thomas Avellino took up the family mantle and created Strattham in order to reap significant personal profits from Madoff's Ponzi scheme. REDACTED

60

REDACTED

During the course of its existence, Thomas Avellino

and Strattham succeeded in raising funds                          REDACTED

180.    Thomas Avellino operated Strattham          REDACTED              As

the director and president of Ascent, Thomas Avellino for all practical purposes, completely

controlled the entity and it was his alter ego.          REDACTED

181.    Thomas Avellino              REDACTED              despite having little

or no professional experience, training or education in investing or the securities business.

REDACTED

182.              REDACTED

183.    Upon information and belief, Avellino informed Thomas Avellino that Madoff had promised to pay BLMIS IA accounts controlled by Avellino and Bienes guaranteed rates of return, and that Strattham would receive similar guaranteed rates of return.  Upon information and belief, Avellino also informed Thomas Avellino that BLMIS would utilize the fictitious non-hedged options transactions discussed above to meet the guaranteed rates of return.

184.    The Strattham account was provided approximately $205,284 in additional profit by BLMIS during the years of 2004 ($26,028) and 2005 ($179,256) through the use of fictitious, non-hedged, and profitable option trades reflected in the Strattham account statements.

185.    Consistent with promised rates of return for the Avellino and Bienes IA accounts, in 1998 and 1999, the Strattham IA account received rates of return of at least 17%.  Similarly, the Strattham IA account received approximate returns for the year 2002 that almost precisely matched the guaranteed rate of return of 14% received by the IA accounts controlled by Avellino and Bienes.  This continued through 2007, when the Strattham IA account received approximate rates of return consistent with Madoff's guaranteed rate of return of 11% provided to the Avellino and Bienes-controlled IA accounts.

186.    The payment of additional profits to Strattham through the recording of fictitious, non-hedged options trades should have been an obvious indicator of fraud to Thomas Avellino, Ascent and Strattham.  Likewise, Thomas Avellino, Ascent, and Strattham also knew or should have known that it was not possible for Madoff to guarantee and consistently deliver predetermined rates of return.  These defendants ignored these obvious red flags and/or chose to look the other way as they collected exorbitant management fees and lined their pockets with other people's money.

187.    Upon information and belief, Thomas Avellino was accustomed to enriching

himself through questionable conduct and a willingness to cut corners when it suited his personal

financial interests.                              REDACTED



188.                              REDACTED



189.                              REDACTED

REDACTED

190.                                            REDACTED

In addition, bank records

reflect that for the period of 2002 through 2008, Thomas Avellino withdrew more from

Strattham than he deposited or transferred into Strattham during that same time period.

Strattham also withdrew $4,250,000 from its IA account within 90 days of the Filing Date.  As

detailed below, this constituted the withdrawal of principal invested in the Strattham IA account.

## DEFENDANTS IGNORE OTHER INDICIA OF FRAUD

191.    The Individual Defendants, the Entity Defendants and Ascent knew or should

have known that they were benefiting from fraudulent activity or, at a minimum, failed to

exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi

scheme.  In addition to the allegations set forth above, the defendants were on notice of the

following indicia of fraud, yet failed to make sufficient inquiry.

192.    BLMIS, which reputedly ran the world's largest hedge fund, was purportedly

audited by Friehling & Horowitz, an accounting firm that had three employees with offices

located in a strip mall.  Of the two accountants at the firm, one was semi-retired and living in

Florida for many years prior to the Filing Date.  No experienced business person, especially

CPAs with decades of accounting experience as Avellino and Bienes had, could have reasonably

believed it possible for any such firm to have competently audited an entity the size of BLMIS.

Because the outside auditor was woefully unqualified to audit a broker-dealer of BLMIS's size,

Avellino and Bienes knew they could demand guaranteed rates of return and fraudulent side

payments and the outside auditor was unlikely to notice or inquire.

193.    Despite its immense size in terms of assets under management, BLMIS was

substantially a family-run operation, employing many of Madoff's relatives and virtually no

outside professionals.  Because all the key senior management positions at BLMIS were held by

members of Madoff's family, Avellino and Bienes knew they could demand guaranteed rates of

return and fraudulent side payments and no one at BLMIS would raise an objection or question

the favorable treatment received by their IA accounts.

194.    For decades, Madoff provided Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and

Thomas Avellino, and the entities created for their benefit and under their dominion and control,

with the significant financial incentives described herein so that the defendants would and did

ignore the clear evidence of fraud at BLMIS.

**AFTER REVELATION OF MADOFF'S FRAUD,
BIENES LIES IN A TELEVISION INTERVIEW**

195.    Prior to February 6, 2009, Bienes was aware of ongoing investigations by the FBI,

U.S. Department of Justice (the "DOJ"), and the SEC into the fraud perpetrated at BLMIS.

Bienes knew that the FBI, the DOJ, and the SEC were actively attempting to identify persons

who aided and abetted Madoff and BLMIS in conducting the fraud or who had contemporaneous

personal knowledge of Madoff's and others' fraudulent acts prior to December 12, 2008.  Bienes

was also aware that the Trustee was conducting his own investigation into the fraud perpetrated

at BLMIS to recover assets for the benefit of the estate from individuals and entities who

received avoidable transfers of fictitious profits and/or transfers of principal under circumstances

that gave them notice of the fraud.

196.    On February 6, 2009, Bienes gave a videotaped interview to a television journalist

for the Public Broadcasting Service's *Frontline* television program.  During the interview,

Bienes gave numerous false answers knowing that significant portions of the interview would be

broadcast on national television. Bienes knew and understood that individuals working on investigations being conducted by the FBI, the DOJ, the SEC, and the Trustee would likely see portions of his interview. Upon information and belief, Bienes intentionally gave false answers in the interview in an attempt to obscure his conduct and knowledge relating to BLMIS.

197.   For example, notwithstanding Bienes' knowledge of the creation of the Phony A&B IA Account, the fraudulent alteration of previously issued BLMIS account statements, his own false testimony to the SEC, and the years of fraudulent side payments paid via fictitious options trades, Bienes falsely denied having any inkling that fraudulent conduct was occurring at BLMIS: "[a]s God as my only judge, on my mother's grave, not an inkling, not a tickle, nothing. May [H]e strike me dead." These statements were false.

198.   At one point during the interview, Bienes was asked whether he ever checked to see that the stock transactions were taking place within the trading range of the stock on the day that those stocks were ostensibly sold. Bienes answered no, and explained why he did not. In his explanation, Bienes falsely stated that, "nothing ever jumped out at me." Bienes also falsely added that "everything was in a parameter. And the **gains were small, never big**" (emphasis added). At the time Bienes falsely represented that "nothing ever jumped out to me," he knew that in June 1992 BLMIS had created fraudulent account statements with fictitious backdated trades in order to make it appear to the SEC and others that A&B had assets sufficient to cover funds invested by its underlying investors.

199.   Notwithstanding Bienes' lie that the "gains were small, never big," the account statements for the Phony A&B IA Account included backdated transactions which resulted in massive gains that should have aroused the suspicions of a reasonable investor. For example, the backdated January 1991 statement reflects the purchase of 5,950 "S&P 100 Index – April 335

Call" option contracts which were thereafter reported on the April 1991 statement to have been sold for an approximate gain of $18,019,575.  Likewise, the December 1991 statement reflects purchases on December 12, 1991 of 3,500 "S&P 100 Index – January 355 Call" option contracts and 3,000 "S&P 100 Index – January 360 Call" option contracts, which are reflected as sold in the January 1992 statement for gains of $10,480,750 and $8,458,500 respectively.  Bienes' statement also conveniently ignored the fact that his withdrawals from the Ponzi scheme sustained his and his wife's lavish lifestyle for decades.

200.    When the interviewer asked Bienes what return he made on investments with BLMIS after he reinvested following the liquidation of A&B in 1992, Bienes falsely stated:

> I said to my partner, Frank, at that time:  "How lucky we are.  Thank God they closed us down."  You know what we were getting?  9 ½, 10 maybe, at best. Bernie said:  "The golden days are over."

201.    At the time he falsely stated that they only made 9 ½ or 10 % at best, Bienes knew that following the liquidation of A&B, Madoff had promised and delivered to accounts that Avellino and Bienes controlled guaranteed rates of return of 17%, which were later reduced to 14% and then 11%.  Bienes knew that accounts that he and Avellino controlled had also received the fraudulent side payments, in addition to the guaranteed rates of return, which provided additional returns well above the 9 ½ to 10% level he falsely claimed.

202.    During the interview, Bienes also made the following false statement:

> When I left Bernie in '93, and he allowed us to reinvest, I walked away from the whole thing . . . I swear to God in all [H]is mercy I left it all behind.  I had no clients.  I brought no one to him.  I never mentioned his name. . . .

The interviewer thereafter asked Bienes where the A&B investors went, to which Bienes falsely responded, "I don't know where they went, and I couldn't care less."  When the interviewer asked whether Bienes advised people to call the principal of S&P and P&S, Bienes adamantly responded, "[n]o.  Absolutely not.  Never."  When asked who introduced all the clients that used

67

to invest in A&B to S&P and P&S, Bienes, despite having received a percentage of the

management fees A&B investors paid to P&S Associates and S&P Associates, falsely answered:

"I don't [know] if he had clients who used to go to Avellino & Bienes."

203.    The interviewer also commented to Bienes that almost all of the A&B investors

went back to Madoff.  Bienes, whose accounts were benefiting from the fraudulent side

payments specifically calculated from the $336 million reinvested with BLMIS by former A&B

investors, falsely stated:

> I don't know if almost all of them did, because I didn't track it.  I didn't care.  I
> was not interested.  I ran and I hid in the tall grass and licked my wounds.

204.    The interviewer specifically asked Bienes if Avellino had taken any money from

anyone and placed it with Madoff post-'92.  Bienes answered, "[a]bsolutely not that I was aware

of.  No.  No.  No.  No."  Thereafter, Bienes was asked again whether Avellino was steering

people to the principal of P&S and S&P.  Bienes knew that he and Avellino were receiving

payments from P&S and S&P for referred investors, but lied and stated:  "I don't know.  I don't

know.  I really don't know. . . ."

205.    Bienes, having reaped the benefits of tens of millions of dollars of fictitious

profits from the Ponzi scheme which was other people's money, assured the interviewer:

> And we never were pigs.  That's one thing that kept us going:  We were never
> pigs.  We were never pigs.

206.    In one of the few moments of candor during the interview, in response to whether

he was making easy money with Madoff, Bienes stated:

> Easy, easy-peasy, like a money machine.  I always said I never lifted any heavy
> weights . . . I never worked hard . . .

207.    Despite knowledge of and participation in the fraudulent conduct set forth in this

Complaint, in response to a question of whether he believed the money Madoff provided was too

good and too easy, Bienes attributed his "good fortune" to divine intervention in that "God

wanted us" to receive other people's money.

208.    When compelled to an investigative examination by the Trustee some months

later, Bienes reconsidered and decided the safer course was not to answer questions about his

role in the fraud.  He, his wife, Avellino, and Thomas Avellino asserted their Fifth Amendment

privileges against self-incrimination and refused to answer any questions about Madoff or

BLMIS.

### AVELLINO'S, BIENES' AND THOMAS AVELLINO'S KNOWLEDGE OF THE FICTITIOUS ACCOUNTS, FRAUDULENT SIDE PAYMENTS AND OTHER RED FLAGS SHOULD BE IMPUTED TO NANCY AVELLINO, DIANNE BIENES, AND TO THE ENTITY DEFENDANTS

209.    Avellino's, Bienes' and Thomas Avellino's knowledge and bad faith, as set forth

in this Complaint should be imputed to all of the Entity Defendants on the basis of: (i) their

equitable and/or beneficial ownership of those entities, and (ii) their domination and control over

the Entity Defendants and their BLMIS accounts.

210.    Upon information and belief, Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and

Thomas Avellino were at all times the equitable and/or beneficial owners of certain of the Entity

Defendants and the accounts held in their names.  Upon information and belief, Avellino, Bienes,

Mrs. Avellino, Mrs. Bienes, and Thomas Avellino not only formed, funded, directed and

controlled the Entity Defendants, they also retained the beneficial use over the funds and assets

of those entities, including their BLMIS accounts and directed and determined how and to whom

funds could be disbursed.  Upon information and belief, any actions Avellino, Bienes, Mrs.

Avellino, Mrs. Bienes, and Thomas Avellino took with respect to the Entity Defendants' BLMIS

accounts, with the exception of the KJA and Strattham accounts, were taken primarily for the

benefit of themselves and/or their families.

211.    Avellino, Bienes, and Thomas Avellino freely transferred funds between IA accounts of the Entity Defendants and among bank accounts held by the Entity Defendants.  For example, Avellino and Bienes funded the St. James and Aster IA accounts with significant transfers from the Grosvenor Partners account.

212.    Upon information and belief, many of the Transfers (defined below) were made directly to the Individual Defendants completely bypassing any formalities required by the Entity Defendants that held the IA accounts.

213.    Furthermore, as set forth in paragraphs 15–25 above, one or all of the Individual Defendants were also the ultimate controlling principals, managing members, or in control of the general partners of all of the Entity Defendants.  Upon information and belief, one or more of the Individual Defendants dominated and/or controlled the Entity Defendants themselves or through other entities they owned and controlled.  The Individual Defendants acted on behalf of, and, in effect, as agents for, the Entity Defendants, and thus their bad faith and knowledge should be imputed to those entities.

214.    Additionally, based on the above facts, the corporate form of the Entity Defendants should be disregarded.  Upon information and belief, the Individual Defendants routinely disregarded the corporate formalities of the Entity Defendants that they owned, formed, funded, dominated and controlled, and freely transferred funds between themselves (or their family members) and the Entity Defendants, including between certain Entity Defendant IA accounts and the bank accounts of other entities that did not hold BLMIS accounts.

215.    Upon further information and belief, the Individual Defendants deliberately used the Entity Defendants, to shield from their creditors the fictitious profits and other fraudulent transfers that they received from Madoff that they either knew, or should have known, were the

product of fraudulent activity.  The creation of limited partnerships and corporate managing

partners was designed to shield the Ponzi scheme transfers these entities received from BLMIS.

Accordingly, there is no distinction between the knowledge and bad faith of the Individual

Defendants and that of the Entity Defendants.

216.    Avellino's and Bienes' knowledge and bad faith as set forth in this Complaint

should also be imputed to their wives, Mrs. Avellino and Mrs. Bienes, to the extent they were not

the absolute and beneficial owners of certain of the Entity Defendants.  Based on information

and belief, Avellino and Bienes discussed with their wives information that should have alerted

Mrs. Avellino and Mrs. Bienes that BLMIS had been operating fraudulently.  In many instances,

as set forth in this Complaint, Mrs. Avellino and Mrs. Bienes were owners of the Entity

Defendants as either general or limited partners.  Mrs. Avellino and Mrs. Bienes benefited

greatly from Avellino's and Bienes' control of the Entity Defendants and the IA accounts they

held.  Avellino and Bienes directed the transfers that were made to or for the benefit of Mrs.

Avellino and Mrs. Bienes.  These transfers were made to Mrs. Avellino and Mrs. Bienes while

their husbands were on notice of the fraudulent Ponzi scheme and their bad faith should be

imputed to both Mrs. Avellino and Mrs. Bienes.

## THE TRANSFERS

217.    According to BLMIS's records and based upon information and belief, A&B,

Avellino Family Trust, A&B Pension Plan, Mrs. Bienes, Grosvenor Partners, Mayfair Ventures,

Aster, St. James, Strattham, and KJA maintained accounts with BLMIS as set forth on Exhibit A

(collectively, the "Accounts") and executed one or more of the following Account Agreements:

a Customer Agreement, an Option Agreement, a Trading Authorization Limited to Purchases and

Sales of Securities and Options, a Trading Authorization Limited to Purchases and Sales of

Securities, and/or a Trading Authorization Limited to Purchase and Sales of Securities and

Commons (collectively, the "Account Agreements"). The Account Agreements were executed

and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

218.    The Account Agreements were to be performed in New York, New York through

securities trading activities that would take place in New York, New York. The Accounts were

held in New York, New York, and the defendants sent funds to BLMIS and/or to BLMIS's

account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account")

in New York, New York for application to the Accounts and the purported conducting of trading

activities.

219.    The Entity Defendants who held the accounts identified on Exhibit A were initial

transferees of the avoidable Transfers, as set forth and defined below. In addition, because

Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino, upon information and

belief, routinely disregarded corporate formalities, and dominated and controlled the Entity

Defendants, they were initial transferees of the transfers made to the Entity Defendants. To the

extent that any of the defendants were general partners, then they are individually liable for the

obligations of the general partnerships of which they were general partners.

220.    Avellino was the initial transferee of at least the following BLMIS accounts:

A&B related accounts (100126, 100127, 1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050,

1A0051, and 1A0053), Grosvenor Partners (1ZB046), Mayfair Ventures (1ZB032), Aster

(1ZB509), and KJA (1ZA879).

221.    Mrs. Avellino was the initial transferee of at least the following BLMIS accounts:

Grosvenor Partners (1ZB046), Mayfair Ventures (1ZB032), and Aster (1ZB509).

222.    Bienes and Mrs. Bienes were initial transferees of at least the following BLMIS

accounts: A&B related accounts (1A0045, 1A0046, 1A0047, 1A0048, 1A0049, 1A0050,

1A0051, and 1A0053), Diane K. Bienes (1B0018), Grosvenor Partners (1ZB046), Mayfair

Ventures (1ZB032), and St. James (1ZB510).

223.    Thomas Avellino was the initial transferee of at least the following BLMIS

account: Strattham (1ZB262).

224.    The Entity Defendants are either initial transferees of the Transfers or conduits of

such Transfers for the benefit of the Individual Defendants.  If the Entity Defendants are the

initial transferees of the Transfers, then the Individual Defendants are the subsequent transferees

for the purposes of this Complaint and are included in the definition of Subsequent Transferee

Defendants (defined below).  To the extent the Entity Defendants are determined to be a conduit

for the funds withdrawn for the benefit of the Individual Defendants, the Individual Defendants

are initial transferees for whose benefit such transfers were made for purposes of this Complaint.

To the extent the Entity Defendants are determined to be a conduit for the funds withdrawn for

the benefit of the Subsequent Transferee Defendants, the Subsequent Transferee Defendants are

initial transferees for whose benefit such transfers were made, for the purposes of this Complaint.

225.    From at least April 1981, the Individual Defendants, the Entity Defendants and

Subsequent Transferee Defendants withdrew directly or indirectly more than $904,515,689 in

principal, fictitious profits, and management/professional fees from the Accounts (the

"Transfers") under circumstances that should have put them on notice that the Transfers were

fraudulent.  *See* Exhibit A.  Of this amount, at least $571,148,626 constituted non-existent profits

supposedly earned in the Accounts (the "Fictitious Profits"), and approximately $333,367,063

constituted the return of principal.  The Fictitious Profits received by the Individual Defendants,

the Entity Defendants, and Subsequent Transferee Defendants were other people's money.

226.    Upon information and belief, some or all of the Transfers were transferred from BLMIS into one or more bank accounts held jointly by Avellino and Mrs. Avellino.  To the extent that Avellino and Mrs. Avellino received some or all of the Transfers from BLMIS through one or more jointly held bank accounts, Avellino and Mrs. Avellino are jointly and severally liable for the Transfers as direct or subsequent transferees.

227.    Upon information and belief, some or all of the Transfers were transferred from BLMIS into one or more bank accounts held jointly by Bienes and Mrs. Bienes.  To the extent that Bienes and Mrs. Bienes received some or all of the Transfers from BLMIS through one or more jointly held bank accounts, Bienes and Mrs. Bienes are jointly and severally liable for the Transfers as direct or subsequent transferees.

**The Fraudulent Transfers**

228.    From at least April 1981, the Individual Defendants, the Entity Defendants and Subsequent Transferee Defendants withdrew directly or indirectly more than $904,515,689 in principal and fictitious profits, from the Accounts under circumstances that should have put these defendants on notice that the Transfers were fraudulent.  *See* Exhibit A.  Of this amount, at least $571,148,626 constituted Fictitious Profits and approximately $333,367,063 constituted the return of principal (collectively, the "Full History Fraudulent Transfers").

229.    The Full History Fraudulent Transfers are avoidable and recoverable under sections 544, 548(a), 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), applicable provisions of DCL sections 273–279, and CPLR sections 203(g) and 213(8).  The Full History Fraudulent Transfers were directly or indirectly made to or for the benefit of the defendants, as set forth below.

74

230.   During the six years prior to the filing date, BLMIS made payments of more than $82,105,000 in avoidable transfers, of which $26,455,000 represented principal and $55,650,000 represented fictitious profits from the Ponzi scheme (collectively, the "Six Year Fraudulent Transfers").  *See* Exhibit A.

231.   The Six Year Fraudulent Transfers are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273–279.  The Six Year Fraudulent Transfers were directly or indirectly made to, or for the benefit of the defendants, as set forth below.

232.   During the two years prior to the Filing Date, BLMIS made payments of at least $35,180,000 in avoidable transfers, of which $17,980,000 represented principal and $17,200,000 represented fictitious profits from the Ponzi scheme (collectively, the "Two Year Fraudulent Transfers").  *See* Exhibit A.

233.   The Two Year Fraudulent Transfers are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3), and applicable provisions of DCL sections 273–279.  The Two Year Transfers were directly or indirectly made to, or for the benefit of the defendants, as set forth below:

**Frank Avellino**

234.   Avellino received the following fraudulent transfers:

a.   Full History Fraudulent Transfers of at least $831,124,727 from BLMIS through IA accounts held by entities Avellino controlled and personal IA accounts managed by Avellino.  *See* Exhibit B, Column 3.  Approximately $307,301,096 of this amount constituted a return of principal and at least $523,823,631 represented fictitious profits from the Ponzi scheme.

A detailed list of the Full History Fraudulent Transfers made to or for the benefit of Avellino is attached as Exhibits B1–B14, Column 5;

      b.      Six Year Fraudulent Transfers of at least $40,550,000 from BLMIS through IA accounts held by entities Avellino controlled. *See* Exhibit B, Column 4. Approximately $2,350,000 of this amount constituted a return of principal and at least $38,200,000 represented fictitious profits from the Ponzi scheme. A detailed list of the Six Year Fraudulent Transfers made to or for the benefit of Avellino is attached as Exhibits B1–B14, Column 6; and

      c.      Two Year Fraudulent Transfers of at least $8,500,000 from BLMIS through IA accounts held by entities Avellino controlled, all of which represented fictitious profits from the Ponzi scheme. *See* Exhibit B, Column 5. A detailed list of the Two Year Fraudulent Transfers made to or for the benefit of Avellino is attached as Exhibits B1–B14, Column 7.

### Michael Bienes

235.    Bienes received the following fraudulent transfers:

      a.      Full History Fraudulent Transfers of at least $858,798,140 from BLMIS through IA accounts held by entities Bienes controlled. *See* Exhibit C, Column 3. Approximately $300,019,851 of this amount constituted a return of principal and at least $558,778,289 represented fictitious profits from the Ponzi scheme. A detailed list of the Full History Fraudulent Transfers made to or for the benefit of Bienes is attached as Exhibits C1–C11, Column 5;

      b.      Six Year Fraudulent Transfers of at least $49,650,000 from BLMIS through IA accounts held by entities Bienes controlled. *See* Exhibit C, Column 4.

Approximately $1,000,000 of this amount constituted a return of principal and at least

$48,650,000 represented fictitious profits from the Ponzi scheme.  A detailed list of the Six Year

Fraudulent Transfers made to or for the benefit of Bienes is attached as Exhibits C1–C11,

Column 6; and

c.      Two Year Fraudulent Transfers of at least $13,700,000 from BLMIS

through IA accounts held by entities Bienes controlled, all of which represented fictitious profits

from the Ponzi scheme.  *See* Exhibit C, Column 5.  A detailed list of the Two Year Fraudulent

Transfers made to or for the benefit of Bienes is attached as Exhibits C1–C11, Column 7.

**Nancy Avellino**

236.    Mrs. Avellino received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $136,453,000 from BLMIS

through IA accounts held by entities that were controlled by Avellino.  *See* Exhibit D, Column 3.

Of this amount, approximately $66,851,600 constituted a return of principal and at least

$69,601,400 represented fictitious profits from the Ponzi scheme.  A detailed list of the Full

History Fraudulent Transfers made to or for the benefit of Mrs. Avellino is attached as Exhibits

D1–D3, Column 5;

b.      Six Year Fraudulent Transfers of at least $38,200,000 from BLMIS

through IA accounts held by entities Avellino controlled, all of which represented fictitious

profits from the Ponzi scheme.  *See* Exhibit D, Column 4.  A detailed list of the Six Year

Fraudulent Transfers made to or for the benefit of Mrs. Avellino is attached as Exhibits D1–D3,

Column 6; and

c.      Two Year Fraudulent Transfers of at least $8,500,000 from BLMIS

through IA accounts held by entities Avellino controlled, all of which represented fictitious

profits from the Ponzi scheme.  *See* Exhibit D, Column 5.  A detailed list of the Two Year

Fraudulent Transfers made to or for the benefit of Mrs. Avellino is attached as Exhibits D1–D3,

Column 7.

**Dianne Bienes**

237.    Mrs. Bienes received the following fraudulent transfers:

a.    Full History Fraudulent Transfers of at least $858,798,140 from BLMIS

through IA accounts held by entities which were controlled by Mrs. Bienes and/or Bienes, and an

IA account held in her name.  *See* Exhibit E, Column 3.  Of this amount, approximately

$300,019,851 constituted a return of principal and at least $558,778,289 represented fictitious

profits from the Ponzi scheme.  A detailed list of the Full History Fraudulent Transfers made to

or for the benefit of Mrs. Bienes is attached as Exhibits E1–E11, Column 5;

b.    Six Year Fraudulent Transfers of at least $49,650,000 from BLMIS

through IA accounts held by entities Bienes controlled.  *See* Exhibit E, Column 4.

Approximately $1,000,000 of this amount constituted a return of principal and at least

$48,650,000 represented fictitious profits from the Ponzi scheme.  A detailed list of the Six Year

Fraudulent Transfers made to or for the benefit of Mrs. Bienes is attached as Exhibits E1–E11,

Column 6; and

c.    Two Year Fraudulent Transfers of at least $13,700,000 from BLMIS

through IA accounts held by entities Bienes controlled, all of which represented fictitious profits

from the Ponzi scheme.  *See* Exhibit E, Column 5.  A detailed list of the Two Year Fraudulent

Transfers made to or for the benefit of Mrs. Bienes is attached as Exhibits E1–E11, Column 7.

**Thomas Avellino**

238.    Thomas Avellino received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $23,820,000 in principal withdrawn from BLMIS through the IA account held in the name of Strattham an entity which Thomas Avellino controlled.  *See* Exhibit F, Column 3.  A detailed list of the Full History Fraudulent Transfers made to or for the benefit of Thomas Avellino is attached as Exhibit F1, Column 5;

b.      Six Year Fraudulent Transfers of at least $23,105,000 in principal withdrawn from BLMIS through an IA account held in the name of Strattham, an entity which Thomas Avellino controlled.  *See* Exhibit F, Column 4.  A detailed list of the Six Year Fraudulent Transfers made to or for the benefit of Thomas Avellino is attached as Exhibit F1, Column 6; and

c.      Two Year Fraudulent Transfers of at least $17,980,000 in principal withdrawn from BLMIS through an IA account held in the name of Strattham, an entity which Thomas Avellino controlled.  *See* Exhibit F, Column 5.  A detailed list of the Two Year Fraudulent Transfers made to or for the benefit of Thomas Avellino is attached as Exhibit F, Column 7.

### Avellino & Bienes

239.    A&B received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $672,607,455 from BLMIS through six IA accounts held in the name of A&B.  *See* Exhibit G, Column 3.  Of this amount, approximately $226,572,147 constituted a return of principal and at least $446,035,308 represented fictitious profits from the Ponzi scheme.  A detailed list of the Full History Fraudulent Transfers made to A&B is attached as Exhibits G1–G6, Column 5.

79

**Avellino Family Trust**

240.    Avellino Family Trust received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $750,000 from BLMIS

through an IA account held in the name of Avellino Family Trust.  *See* Exhibit H, Column 3.  Of

this amount, approximately $400,000 constituted a return of principal and at least $350,000

represented fictitious profits from the Ponzi scheme.  A detailed list of the Full History

Fraudulent Transfers made to Avellino Family Trust is attached as Exhibit H1, Column 5.

**Avellino & Bienes Pension Plan & Trust**

241.    A&B Pension Plan received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $7,166,723 from BLMIS

through an IA account held in the name of Avellino Family Trust.  *See* Exhibit I, Column 3.  Of

this amount, approximately $4,350,138 constituted a return of principal and at least $2,816,585

represented fictitious profits from the Ponzi scheme.  A detailed list of the Full History

Fraudulent Transfers made to A&B Pension Plan is attached as Exhibit I1, Column 5.

**Grosvenor Partners**

242.    Grosvenor Partners received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $101,603,000 from BLMIS

through an IA account held in the name of Grosvenor Partners.  *See* Exhibit J, Column 3.  Of this

amount, approximately $43,351,600 constituted a return of principal and at least $58,251,400

represented fictitious profits from the Ponzi scheme.  A detailed list of the Full History

Fraudulent Transfers made to Grosvenor Partners is attached as Exhibit J1, Column 5;

b.      Six Year Fraudulent Transfers of at least $28,650,000 from BLMIS

through an IA account held in the name of Grosvenor Partners, all of which constituted fictitious

profits from the Ponzi scheme.  *See* Exhibit J, Column 4.  A detailed list of the Six Year

Fraudulent Transfers made to Grosvenor Partners is attached as Exhibit J1, Column 6; and

        c.      Two Year Fraudulent Transfers of at least $2,500,000 from BLMIS

through an IA account held in the name of Grosvenor Partners, all of which constituted fictitious

profits from the Ponzi scheme.  *See* Exhibit J, Column 5.  A detailed list of the Two Year

Fraudulent Transfers made to Grosvenor Partners is attached as Exhibit J1, Column 7.

### Mayfair Ventures

243.    Mayfair Ventures received the following fraudulent transfers:

        a.      Full History Fraudulent Transfers of at least $27,850,000 from BLMIS

through an IA account held in the name of Mayfair Ventures.  *See* Exhibit K, Column 3.  Of this

amount, approximately $23,500,000 constituted a return of principal and at least $4,350,000

represented fictitious profits from the Ponzi scheme.  A detailed list of the Full History

Fraudulent Transfers made to Mayfair Ventures is attached as Exhibit K1, Column 5;

        b.      Six Year Fraudulent Transfers of at least $2,550,000 from BLMIS through

an IA account held in the name of Mayfair Ventures, all of which constituted fictitious profits

from the Ponzi scheme.  *See* Exhibit K, Column 4.  A detailed list of the Six Year Fraudulent

Transfers made to Mayfair Ventures is attached as Exhibit K1, Column 6; and

        c.      Two Year Fraudulent Transfers of at least $2,500,000 from BLMIS

through an IA account held in the name of Mayfair Ventures, all of which constituted fictitious

profits from the Ponzi scheme.  *See* Exhibit K, Column 5.  A detailed list of the Two Year

Fraudulent Transfers made to Mayfair Ventures is attached as Exhibit K1, Column 7.

### Aster Associates

244.    Aster received the following fraudulent transfers:

a.      Six Year Fraudulent Transfers of at least $7,000,000 from BLMIS through an IA account held in the name of Aster, all of which constituted fictitious profits from the Ponzi scheme. *See* Exhibit L, Column 4. A detailed list of the Six Year Fraudulent Transfers made to Aster is attached as Exhibit L1, Column 6; and

b.      Two Year Fraudulent Transfers of at least $3,500,000 from BLMIS through an IA account held in the name of Aster, all of which constituted fictitious profits from the Ponzi scheme. *See* Exhibit L, Column 5. A detailed list of the Two Year Fraudulent Transfers made to Aster is attached as Exhibit L1, Column 7.

### St. James Associates

245.    St. James received the following fraudulent transfers:

a.      Six Year Fraudulent Transfers of at least $18,450,000 from BLMIS through an IA account held in the name of St. James. *See* Exhibit M, Column 4. Of this amount, approximately $1,000,000 constituted a return of principal and at least $17,450,000 represented fictitious profits from the Ponzi scheme. A detailed list of the Six Year Fraudulent Transfers made to St. James is attached as Exhibit M1, Column 6; and

b.      Two Year Fraudulent Transfers of at least $8,700,000 from BLMIS through an IA account held in the name of St. James, all of which constituted fictitious profits from the Ponzi scheme. *See* Exhibit M, Column 5. A detailed list of the Two Year Fraudulent Transfers made to St. James is attached as Exhibit M1, Column 7.

### Kenn Jordan Associates

246.    KJA received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of approximately $5,745,000 from BLMIS through an IA account held in the name of KJA, all of which constituted a return of

principal.  *See* Exhibit N, Column 3.  A detailed list of the Full History Fraudulent Transfers made to KJA is attached as Exhibit N1, Column 5; and

b.      Six Year Fraudulent Transfers of at least $2,350,000 from BLMIS through an IA account held in the name of KJA, all of which constituted a return of principal.  *See* Exhibit N, Column 4.  A detailed list of the Six Year Fraudulent Transfers made to KJA is attached as Exhibit N1, Column 6.

### Strattham Partners

247.    Strattham received the following fraudulent transfers:

a.      Full History Fraudulent Transfers of at least $23,820,000 from BLMIS through an IA account held in the name of Strattham, all of which constituted a return of principal.  *See* Exhibit O, Column 3.  A detailed list of the Full History Fraudulent Transfers made to Strattham is attached as Exhibit O1, Column 5;

b.      Six Year Fraudulent Transfers of at least $23,105,000 from BLMIS through an IA account held in the name of Strattham, all of which constituted a return of principal.  *See* Exhibit O, Column 4.  A detailed list of the Six Year Fraudulent Transfers made to Strattham is attached as Exhibit O1, Column 6; and

c.      Two Year Fraudulent Transfers of at least $17,980,000 from BLMIS through an IA account held in the name of Strattham, all of which constituted fictitious profits from the Ponzi scheme.  *See* Exhibit O, Column 5.  A detailed list of the Two Year Fraudulent Transfers made to Strattham is attached as Exhibit O1, Column 7.

### The Preference Transfers

248.    During the 90-day period prior to the Filing Date, Strattham received transfers constituting the return of principal in the amount of $4,250,000 (the "Preference Transfers").

The Preference Transfers were directly or indirectly made to Strattham and Thomas Avellino, as a general partner, and include, but are not limited to, the Transfers listed in Exhibit O1, Column 8 and Exhibit F1, Column 8, respectively.

249.    The Preference Transfers are recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

**The Subsequent Transfers**

250.    Upon information and belief, all or a portion of the avoidable transfers set forth above were subsequently transferred to one or more of the defendants named in this Complaint (the "Subsequent Transfers").  Upon information and belief, the following defendants received the Subsequent Transfers of the avoidable fraudulent transfers referenced below, which are recoverable pursuant to section 550(a) of the Bankruptcy Code: (a) the Entity Defendants; (b) Avellino, individually, and as Trustee for the following trusts: FJA Revocable Trust Number One 1990, FJA GRAT 1992, FJA GRAT Two 1992, FJA Revocable Trust Number One 1988, Heather Lowles Trust, Tiffany Lowles Trust, Melanie Lowles Trust, Taylor McEvoy Trust, Madison McEvoy Trust, S. A. GRAT, N. A. GRAT, St. A. GRAT, Avellino Family Trust, and A&B Pension Plan; (c) Mrs. Avellino, individually, and as Trustee for the following Trusts: Nancy Avellino GRAT 1992, Rachel Rosenthal Trust, Rachel Rosenthal Trust #3, Heather Lowles Trust, Tiffany Lowles Trust, Melanie Lowles Trust, Taylor McEvoy Trust and Madison McEvoy Trust; (d) FJA Revocable Trust Number One 1990; (e) FJA GRAT 1992; (f) FJA GRAT Two 1992; (g) FJA Revocable Trust Number One 1988; (h) Nancy Avellino GRAT 1992; (i) Thomas Avellino; (j) Joseph Avellino; (k) Mrs. Bienes, individually, and as Trustee for the following Trusts: Dianne Bienes GRAT and T. C. D. Trust; (l) Bienes, individually, and as Trustee for Glenn Dydo Trust, and A&B Pension Plan; (m) Dianne Bienes GRAT; (n) Glenn

Dydo; (o) Sandra Dydo; (p) Glenn Dydo Trust; (q) Lorraine McEvoy; (r) Michael McEvoy; (s)

AFF; (t) Rachel Rosenthal; (u) Rachel Rosenthal Trust; (v) the Rachel Rosenthal Trust #3; (w)

Taylor McEvoy Trust; (x) Taylor McEvoy; (y) Madison McEvoy Trust; (z) Madison McEvoy;

(aa) S. A. GRAT; (bb) S. A.; (cc) N. A. GRAT, (dd) N. A.; (ee) St. A. GRAT; (ff) St. A.; (gg)

Heather Lowles Trust; (hh) Heather Lowles; (ii) Tiffany Lowles Trust; (jj) Tiffany Lowles; (kk)

Devon Paxson; (ll) Roslyck Paxson; (mm) Melanie Lowles Trust; (nn) T. C. D.; (oo) Ascent;

(pp) 27 Cliff; (qq) Mayfair Bookkeeping; (rr) T. C. D. Trust; (ss) Melanie Lowles; and (tt) Optus

(collectively, the "Subsequent Transferee Defendants").

251.    Upon information and belief, some or all of the Preference Transfers were

subsequently transferred during the preference period to Subsequent Transferee Defendants

Thomas Avellino, Devon Paxson, and Roslyck Paxson.

252.    The Subsequent Transfers, or the value thereof, are recoverable from the

Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

253.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pleaded in the alternative.

254.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i)

supplement the information regarding the Transfers and any additional transfers, and (ii) seek

recovery of such additional transfers.

## CUSTOMER CLAIMS

255.    Some of the defendants named herein filed customer claims (the "Customer

Claims"), as reflected in Exhibit P.

256.    In response to certain Customer Claims, as reflected in Exhibit P, the Trustee

issued a Notice of Trustee's Determination of Claim (the "Determinations") denying such

claims.

257.    On December 23, 2008, this Court entered an Order on Application for Entry of

an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief

(the "Claims Procedures Order;" Docket No. 12).  The Claims Procedures Order includes a

process for determination and allowance of claims under which the Trustee has been operating.

258.    There were no objections to the Determinations filed with the Court.   Having

failed to file an objection to the Determinations, pursuant to the Claims Procedures Order, the

Determinations are final and such claims are disallowed for all purposes.

259.    The Trustee intends to resolve the Customer Claims as to which no

determinations have been made as yet (the "Undetermined Customer Claims") through a separate

hearing as contemplated by the Claims Procedures Order.  *See* Exhibit P.

<u>COUNT ONE:</u>
<u>FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551</u>

260.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

261.    Each of the Two Year Fraudulent Transfers was made on or within two years

before the Filing Date.

262.    Each of the Two Year Fraudulent Transfers constituted a transfer of an interest of

BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code

and pursuant to section 78fff-2(c)(3) of SIPA.

263.    Each of the Two Year Fraudulent Transfers was made by BLMIS with the actual

intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

BLMIS made the Two Year Fraudulent Transfers to or for the benefit of the defendants

identified in Exhibit Q in furtherance of a fraudulent investment scheme.

264.     Each of the Two Year Fraudulent Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code pursuant to section 550(a) of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA.

265.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received the Two Year Fraudulent Transfers: (a) avoiding and preserving the Two Year Fraudulent Transfers, (b) directing that the Two Year Fraudulent Transfers be set aside, and (c) recovering the Two Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

### COUNT TWO:
### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

266.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

267.     Each of the Two Year Fraudulent Transfers was made on or within two years before the Filing Date.

268.     Each of the Two Year Fraudulent Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

269.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Fraudulent Transfers.

270.     At the time of each of the Two Year Fraudulent Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Fraudulent Transfers.

271.    At the time of each of the Two Year Fraudulent Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS constituted unreasonably small capital.

272.    At the time of each of the Two Year Fraudulent Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

273.    Each of the Two Year Fraudulent Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and recoverable pursuant to section 550(a) and section 78fff-(2)(c)(3) of SIPA.

274.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received Two Year Fraudulent Transfers: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Fraudulent Transfers be set aside, and (c) recovering the Two Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

275.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

276.    At all times relevant to the Six Year Fraudulent Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

277.     Each of the Six Year Fraudulent Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

278.     Each of the Six Year Fraudulent Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Fraudulent Transfers to or for the benefit of the defendants identified in Exhibit Q in furtherance of a fraudulent investment scheme.

279.     Each of the Six Year Fraudulent Transfers was received by the defendants identified in Exhibit Q with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year Fraudulent Transfers, and/or future creditors of BLMIS.

280.     As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received the Six Year Fraudulent Transfers: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, (c) recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees.

### COUNT FOUR:
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

281.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

282.     At all times relevant to the Six Year Fraudulent Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

283.     Each of the Six Year Fraudulent Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

284.     BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

285.     BLMIS was insolvent at the time it made each of the Six Year Fraudulent Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Fraudulent Transfers.

286.     As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received the Six Year Fraudulent Transfers: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, and (c) recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT FIVE:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

287.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

288.     At all times relevant to the Six Year Fraudulent Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

289.     Each of the Six Year Fraudulent Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

290.     BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

291.    At the time BLMIS made each of the Six Year Fraudulent Transfers, BLMIS was engaged, or was about to engage, in a business or transaction for which the property remaining in its hands after each of the Six Year Fraudulent Transfers was an unreasonably small capital.

292.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received the Six Year Fraudulent Transfers: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, and (c) recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

<u>COUNT SIX:</u>
<u>FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW</u>
<u>§§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551</u>

293.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

294.    At all times relevant to the Six Year Fraudulent Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

295.    Each of the Six Year Fraudulent Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

296.    BLMIS did not receive fair consideration for the Six Year Fraudulent Transfers.

297.    At the time BLMIS made each of the Six Year Fraudulent Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

91

298.     As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the

Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or

indirectly, received the Six Year Fraudulent Transfers: (a) avoiding and preserving the Six Year

Fraudulent Transfers, (b) directing that the Six Year Fraudulent Transfers be set aside, and (c)

recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of

BLMIS.

## COUNT SEVEN:
## RECOVERY OF FULL HISTORY FRAUDULENT TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 544, 550(a) AND 551

299.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

300.     At all times relevant to the Full History Fraudulent Transfers, the fraudulent

scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured

creditor of BLMIS.

301.     At all times relevant to the Full History Fraudulent Transfers, there have been one

or more creditors who have held and still hold matured or unmatured unsecured claims against

BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable

only under section 502(e) of the Bankruptcy Code.

302.     Each of the Full History Fraudulent Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

303.     Each of the Full History Fraudulent Transfers was made by BLMIS with the

actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Full History

Fraudulent Transfers to, or for the benefit of, the defendants identified in Exhibit Q in furtherance of a fraudulent investment scheme.

304.    Each of the Full History Fraudulent Transfers was received by the defendants identified in Exhibit Q with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

305.    As a result of the foregoing, pursuant to CPLR sections 203(g) and 213(8), DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q who, directly or indirectly, received the Full History Fraudulent Transfers: (a) avoiding and preserving the Full History Fraudulent Transfers, (b) directing that the Full History Fraudulent Transfers be set aside, (c) recovering the Full History Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees.

## COUNT EIGHT:
## PREFERENTIAL TRANSFERS – 11 U.S.C. §§ 547(b), 550, AND 551

306.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

307.    At the time of each of the Preference Transfers, defendants Thomas Avellino and Strattham were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

308.    Each of the Preference Transfers constituted the transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

309.    Each of the Preference Transfers was made directly or indirectly to, or for the benefit of, defendants Thomas Avellino and Strattham.

310.    Each of the Preference Transfers was made for, or on account of, an antecedent debt owed by BLMIS to defendants Thomas Avellino and Strattham for the return of their principal before such transfer was made.

311.    Each of the Preference Transfers was made while BLMIS was insolvent.

312.    Each of the Preference Transfers was made within one year of the Filing Date.

313.    Preference Transfers in the amount of $4,250,000 were made within the 90-day period prior to the Filing Date.

314.    Defendants Thomas Avellino and Strattham who obtained the Preference Transfers received more than they would receive if: (i) this case were a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) defendants Thomas Avellino and Strattham received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

315.    The Preference Transfers are avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable pursuant to section 550(a) of the Bankruptcy Code and SIPA section 78fff-2(c)(3).

316.    As a result of the foregoing, pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against defendants Thomas Avellino and Strattham who, directly or indirectly, received the Preference Transfers: (a) avoiding and preserving the Preference Transfers, (b) directing that the Preference Transfers be set aside, and (c) recovering the Preference Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT NINE:
## RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 273–279, AND 11 U.S.C. §§ 544, 547, 548, 550(a), AND 551

317.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

318.     Each of the Two Year Fraudulent Transfers, the Six Year Fraudulent Transfers, the Full History Fraudulent Transfers, and the Preference Transfers are avoidable under sections 544, 547, and 548 of the Bankruptcy Code, DCL sections 273, 274, 275, and/or 276 and section 78fff-2(c)(3) of SIPA.

319.     Upon information and belief, the Subsequent Transfers were transferred by the defendants identified in Exhibit Q to Subsequent Transferee Defendants identified in Exhibit Q.

320.     Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, Subsequent Transferee Defendants identified in Exhibit Q.

321.     The Subsequent Transferee Defendants are immediate or mediate transferees of the Subsequent Transfers from the defendants identified in Exhibit Q.

322.     As a result of the foregoing and the avoidance of the Two Year Fraudulent Transfers, the Six Year Fraudulent Transfers, the Full History Fraudulent Transfers, and the Preference Transfers pursuant to CPLR sections 203(g) and 213(8), DCL sections 273–279, sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Subsequent Transferee Defendants identified on Exhibit Q: (a) recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS, and (b) recovering attorneys' fees.

## COUNT TEN:
## DISALLOWANCE OF CUSTOMER CLAIMS

323.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

324.    Certain defendants filed Customer Claims, some of which have not yet been

determined and/or some of which were determined.  *See* Exhibit P.

325.    The Customer Claims filed for defendants Strattham (Claim #005410) and KJA

(Claim #012840) and Subsequent Transferee Defendant Mayfair Bookkeeping (Claim #012824)

should not be allowed pursuant to section 502(d) of the Bankruptcy Code, as those who filed the

Customer Claims are the recipients of transfers of BLMIS's property which are avoidable and

recoverable under sections 544, 547, 548, and/or 550(a) of the Bankruptcy Code, DCL sections

273–276, and section 78fff-2(c)(3) of SIPA, as set forth above, and have not returned the

transfers to the Trustee.

326.    The Claims Procedures Order includes a process for determination and allowance

of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee

intends to resolve defendants Strattham and KJA and Subsequent Transferee Defendant Mayfair

Bookkeeping's Customer Claims and any related objections through the mechanisms

contemplated by the Claims Procedures Order.

## COUNT ELEVEN:
## EQUITABLE SUBORDINATION

327.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

328.    Certain defendants hold Undetermined Customer Claims.  *See* Exhibit P.

329.    Based on the inequitable conduct as described above, the customers of BLMIS

have been misled as to the true financial condition of the debtor, customers have been induced to

invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

330.    Based upon the inequitable conduct and actual and/or inquiry notice of the fraudulent nature of the transfers made by BLMIS to the defendants identified in Exhibit Q, as set forth above, the Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by defendants KJA and Strattham and Subsequent Transferee Defendant Mayfair Bookkeeping directly or indirectly against the estate – and only to the extent such claims are allowed – are subordinated for distribution purposes pursuant to sections 105(a) and 510(c)(1) of the Bankruptcy Code.

331.    Equitable subordination of the Undetermined Customer Claims, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

**COUNT TWELVE:
CONVERSION**

332.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

333.    BLMIS had a possessory right and interest to its assets, including its customers' investment funds.

334.    The Individual Defendants and the Entity Defendants converted the investment funds of BLMIS customers when they received money originating from other BLMIS customer accounts in the form of withdrawals and transfers, which included fraudulent side payments and fictitious profits.  As alleged herein, the Individual Defendants and the Entity Defendants took money out of BLMIS to fund the lavish lifestyles of the Individual Defendants when they knew

or should have known that the monies received from BLMIS were the result of fraudulent

activity. These actions deprived BLMIS and its creditors of the use of this money.

335.    As a direct and proximate result of this conduct, BLMIS and its creditors have not

had the use of the money converted by the Individual Defendants and the Entity Defendants.

336.    By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is

entitled to an award of compensatory damages in an amount to be determined at trial.

337.    The Individual Defendants' and the Entity Defendants' conscious, willful,

wanton, and malicious conduct entitles the Trustee, on behalf of BLMIS and its creditors, to an

award of punitive damages in an amount to be determined at trial.

## COUNT THIRTEEN:
## UNJUST ENRICHMENT

338.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

339.    The Individual Defendants and the Entity Defendants have been unjustly

enriched. As alleged herein, the Individual Defendants and the Entity Defendants greatly

benefited from the receipt of stolen money from BLMIS for which they did not in good faith

adequately provide value.  Rather, the Individual Defendants and the Entity Defendants received

these monies by enabling and aiding in a fraudulent scheme of which they knew or should have

known.

340.    This enrichment was at the expense of BLMIS and, ultimately, at the expense of

BLMIS's other customers.

341.    Equity and good conscience require full restitution of the monies received by the

Individual Defendants and the Entity Defendants from BLMIS.

342.    The Individual Defendants' and the Entity Defendants' conscious, intentional, and willful tortious conduct entitles BLMIS to recapture profits derived by the Individual Defendants and the Entity Defendants utilizing monies they received from BLMIS including, by way of example and without limitation, profits earned from real estate interests they purchased with BLMIS's customer funds.

343.    By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is entitled to an award of compensatory damages in an amount to be determined at trial.

### COUNT FOURTEEN:
### MONEY HAD AND RECEIVED

344.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

345.    The Individual Defendants and the Entity Defendants are currently in possession of, or have control over, money which originated from BLMIS. This money is Customer Property and belongs to the customer fund under the Trustee's control. The Individual Defendants and the Entity Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit and/or mistake.

346.    In equity and good conscience, the Individual Defendants and the Entity Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The Individual Defendants and the Entity Defendants are obligated to return all such money to the Trustee.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the defendants identified in Exhibit Q as follows:

(i)    On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a

judgment against the defendants identified in Exhibit Q: (a) avoiding and preserving the Two

Year Fraudulent Transfers; (b) directing that the Two Year Fraudulent Transfers be set aside; and

(c) recovering the Two Year Fraudulent Transfers, or the value thereof, for the benefit of the

estate of BLMIS;

(ii)     On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550,

and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a

judgment against the defendants identified in Exhibit Q: (a) avoiding and preserving the Two

Year Fraudulent Transfers; (b) directing that the Two Year Fraudulent Transfers be set aside; and

(c) recovering the Two Year Fraudulent Transfers, or the value thereof, for the benefit of the

estate of BLMIS;

(iii)     On the Third Claim for Relief, pursuant to DCL sections 276, 276-a, 278,

and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of

SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q: (a)

avoiding and preserving the Six Year Fraudulent Transfers; (b) directing that the Six Year

Fraudulent Transfers be set aside; (c) recovering Six Year Fraudulent Transfers, or the value

thereof, for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees;

(iv)     On the Fourth Claim for Relief, pursuant to DCL sections 273, 278, and/or

279, sections 544, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the

Trustee is entitled to a judgment against the defendants identified in Exhibit Q: (a) avoiding and

preserving the Six Year Fraudulent Transfers; (b) directing that the Six Year Fraudulent

Transfers be set aside; and (c) recovering the Six Year Fraudulent Transfers, or the value thereof,

for the benefit of the estate of BLMIS;

(v)      On the Fifth Claim for Relief, pursuant to DCL sections 274, 278, and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q: (a) avoiding and preserving the Six Year Fraudulent Transfers; (b) directing the Six Year Fraudulent Transfers be set aside; and (c) recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the state of BLMIS;

(vi)     On the Sixth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q: (a) avoiding and preserving the Six Year Fraudulent Transfers; (b) directing that the Six Year Fraudulent Transfers be set aside; and (c) recovering the Six Year Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(vii)    On the Seventh Claim for Relief, pursuant to CPLR sections 203(g) and 213(8), DCL sections 276, 276-a, 278, and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the defendants identified in Exhibit Q: (a) avoiding and preserving the Full History Fraudulent Transfers; (b) directing that the Full History Fraudulent Transfers be set aside; (c) recovering the Full History Fraudulent Transfers, or the value thereof, for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees;

(viii)   On the Eighth Claim for Relief, pursuant to sections 547(b), 550 and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against defendants Thomas Avellino and Strattham: (a) avoiding and preserving the Preference

Transfers; (b) directing that the Preference Transfers be set aside; and (c) recovering the

Preference Transfers, or the value thereof, for the benefit of the estate of BLMIS;

(ix) On the Ninth Claim for Relief as a result of the avoidance of the Two Year

Fraudulent Transfers, the Six Year Fraudulent Transfers, and/or the Full History Fraudulent

Transfers, and the Preference Transfers, pursuant to CPLR sections 203(g) and 213(8), DCL

sections 273–279, sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, and section

78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Subsequent Transferees

identified in Exhibit Q: (a) recovering the Subsequent Transfers, or the value thereof, for the

benefit of the estate of BLMIS; and (b) recovering attorneys' fees;

(x) On the Tenth Claim for Relief, the Undetermined Customer Claims shall

not be allowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Transfers

are paid to the Trustee;

(xi) On the Eleventh Claim for Relief, the Undetermined Customer Claims,

and any payments, or benefits, of whatever kind or nature, which are asserted or sought by

defendants Strattham and KJA and Subsequent Transferee Defendant Mayfair Bookkeeping

directly or indirectly against the estate and only to the extent such Customer Claims are allowed

– shall be equitably subordinated pursuant to sections 105(a) and 510(c)(1) of the Bankruptcy

Code;

(xii) On the Twelfth, Thirteenth, and Fourteenth Claims for Relief, the Trustee

is entitled to a judgment against the Individual Defendants and the Entity Defendants for

compensatory and punitive damages in amounts to be determined at trial;

(xiii)   On all Claims for Relief, pursuant to federal common law and CPLR sections 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

(xiv)   On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

(xv)   On all Claims for Relief, assignment of income tax refunds received by the defendants identified in Exhibit Q from the United States, state and local governments paid on fictitious profits during the course of the scheme;

(xvi)   Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

(xvii)   Granting the Trustee such other, further, and different relief as the Court

deems just, proper, and equitable.

Date:  December 10, 2010
       New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
Adam J. Smith
Email: ajsmith@bakerlaw.com
Christy Nixon
Email: cnixon@bakerlaw.com
Elizabeth Urda
Email: eurda@bakerlaw.com

By: */s/* David J. Sheehan
    Keith R. Murphy
    Geraldine E. Ponto
    Jonathan Barr
    Jimmy Fokas

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Jonathan Barr
Email: jbarr@bakerlaw.com
Jimmy Fokas
Email: jfokas@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

104