HAILE, SHAW & PFAFFENBERGER, P.A.
660 U. S. Highway One, Third Floor
North Palm Beach, FL 33408
Tel: (561) 627-8100
Fax: (561) 622-7603
Gary A. Woodfield
*Attorneys for Frank Avellino, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                 Plaintiff-Applicant,

     v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                 Defendant.
---------------------------------------------------------x
In re:

BERNARD L. MADOFF,

Debtor.
---------------------------------------------------------x
IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                 Plaintiff,

     v.

FRANK AVELLINO, et al.,

                 Defendants.
---------------------------------------------------------x

Adv. Pro. No. 08-01789 (SMB)

SIPA LIQUIDATION

(Substantively Consolidated)

Adv. Pro. No. 10-05421 (SMB)

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF</u>**
**<u>THEIR MOTION TO DISMISS TRUSTEE'S AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

I.  The Trustee Cannot Seek To Avoid Transfers Other Than Those Made by BLMIS in
This Case ............................................................................................................................ 2

II.  The Court Should Reverse and Decline to Follow the District Court's Decision in
*Cohmad* .......................................................................................................................... 4

III.  The Trustee Lacks Standing to Pursue Claims Piercing the Corporate Veils of the
Entity Defendants ............................................................................................................. 8

IV.  *In Pari Delicto* Bars the Action by the Trustee to Pierce the Corporate Veil of the
Entity Defendants ........................................................................................................... 11

V.  The Trustee Has Failed to Plead Sufficiently Under the *Twombly* Rule 8 Standard or
Under the Heightened Pleading Standard of Rule 9 or as Established by the Rulings of
the District Court ............................................................................................................. 13

VI.  The Trustee Cannot Seek to Avoid Transfers Made More Than Two Years Prior to the
Petition Date as Such Claims are Barred by 11 U.S.C. 546(e) ........................................ 15

VII.  The Trustee Cannot Recover Transfers of Principal to the Defendants as the Trustee
Has Not Alleged the Requisite Lack of Good Faith ........................................................ 20

VIII.  The Trustee Cannot Seek to Avoid any Transfer Which Constituted Compensation to
the Defendants for Services Rendered ............................................................................ 22

IX.  The Transfers Which the Trustee Seeks to Avoid Under New York Debtor and Creditor
Law Fail to State a Claim Upon Which Relief Can be Granted ....................................... 24

X.  Any Alleged Knowledge of Avellino Cannot be Imputed to Mrs. Avellino and Actual
Knowledge of Avellino Cannot be Imputed to the Partnership, to Another General
Partner or a Limited Partner ........................................................................................... 25

XI.  The Trustee's Amended Complaint Fails to State Sufficient Facts to Pierce the
Corporate Veil of the Entity Defendants ........................................................................ 30

XII.  Count Twelve for Equitable Subordination Should be Dismissed .................................. 31

A435.001-1/00313554 v3

XIII.  The Trustee Lacks Standing to Bring These Claims as it May Only Seek to Recover Property of the Debtor and No Such Property Exists ........................................................ 33

XIV.  Any Transfers by the Defendants Between or Among Accounts Owned by the Defendants at BLMIS or Credits to Such Accounts by BLMIS Were Not Transfers of Property of the Debtor and Cannot be Considered Fraudulent Transfers or Preferences Avoidable Under the Bankruptcy Code ............................................................................. 37

CONCLUSION ...................................................................................................................... 40

EXHIBIT A........................................................................................................................... A-1

EXHIBIT B ........................................................................................................................... B-1

A435.001-1/00313554 v3

# TABLE OF AUTHORITIES

**Cases**

*A.R. Baron, Inc. v. D.H. Blair & Company, Inc.*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002) ............ 15

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...................................................................... 39

*Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012) ............................................................ 4

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969 (S.D.N.Y. 1992) ........ 41

*Arizona v. California*, 460 U.S. 605 (1983) ................................................................................ 9

*Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) .................................................... 28

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) ...................................................... 16

*Burrage v. United States*, 134 S. Ct. 881 (2014). .......................................................................... 6

*Butner v. United States*, 440 U.S. 48 (1979) ............................................................................... 46

*Campbell v. Mark Hotel Sponsor, LLC*, 2010 WL 3466020 (S.D.N.Y. Sept. 3, 2010) ................ 27

*Caplin v. Marine Midland Grace Trust of New York*, 92 S.Ct. 1678 (1972) .............. 10, 11, 12, 13

*Celotex Corp. v. Edwards*, 514 US 300 (1995) ............................................................................ 4

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992) ..................................................... 8

*Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla. 1984) ............................................. 37

*Doe v. Dep't of Veterans Affairs*, 519 F.3d 456 (8th Cir. 2008) ................................................... 6

*E.F. Hutton & Co. Inc., v. Hadley*, 901 F.3d 979 (11th Cir. 1990) ............................................. 11

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) ......................................................................................................... 39

*Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995) ..................................................................... 37

*Granite Partners L.P. v. Bear Stearns & Co., Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ........... 41

*Grede v. Fcstone, LLC*, 746 F.3d 244 (7th Cir. 2014) ................................................................... 7

*Harte v. United Benefit Life Ins. Co.*, 66 Cal. 2d 148 (1967) ...................................................... 35

*Harte v. United Benefit Life Ins. Co.*, 66 Cal.2d 148 (1967) ....................................................... 34

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) ....................... 8

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2nd Cir.1995) ................................................ 13

*In re Adler*, 372 B.R. 572 (Bankr. E.D.N.Y. 2007) ................................................................ 18, 34

*In re Bass*, 171 F.3d 1016 (5th Cir. 1999) ................................................................................... 4

*In re Bennet Funding, Group Inc.*, 336 F.3d 94 (2d Cir. 2003) ................................................... 15

*In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011) ................ 14

*In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013) ..................................... 12, 14

A435.001-1/00313554 v3

*In re Bernard L. Madoff Securities LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ....................... 24

*In re Bernard L. Madoff Securities, LLC v. J. Ezra Merkin, et al.*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010) ............................................................................................................................ 47

*In re Bernard L. Madoff Securities, LLC*, 424 B.R. 122, (Bankr. S.D.N.Y. 2010) ..................... 42

*In re Bernstein*, 259 B.R. 555 (Bankr. D.N.J. 2001) ................................................................. 30

*In re Carrozella & Richardson*, 286 B.R. 450 (Bankr. D. Ct. 2002) ........................................ 29

*In re Churchill Mortgage Investment Corp.*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000) ............. 28, 29

*In re Derivium Capital LLC*, 716 F.3d 355 (4th Cir. 2011) .................................................. 46, 48

*In re Empresas Noroeste, Inc.*, 806 F.2d 315 (1st Cir. 1986) ..................................................... 9

*In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991) ............................................................. 39

*In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325 (11th Cir. 2002) ......................... 29

*In re First Commercial Management Group, Inc.*, 279 B.R. 230 (Bankr. N.D. Ill. 2002) ........... 29

*In re Friedlander Capital Mgmt. Corp.*, 411 B.R. 434 (Bankr. S.D. Fla. 2009) ........................ 37

*In re Gaudette*, 241 B.R. 491 (Bankr. D. NH 1999) ................................................................. 11

*In re Gauthier, 349 Fed. Appx. 943 (5th Cir. 2009)* ................................................................. 31

*In re Marketxt Holdings Corp.*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007) ..................................... 32

*In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) .................................................................. 15

*In re Merkin,* 817 F. Supp. 2d 346 (S.D.N.Y. 2011) ................................................................. 23

*In re Miller*, 197 B.R. 810 (W.D.N.C. 1996) ........................................................................... 13

*In re Ogden*, 314 F.3d 1190 (10th Cir. 2002) .......................................................................... 47

*In re Ozark Restaurants*, 816 F.2d 1222 (8th Cir. 1987) .......................................................... 11

*In re Perrone*, 2003 WL 24027465 (Bankr. M.D. La. Dec. 8, 2003) ......................................... 31

*In re Petters Co., Inc.*, 495 B.R. 687 (Bankr. D. Minn. 2013) .................................................. 30

*In re R.H.N. Realty Corp*, 84 B.R. 356 (Bankr. S.D.N.Y. 1988) ............................................... 12

*In re RCS Engineered Products Co., Inc.*, 102 F.3d 223 (6th Cir. 1996) ................................... 11

*In re Sharp Intern. Corp.*, 403 F.3d 43 (2d Cir. 2005) .............................................................. 33

*In re Shattuc Cable Corp.*, 138 B.R. 557 (Bankr.N.D.Ill. 1992) ................................................. 9

*In re US*, 733 F.2d 10 (2d Cir. 1984) ....................................................................................... 10

*Jehly v. Brown*, 327 P.3d 351 (Colo. Ct. Appeals 2014) ........................................................... 34

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115 (Bankr. S.D.N.Y. 2008) ........ 39

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (2003) ................................................ 27

*Kirschner v. Grant Thornton LLP*, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009) ...................... 40

*Koch Refining v. Farmer's Union Cent. Exchange., Inc.*, 831 F.2d 1339 (7th Cir. 1987) ........... 12

A435.001-1/00313554 v3

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ............................................................ 8

*Law v. Seigel*, 134 S.Ct. 1188 (2014) ..................................................................... 7

*Lerner v. Fleet Bank, NA.*, 459 F.3d 273 (2d Cir. 2006) .......................................... 27

*Levinson v. PSCC Services, Inc.*, 2010 WL 5477250 (D. Conn. Dec. 29, 2010) ........................ 33

*Life Receivables Trust v. Syndicate*, 102 at Lloyd's of London, 549 F.3d 210 (2d Cir. 2008) ...... 6

*Lihosit v. I & W, Inc.*, 913 P.2d 262 (N.M. Ct. App. 1996)...................................... 35

*Matter of Reed*, 700 F.2d 986 (5th Cir. 1983) ........................................................ 32

*Matthew v. Unum Life Ins. Co. of Am,* 639 F.3d 857 (8th Cir. 2011)............................... 6

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993).................................... 28

*Mishkin v. Peat, Marwick*, 744 F. Supp. 531 (S.D.N.Y. 1990) ..................................... 45

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F.Supp. 2d 137 (S.D.N.Y. 2010)................. 26

*Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066 (8th Cir. 1995)................ 9

*Newman v. Family Mgmt. Corp.*, 748 F.Supp. 2d 299 (S.D.N.Y. 2010)................................. 25

*Picard v. Grieff*, 476 B.R. 715 (S.D.N.Y. 2012) ...................................................... 18

*Picard v. HSBC Bank PLC*, 134 S. Ct. 2895 (2014)................................................... 12

*Picard v. HSBC Bank PLC*, 454 B.R. 25, 31 (S.D.N.Y. 2011) .................................... 14, 41

*Picard v. JP Morgan Chase & Co.*, 721 F.3d 54 (2d Cir. 2013) .................................... 40

*Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011)............................................... 8, 18, 25, 27

*Pucket v. Hot Springs Sch. Dist. No. 23–2*, 526 F.3d 1151 (8th Cir. 2008) ....................... 6

*Rine & Rine Auctioneers, Inc. v. Myers (In re Rine & Rine Auctioneers, Inc.)*, 74 F.3d 854
    (8th Cir. 1996)................................................................................... 47

*Roberts Real Estate, Inc. v. New York State Dep't of State, Div. of Licensing Servs.*, 80
    N.Y.2d 116 (1992) ............................................................................... 35

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..................................................... 18

*Saltz v. First Frontier, LP*, 2010 WL 5298225 (S.D.N.Y. Dec. 23, 2010)............................ 25, 26

*SEC v. Cohmad Sec. Corp.*, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)................................. 26

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 2013
    WL 1609154 (S.D.N.Y. April 12, 2013) ................................................... passim

*Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities
    LLC, 516 B.R. 18 (S.D.N.Y. April 27, 2014)* ............................................... *passim*

*Securities Investor Protection Corporation v. Bernard L. Madoff Securities LLC*, 513 B.R.
    437 (S.D.N.Y. 2014) ............................................................................. 9

*Securities Investor Protection Corporation v. Grieff*, 476 B.R. 715 (S.D.N.Y 2012)................. 8

A435.001-1/00313554 v3

*Securities Investors Protection Corporation v. Bernard L. Madoff Investment Securities
LLC*, 2014 WL 68779248 (Dec. 5, 2014 Bankr. S.D.N.Y.) ...................................................... 49

*Securities Investors Protection Corporation v. Bernard L. Madoff Investment Securities
LLC*, 499 B.R. 416 (2013) .......................................................................................................... 49

*Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987 (Fla. 4th DCA 1998) .............................. 38

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ............................ 14, 16

*SIPC v. Vigman*, 803 F.2d 1517 (9th Cir. 1986) ........................................................................... 45

*Snook v. Netherby*, 124 Cal. App. 2d 797 (Cal. Dist. Ct. App. 1954) ........................................ 35

*St. Paul Fire v. Pepsico, Inc.*, 844 F.2d 688 (2d Cir. 1988) .................................................. 12, 13

*Steinberg v. Buczynzki*, 40 F.3d 890 (U.S. 7th Cir. 1994) ........................................................... 12

*Steinhardt v. Banks*, 511 So.2d 336 (Fla. 4th DCA 1987) .......................................................... 38

*Stephenson v. Citco Group Limited*, 700 F.Supp. 2d 599 (S.D.N.Y. 2010) ........................... 25, 26

*Stoffels ex rel. SBC Telephone Concession Plan v. SBC Communications, Inc.*, 677 F.3d
720 (5th Cir. 2012) ....................................................................................................................... 9

*Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336 (10th Cir. 1998) .................................................. 46

*Telllabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................................... 26

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) .................................................................... 7

*Trefny v. Bears Stearns Securities Corp.*, 243 B.R. 300 (Bankr. S.D. N.Y. 1999) ..................... 45

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992) ........................ 10

*Weston Funding LLC v. Consorcio G. Groups*, 451 F.Supp 585 (S.D.N.Y. 2006) ..................... 42

*Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988) .................................................. 11

**Statutes**

*11 U.S.C. § 544(b)* ...................................................................................................................... 24

*11 U.S.C. § 546(e)* ................................................................................................................. passim

*11 U.S.C. § 548* ........................................................................................................................... 37

*11 U.S.C. § 548(c)* ................................................................................................................ passim

*11 U.S.C. § 550(b)* ......................................................................................................... 20, 28, 30

*11 U.S.C. § 727(a)(2)(A)* ............................................................................................................ 25

*15 U.S.C. § 78fff(b)* ..................................................................................................................... 36

*15 U.S.C. § 78fff(c)(3)* ................................................................................................................ 38

*15 U.S.C. § 78fff-2(c)(3)* .............................................................................................................. 3

*15 U.S.C. § 78lll(4)* ..................................................................................................................... 35

*15 U.S.C. § 78lll(5)* ....................................................................................................................... 3

A435.001-1/00313554 v3

*28 U.S.C. § 151* ......................................................................................................... 8

*28 U.S.C. § 152(a)(1)* ............................................................................................... 8

**Other Authorities**

*Florida Revised Uniform Partnership Act § 620.8102* ............................................. 29

*New York Debtor & Creditor Law § 276 (McKinney)* ............................................. 27

**Rules**

*New York Civil Practice Law and Rules § 213* ....................................................... 24

A435.001-1/00313554 v3

Defendants[1] submit this memorandum of law in support of their motion, pursuant to

Rules 8, 9, and 12(b)(6), Federal Rules of Civil Procedure (as incorporated by Federal Rules of

Bankruptcy Procedure 7008, 7009 and 7012), to dismiss all counts of the Trustee's Amended

Complaint (the "TAC") for the reasons that follow.[2]

## PRELIMINARY STATEMENT

On December 10, 2010, Irving H. Picard, as trustee (the "Trustee") for the liquidation of

the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") commenced this

adversary proceeding with the filing of a fourteen count, 346 paragraph Complaint against Frank

Avellino ("Avellino"), his immediate and extended family, various family and related entities

(collectively, the "Avellino Defendants") as well as others.   On June 6, 2011, the Avellino

Defendants moved both to dismiss the Complaint and to withdraw the reference.   On March 6,

2012, Judge Jed S. Rakoff entered an order withdrawing the reference in this and a number of

other adversary proceedings to decide the issues identified in his order.   After ruling on these

issues, on April 27, 2014, Judge Rakoff entered an order returning this adversary proceeding to

this court.   On September 24, 2014, the Avellino Defendants filed a Supplemental Memorandum

in Support of Their Motion to Dismiss. Rather than respond to the motion to dismiss, on

November 24, 2014, the Trustee filed the TAC, which the Defendants now move to dismiss as to

all counts.

## INTRODUCTION

Although unnecessary to recite the underlying facts of the Madoff Securities fraud and

---

[1] The Defendants include Frank Avellino, his wife, Nancy Avellino, their families, family trusts, charitable foundation and certain other entities in which they have an interest, all of whom are identified in Exhibit A attached hereto.

[2] On June 6, 2011, Defendants filed their Motion to Dismiss and supporting Memorandum of Law [D.E. 23-27]. On September 24, 2014, the Defendants filed their Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint. [D.E. 82] This Memorandum supplements Defendants' initial and supplemental memoranda and is not a waiver of any of the arguments raised therein.

A435.001-1/00313554 v3

ensuing bankruptcy, as courts have repeatedly noted, this case is not a bankruptcy case, per se, but rather a liquidation of a brokerage firm pursuant to the Security Investors Protection Act ("SIPA").  This distinction is significant, as the purpose of SIPA is the protection of customers, whereas, under the Bankruptcy Act, the objective is the protection of the interests of the creditors in an attempt to either reorganize the Debtor under Chapter 11 or liquidate the debtor under Chapter 7. If there is a conflict between the Bankruptcy Act and SIPA, the Bankruptcy Act must yield.  As a consequence of this being a proceeding under SIPA, Judge Rakoff and other courts have made rulings regarding the interplay of SIPA and the bankruptcy code, which require dismissal of the TAC.

The TAC seeks to recover over $900 million from Frank Avellino, other Individual Defendants (as defined in ¶¶ 30-31, 57)[3] certain Entity Defendants (¶¶ 58-60), (the "Subsequent Transferee Defendants"), and twenty-nine additional individuals and entities asserting claims for intentional and constructive fraudulent transfers under sections 548(a)(1)(A) (Count One) and (B) (Count Two) of the Bankruptcy Code, and state law (Counts Three through Seven and Nine), preferential transfer (Count Eight), disallowance of customer claims (Count Ten), equitable disallowance of claims (Count Eleven), equitable subordination of customer claims (Count Twelve), and general partner liability (Count Thirteen).[4] For the reasons set forth herein, the TAC should be dismissed.

## ARGUMENT

## I.   THE TRUSTEE CANNOT SEEK TO AVOID TRANSFERS OTHER THAN THOSE MADE BY BLMIS IN THIS CASE

Jurisdiction and standing in this case stem from the provisions of SIPA.  As alleged in the

---

[3] Citations in parentheses are to paragraphs of the TAC.
[4] Pursuant to a stipulation and order dated September 19, 2011, Counts Twelve, Thirteen and Fourteen of the original Complaint, which asserted common law claims of conversion, unjust enrichment and money had and received, were dismissed for lack of standing.

TAC, SIPC filed an application in the District Court pursuant to § 78eee(a)(4)(B) of SIPA alleging that BLMIS was not able to meet its obligations to its customers and the customers needed protection under SIPA (¶ 90).   The district court appointed a Trustee for the liquidation of BLMIS pursuant to § 78eee(b)(3) of SIPA and removed the case to bankruptcy court pursuant to § 78eee(b)(4) of SIPA. Thus, before the Court is the liquidation of BLMIS, a New York Limited Liability Company formed in 2001, a member of SIPC, and a debtor under SIPA.

15 U.S.C. § 78lll(5) defines the term debtor as follows:

> The term "debtor" means a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title or a direct payment procedure has been instituted under section 78fff-4(b) of this title. (emphasis supplied).

What is not before the Court, nor can the Trustee take any action in regard thereto, are the activities of Madoff during the time period he acted as a sole proprietorship which the TAC alleges begin in 1960 (¶ 102).   The sole debtor before this Court is BLMIS.   No other debtor exists.   In turn, the only customer property the Trustee may seek to avoid, is that of a debtor, as defined in SIPA, i.e., BLMIS.   This is because the Trustee only has those powers granted by SIPA.   The power to avoid fraudulent transfers and preferences is granted by § 78fff-2(c)(3):

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11. Such recovered property shall be treated as customer property...

15 U.S.C. § 78fff-2(c)(3) (emphasis supplied).

Indeed, the first sentence of the TAC identifies the Trustee as "trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC".   Therefore, any transfers made prior to 2001 are not within the power of the Trustee to avoid, nor within the jurisdiction of

3

this Court to adjudicate. There has been no protective decree sought as to any entity other than

BLMIS and there are no other debtors before the Court. It is only the liquidation of the limited

liability company formed in 2001, which is before this Court.

A court only has that jurisdiction which is granted to it by statute. *Al-Zahrani v.

Rodriguez,* 669 F.3d 315, 317 (D.C. Cir. 2012) (federal courts are courts of limited subject-

matter jurisdiction; a federal court created by Congress pursuant to Article III of Constitution has

power to decide only those cases over which Congress grants jurisdiction). A bankruptcy court's

jurisdiction is even more circumscribed and is wholly "grounded in and limited by statute." *In re

Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999), *citing Celotex Corp. v. Edwards*, 514 US 300, 307

(1995). In this case, the District Court's referral under SIPA is limited to the liquidation of the

debtor for whom the protective decree was sought in the district court, that is BLMIS, and for no

other purpose. Consequently, all counts invoking the Trustee's power under SIPA and the

bankruptcy code seeking to avoid transfers made by any person or entity other than BLMIS must

be dismissed.

## II.     THE COURT SHOULD REVERSE AND DECLINE TO FOLLOW THE DISTRICTS COURT'S DECISION IN *COHMAD*

The District Court in *Securities Investor Protection Corp. v. Bernard L. Madoff

Investment Securities LLC,* 2013 WL 1609154 (S.D.N.Y. April 12, 2013) ("*Cohmad*") held that

an initial transferee and a subsequent transferee of an alleged fraudulent transfer or any

subsequent transfer would not be afforded the safe harbor protection of 11 U.S.C. § 546(e) if the

Trustee had plead facts that the initial transferee had "actual knowledge of Madoff Securities

fraud". *Cohmad* at *1. The District Court reasoned that if the defendants had knowledge of

Madoff's fraud, their signing of account statements was meaningless as in respect of the

application of 546(e) and their receipt of payments would be known to them as not being

legitimate payments protected by 546(e). The District Court then reasoned that as a matter of public policy the safe harbor could not apply on the grounds that the purpose of SIPA was to prevent the disruption of the securities markets in the event of a major bankruptcy in the securities markets. The District Court further concluded that the goal of SIPA was best served by meeting the reasonable expectations of an investor who believed they were signing a securities contract. A person with knowledge of Madoff's Ponzi scheme did not have such expectations. As the District Court stated: "Neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors." *Cohmad* at *4.

The District Court's ruling in *Cohmad* is clearly erroneous. It violates the most basic principles of statutory construction and grafts unto 546(e) the District Court's policy views of the application of 546(e) and SIPA which is not within the purview of a court. Only Congress can make public policy. A court's sole role is to interpret the text of statutes promulgated by Congress. "[W]hen statutes are straightforward and clear, … policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative." *Pucket v. Hot Springs Sch. Dist. No. 23–2,* 526 F.3d 1151, 1159 (8th Cir. 2008); *Matthew v. Unum Life Ins. Co. of Am,* 639 F.3d 857, 867 (8th Cir. 2011). "A statute's clear language does not morph into something more just because courts think it makes sense for it to do so." *Life Receivables Trust v. Syndicate 102 at Lloyd's of London,* 549 F.3d 210, 216 (2d Cir. 2008) "The role of [a court] is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.' " *Commissioner v. Lundy quoting Burrage v. United States,* 134 S. Ct. 881, 892 (2014). A court's role is "to interpret and apply statutes as written, for the power to redraft laws to implement policy changes is reserved to the legislative branch." *Doe v. Dep't of Veterans*

5

*Affairs,* 519 F.3d 456, 461 (8th Cir. 2008). "Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978).

The Seventh Circuit Court of Appeals recently refused to engraft unto 546(e) an exception based on public policy for these very reasons. *Grede v. Fcstone, LLC*, 746 F.3d 244, 253-4 (7th Cir. 2014) (district court's holding based on equitable considerations ran directly contrary to the public policy choices of Congress reflected in the broad language of 546(e) and could not be followed "however powerful they may be in a particular case"). In *Grede*, the strict application of 546(e) resulted in an extremely inequitable division of the estate's assets to its creditors, which the Seventh Circuit refused to alter, strictly applying the safe harbor of 546(e). *Grede* based its holding on a recent United States Supreme Court case, *Law v. Seigel*, 134 S.Ct. 1188 (2014), which held that the inherent equitable powers of the bankruptcy court cannot overrule the express provisions of the bankruptcy code enacted by Congress. The *Seigel* Court held that inequitable results from application of the express provisions of the bankruptcy code reflected a balance struck by Congress, and it "is not for the Court's to alter that balance struck by the statute". Such power lies exclusively within the purview of the Congress. *Seigel* at 1197-98.

In *Cohmad* the District Court also ignored the most fundamental rules of statutory

A435.001-1/00313554 v3

construction[5].  When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete." *Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992).  Here the text of 546(e) is clear on its face.  It already provides a specific exception to those fraudulent transfers that meet the standard of 548(a)(1)(A) and no others.  "'[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' "*Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (*quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, (2000). The District Court's holding that a person is not entitled to the protection of 546(e) if he had actual knowledge of Madoff's fraud is not found in the clear and precise language of the statute.  To add such an exception goes beyond the power of the court and the principles of statutory construction.

This Court should refuse to follow *Cohmad*, but rather modify it, as it is permitted to do under Rule 54(b). An order on a motion to dismiss is considered an interlocutory order subject to review under Rule 54(b). *See e.g. In re Empresas Noroeste, Inc.*, 806 F.2d 315, 317 (1st Cir. 1986).  A court possesses the inherent power to reconsider an interlocutory order for any reason it deems sufficient. *See e.g., Stoffels ex rel. SBC Telephone Concession Plan v. SBC Communications, Inc.,* 677 F.3d 720, 726–28 (5th Cir. 2012).  Also a second district court judge assigned to a case has the power to modify an interlocutory order of the prior judge. *See, e.g., Stoffels* at 728 (when successor judge replaces another judge, new judge has same discretion as

[5] The District Court's ruling is especially noteworthy in that the court refused to find an "illegal conduct exception" to 546(e) in the context of a Ponzi scheme, as advocated by the Trustee, first, in *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011) and then again in *Securities Investor Protection Corporation v. Grieff*, 476 B.R. 715 (S.D.N.Y 2012). In both instances the District Court refused to find an exception where the express text of 546(e) did not contain any such exception. The District Court held that "[i]n any event, resort to legislative history is inappropriate where, as here, the language of the statute is clear on its face. [C]ourts must presume that the legislature says in a statute what it means and means in a statute what it says." *Katz* at 452 *citing Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992). The District Court concluded that "[i]ndeed to deviate from what Congress has clearly and constitutionally decreed is a power the judiciary does not possess." *Id.*

A435.001-1/00313554 v3

prior judge to reconsider first judge's rulings)[6].

## III.    THE TRUSTEE LACKS STANDING TO PURSUE CLAIMS PIERCING THE CORPORATE VEILS OF THE ENTITY DEFENDANTS

The Trustee has no standing to pursue an action for piercing the corporate veil as such action belongs to the creditors of the debtor and not the debtor itself.

It is without question that a trustee in bankruptcy can only sue on behalf of the debtor and not on behalf of or under an action accruing to the creditors of the debtor.  The seminal case on this point is *Caplin v. Marine Midland Grace Trust of New York*, 92 S.Ct. 1678 (1972) where the United States Supreme Court was faced with the question of who was the proper party under the prior bankruptcy act then in effect to sue an indenture trustee for malfeasance; the creditors or the trustee. The Supreme Court concluded that the trustee lacked standing to sue because nowhere in the statutory scheme was there a provision that the trustee assumed the obligation to sue third parties on behalf of indenture holders. *Id.* at 1685.   Second, the Supreme Court

---

[6] The only limitation on this Court's power to modify the ruling in *Cohmad* would be under the limiting principles of *stare decisis* or law of the case.  Neither apply in this instance.  *Stare decisis* does not apply because bankruptcy courts are not inferior to district courts and are not required to follow their rulings. *See e.g., In re Shattuc Cable Corp.,* 138 B.R. 557, 564 (Bankr.N.D.Ill. 1992). Pursuant to 28 U.S.C. § 151, a bankruptcy court "shall constitute a unit of the district court to be known as the bankruptcy court for that district." Bankruptcy judges serve as "judicial officers of the United States District Court." pursuant to 28 U.S.C. § 152(a)(1). Thus, a bankruptcy court is not "inferior" to a district court in its district; it is itself a division of and therefore an equal to a district court in its district. Consequently the doctrine of *stare decisis* does not preclude a bankruptcy court's reconsideration of an interlocutory order entered by another district court or bankruptcy court. Nor does law of the case bar this Court's reconsideration of *Cohmad.*  The law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment. *Arizona v. California,* 460 U.S. 605 (1983). As Judge Rakoff himself has written, the law of the case doctrine is "a discretionary rule of practice and generally does not limit a court's power to reconsider an issue".  *Securities Investor Protection Corporation v. Bernard L. Madoff Securities LLC*, 513 B.R. 437, 441 (S.D.N.Y. 2014). Several circuits have held that law of the case does not apply to interlocutory orders, but rather only to final judgments. *See, e.g., Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066 (8th Cir. 1995). Although the Second Circuit jurisprudence has been less than clear as to whether law of the case is applicable only to final judgments or rather to all interlocutory orders up to final judgment. *Compare In re US*, 733 F.2d 10 (2d Cir. 1984) *with Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992), even where applicable to non-final judgments, law of the case does not apply if there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Thus, assuming a more restrictive reading of Second Circuit precedent related to the application of law of the case, the holding in *Cohmad* creating an "actual knowledge" exception to application of the safe harbor of 546(e) is clear error and would cause manifest injustice to the Defendants who may be required to forfeit hundreds of millions of dollars due to an erroneous application of the law.

A435.001-1/00313554 v3

concluded that nowhere had the trustee alleged that the debtor could make any claim against the indenture trustee. *Id*. at 1686. At best, the complaint alleged a situation where the parties were *in pari delicto* and thus the petitioner would be barred. *Id*. Lastly, the Court concluded that there would be a risk of inconsistent results if the Court allowed the Trustee to assert standing as the statutory framework did not prohibit future actions by independent debenture holders.

As held in *In re Ozark Restaurants*, 816 F.2d 1222, 1228 (8th Cir. 1987) in adopting the holding of *Caplin*, the court stated "we believe Congress's message is clear-no Trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee as in the present case has power under Section 544 of the Code to assert general causes of action, <u>such as the alter ego claim</u>, on behalf of the bankrupt estate's creditors." *Ozark* at 1228 (emphasis supplied). In part, the reasoning in *Ozark* was a result of the fact that Congress had considered an amendment to Section 544 to overrule *Caplin*, but rejected it. *Id*. *See also, Williams v. California 1st Bank*, 859 F.2d 664, 667 (9th Cir. 1988) (We agree with the Eighth Circuit that Congress' express decision not to overrule *Caplin* is "extremely noteworthy."); *In re RCS Engineered Products Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996); ("the general rule is that piercing corporate veil is only for benefit of third party and never for the benefit of its stockholders or the corporation" and is therefore not property of the estate); *E.F. Hutton & Co. Inc., v. Hadley*, 901 F.3d 979 (11th Cir. 1990) (trustee has no standing to pursue claims of debtor's customer creditors). *In re Gaudette*, 241 B.R. 491 (Bankr. D. NH 1999) (criticizing courts allowing alter ego action to continue in violation of standing requirement); *In re R.H.N. Realty Corp*, 84 B.R. 356 360 (Bankr. S.D.N.Y. 1988) (the corporate veil is never pierced for the benefit of the corporation debtor; a trustee simply does not have standing to bring an alter ego claim on behalf of the debtor's creditors").

The Second Circuit, in the context of the Trustee's attempts to assert claims of creditors

in the Madoff case has rejected those attempts, emphatically endorsed the holding in *Caplin* and

rejected the holding in *St. Paul Fire v. Pepsico, Inc.* 844 F.2d 688 (2d Cir. 1988) to the contrary.

*In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013) *cert. denied sub nom. Picard*

*v. HSBC Bank PLC*, 134 S. Ct. 2895, 189 L. Ed. 2d 832 (2014)("HSBC").[7]  In *St. Paul Fire*, the

Second Circuit held that an alter ego claim did belong to the trustee because he was seeking to

remedy a generalized injury to all creditors and that the bankruptcy code authorized the trustee to

pursue such claims for benefit of all creditors and deprive creditors in their own right of pursuing

such claims  The Court stated:

> It is plain from this passage that Congress intended to protect all creditors by
> making the trustee the proper person to assert claims against the debtor. This
> reasoning extends to common claims against the debtor's alter ego or others who
> have misused the debtor's property in some fashion. If a claim is a general one,
> with no particularized injury arising from it, and if that claim could be brought by
> any creditor of the debtor, the trustee is the proper person to assert the claim, and
> the creditors are bound by the outcome of the trustee's action. (citation omitted)

> Although the claims raised by *PepsiCo* are not against the debtor but are against a
> third party, the same reasoning applies. The claims, if proved, would have the
> effect of bringing the property of the third party into the debtor's estate, and thus
> would benefit all creditors.

*St. Paul Fire* at 701.[8]

The holding of *St. Paul Fire* was summarily rejected in *HSBC* where the Court found that

the trustee had no standing to bring actions against third parties for the benefit of creditors of the

---

[7] By implication the Second Circuit's holding in *HSBC* is a rejection of the holdings of other courts which followed similar reasoning to *St. Paul.  See e.g. Koch Refining v. Farmer's Union Cent. Exchange., Inc.*, 831 F.2d 1339 (7th Cir. 1987), which has been called into question by the 7th Circuit itself in *Steinberg v. Buczynzki*, 40 F.3d 890, 893 (U.S. 7th Cir. 1994) (distinction between personal claims and general claims is "not an illuminating usage"; trustee is confined to enforcing entitlements of the debtor corporation and has no right to enforce the entitlements of a creditor).

[8] As discussed infra, in Paragraph II of this Memorandum, and as noted in *In re Miller*, 197 B.R. 810, 815 (W.D.N.C. 1996) "it is difficult to reconcile *St. Paul* with *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2nd Cir. 1991)  where the Court, relying on *Caplin,* held that the bankruptcy trustee for the debtor (HMK) did not have standing to assert claims for dissipation of corporate funds and what seems the equivalent of an alter ego claim against Shearson because those claims belonged to the creditors of HMK, or the Court's later decision in *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092–94 (2nd Cir.1995), where the Court held that the trustee for the debtor did not have standing to pursue claims of investors in the limited partnerships managed by the debtor against the debtor's accounting firm".

A435.001-1/00313554 v3

estate and that such common law claims were barred by the doctrine of *in pari delicto*.  The

Court stated that the "decisive" issue is whether the trustee had the right to pursue common law

claims on behalf of customers. *Id*. at 58. The Court held that the holding in *St. Paul Fire* was

limited to the specific question of whether a creditor can bring an alter ego claim against the

debtor's parent when the debtor also possesses such claim. In *HSBC*, as here, the trustee sought

to assert claims that are property only of the customer, not of the debtor.  Thus, *St. Paul Fire*

was limited to its facts and did not alter the prior precedent and holding of *Caplin* that a "trustee

may not assert a claim against third parties." *Id.* at 70.

As noted by the District Court in *HSBC*, if SIPA empowered the trustee to bring common

law claims "then there would be no need for SIPA to expressly authorize the trustee to recover

customer property by bringing avoidance actions. Yet the only provision in SIPA that actually

discusses how the trustee is permitted to go about recovering customer property provides the

trustee with the authority to bring avoidance claims, not common law claims." *Picard v. HSBC

Bank PLC*, 454 B.R. 25, 31 (S.D.N.Y. 2011) *amended sub nom, In re Bernard L. Madoff Inv.

Sec. LLC*, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011) and *aff'd sub nom. In re Bernard L.

Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013) and *aff'd sub nom*.

Therefore, the Trustee lacks standing to bring any action to pierce the corporate veils of

the Entity Defendants to recover alleged fraudulent conveyances from the constituent principals

of the Entity Defendants.

## IV.   *IN PARI DELICTO* BARS THE ACTION BY THE TRUSTEE TO PIERCE THE CORPORATE VEIL OF THE ENTITY DEFENDANTS

Under *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), the

Trustee is barred from bringing these actions on behalf of "defrauded" customers of BLMIS.

Under the holding of *Wagoner* and its progeny, where the debtor engages in fraudulent activity,

the trustee is barred from asserting claims against third parties, as the trustee stands in the shoes of the debtor. The Court in *Wagoner* held that the claim did not belong to the bankruptcy estate, but rather to its creditors, holding, "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* The Court then went on to discuss the second basis for dismissing the action. The Court held that the claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not the guilty corporation. *Id.* at 118. *See also, In re Bennet Funding, Group Inc.*, 336 F.3d 94 (2d Cir. 2003); *In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) (creditors committee analogous to trustee and had no standing to bring claim against third parties, such claims belonging to creditor, not debtor).

*A.R. Baron, Inc. v. D.H. Blair & Company, Inc.*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002), is a case analogous to the current situation, in which case the Court barred the trustee from bringing claims against third parties on behalf of the customers of a SIPC member in liquidation and applied the *Wagoner* rule; holding that the "[c]onstitution limits the judicial power of federal courts to deciding cases or controversies." *Id.* at 799. The Court in *A.R. Baron* then went on to conclude, that absent the trustee pleading that there was an existence of an innocent insider that could have prevented the fraud, the wrongdoing would be imputed to the debtor, and the trustee was barred from bringing its claims. The same facts as in *A.R. Baron* exist in this case. As pled by the Trustee, BLMIS was owned one hundred percent by Madoff and the fraud was his doing, at his direction and within his complete control.

The instant case is on all fours with *Wagoner*. Here the Trustee has pled that Madoff owned, controlled and orchestrated a massive fraud victimizing thousands of investors. The

TAC now seeks to pursue a common law claim of piercing the corporate veil against the Entity

Defendants. The Trustee cannot now attempt to assert legal claims, as he is barred from bringing

any such claims.[9] Thus, it is without question that using the common law principal of piercing

the corporate veil of the Entity Defendants seeking personal liability against the constituent

owners of the Entity Defendants for alleged fraudulent conveyances (*See e.g.*, Count One)

brought by the Trustee on behalf of the customers of BLMIS, are barred by *Wagoner* and should

be dismissed.

## V. THE TRUSTEE HAS FAILED TO PLEAD SUFFICIENTLY UNDER THE *TWOMBLY* RULE 8 STANDARD OR UNDER THE HEIGHTENED PLEADING STANDARD OF RULE 9 OR AS ESTABLISHED BY THE RULINGS OF THE DISTRICT COURT

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), sets forth the required

standard and procedure for analyzing the sufficiency of a complaint when considering a motion

to dismiss under Rule 12(b)(6). The standard is well known and does not require repeating. It

was aptly summarized by this Court in *Merkin II, infra* at p. 137-8.

Moreover, Judge Rakoff's decisions impose specific heightened pleading standards on

the Trustee. As to Section 546(e), to prevent application of the safe harbor, the Trustee must

allege actual knowledge on the part of the Defendants "which must show at a minimum that the

transferee had actual knowledge that there were no actual securities transactions being

conducted" or had "actual knowledge" that BLMIS was a Ponzi scheme. *Cohmad* at *4. As to

---

[9] There can also be no question, that based on the pleadings, none of the exceptions to the *Wagoner* holding and its progeny apply, as the Trustee has pled that BLMIS was owned 100% by Madoff, and that the activities of BLMIS were dominated by him and orchestrated by him and thus the Sole Actor rule applies which would void any application of the Adverse Interest Exception. The Adverse Interest Exception applies when those acting on behalf of the company have totally abandoned their duty to the company and are acting solely in their own interest. This is a narrow exception. *In re Mediators, Inc.* 105 F.3d at 827. This exception however, is not applicable where the company is owned 100% by the person who is perpetuating the fraud. *Id.* This is the case, as pled by the trustee, i.e. BLMIS was owned and controlled 100% by Madoff. In addition, paragraph 102 of the TAC alleges that until 2001 BLMIS was operated as a sole proprietorship by Madoff, the epitome of a sole actor. Therefore, the *Wagoner* rule applies.

A435.001-1/00313554 v3

the question whether the Defendants acted in "good faith' under sections 548(c) and 550(b) providing a defense to shield transfers and subsequent transfers to the Defendants, the Trustee must plead either that the Defendants had "actual knowledge of the Madoff Securities fraud" or "willfully blinded himself to circumstances indicating a high probability of such fraud." *Good Faith Decision infra* at 23.  "Without particularized allegations that the defendants here either knew of Madoff Securities' fraud or willfully blinded themselves to it, the Trustee's complaints here cannot make out a plausible claim that he is entitled to recover the monies defendants received from their securities accounts." *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 516 B.R. 18, 24 (S.D.N.Y. April 27, 2014) (the "*Good Faith Decision*"); *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011).  The motion to dismiss should be granted when, as here, defendants can show that, "on the face of the complaint[s], they can invoke the affirmative defense provided by § 548(c)." *Good Faith Decision* at *5; *Picard v. Grieff*, 476 B.R. 715, 723 (S.D.N.Y. 2012).

As most of the causes of action sound in fraud, i.e., they primarily seek the avoidance of transfers by BLMIS because of their fraudulent nature under both federal and state laws, the fraud must be alleged with particularity. *See, e.g. In re Adler*, 372 B.R. 572, 581 (Bankr. E.D.N.Y. 2007).  They are not. The TAC, no matter what the causes of actions are labeled, is premised on a claim of constructive or actual fraud committed by the Defendants.  Such claims alleging fraudulent conduct or misconduct must satisfy the heightened pleading requirements of Rule 9(b).  Under Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  F.R.C.P. Rule 9(b).  Rule 9(b) applies to "all averments of fraud" regardless of the labeling of the cause of action.  *Id.*  "This wording is cast

in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). As a consequence, because the Trustee's allegations in the TAC are essentially a claim of fraud by the Defendants, they must be pled with particularity in accordance with Rule 9(b)'s requirements. The TAC's conclusory allegations fall far short of meeting the pleading required by *Twombly*.

Thus, the TAC fails to meet the pleading requirements of both Rule 8 and Rule 9 and should be dismissed. The TAC is a jumble of conclusory allegations and inconsistent factual allegations, none of which would plausibly entitle the Plaintiff to relief. Indeed, the conflicting allegations of the TAC moot the causes of action and they fail to meet the plausibility test. Thus, even taking the pleadings on their face, and putting aside their conclusory nature, accepting the facts as true as required at this pleading stage, the Trustee is not entitled to the relief it requests, such claims having failed to state a cause of action upon which relief can be granted.

## VI.    THE TRUSTEE CANNOT SEEK TO AVOID TRANSFERS MADE MORE THAN TWO YEARS PRIOR TO THE PETITION DATE AS SUCH CLAIMS ARE BARRED BY 11 U.S.C. § 546(e)

Pursuant to *Cohmad*, the decision in *Katz* and the safe harbor of § 546(e), the Trustee cannot seek to avoid fraudulent transfers or preferences other than transfers made within two years prior to the petition date pursuant to § 548 (a)(1)(A). To eliminate the safe harbor, "[A]t a minimum" the Trustee must show that the Defendants "had actual knowledge that there were no actual securities transactions being conducted by BLMIS," *Cohmad* at *4 and actual knowledge

that BLMIS was a Ponzi scheme.[10] *Id.* at *3. The requirement of actual knowledge applies as well to subsequent transferees. *Id.* at *7. The TAC fails to allege that the Defendants or the Entity Defendants, as initial or subsequent transferees, had actual knowledge that BLMIS was a Ponzi scheme or that there were no actual securities transactions being conducted by BLMIS and therefore Counts Two through Nine of the TAC must be dismissed.

An examination of the TAC reveals this to be true. The TAC is divided into two periods of time. Paragraphs 115 through 177 detail allegations relating to events that occurred in 1992 and 1993 relating to the investment in BLMIS by Avellino and Bienes, alleged to be a partnership registered in Florida ("A&B") and an SEC enforcement action relating to those investments.[11] The TAC alleges that Avellino and A&B raised funds from other investors and in turn invested those funds with BLMIS. (¶ 116). In exchange for raising funds from its investors and investing them in BLMIS, certain Defendants were paid a percentage of the principal amount placed with BLMIS and a fixed rate of return by BLMIS. (¶ 119).

The TAC further alleges that A&B was ultimately closed as a result of an SEC enforcement action claiming that A&B was selling unregistered securities and acting as an unregistered investment adviser. (¶ 126). Pursuant to a consent decree, A&B closed and the money repaid to the A&B investors. (¶ 172). Nowhere in the TAC does it allege that the SEC accused any of the Defendants of committing fraud. The TAC alleges that BLMIS with the knowledge and assistance of Avellino defrauded the SEC in its investigation of A&B by

---

[10] The Defendants' motion to withdraw the reference regarding the application of Section 546(e) was granted by the District Court. Due to the large number of defendants in other adversary proceedings who moved to withdraw the reference on the same grounds, the District Court consolidated the cases and ordered that a single brief be filed on behalf of all the defendants as it related to the application of 546(e), as well as other common issues involved in the proceedings. If Defendants had submitted their own brief, they would have argued as they have in Section II, that an actual knowledge exception to 546(e) is improper.

[11] As noted in Part I of this Memorandum, any transfer or interaction with a party other than the Debtor does not give rise to liability under SIPA, rendering the activities of Defendants prior to 2001 irrelevant for purposes of this TAC.

A435.001-1/00313554 v3

preparing and submitting false documentation to cover up a shortfall of funds between the amount A&B owed its investors and the amount BLMIS had on account for A&B. (¶¶ 152-169). However egregious the activities were of Avellino relating to the SEC investigation, one cannot make a plausible inference that Avellino knew that Madoff was engaged in a Ponzi scheme or was not engaged in actual securities transactions. It may have put him on inquiry notice that something was amiss, but as the District Court held in *Cohmad*, the highest of thresholds must be met; that there was actual knowledge of the Ponzi scheme and that no actual securities transactions were being conducted. Inquiry notice is insufficient. *Cohmad* at *4, f.n. 2. The TAC fails to meet this heightened pleading standard.

The second portion of the TAC relates to the time period from 1992-1993 until the demise of the Madoff Ponzi scheme and the actions of Avellino and Thomas Avellino during that time period. (¶¶ 178 to 291). The TAC alleges that the events that occurred in 1992 and 1993 should have caused Defendants to know that Madoff and BLMIS were conducting a Ponzi scheme and that the alleged knowledge from 1993 should have lasted for some twenty years as to each and every transaction with BLMIS and Madoff. The TAC attempts to frame the ensuing relationship between Avellino and BLMIS as one that equates to actual knowledge of the Ponzi scheme and knowledge that no actual securities transaction were occurring, but fails to do so.

The TAC goes to great lengths to describe the arrangement between Avellino and Thomas Avellino, certain of the Entity Defendants and BLMIS for compensation to them for placing money of other investors with BLMIS. (¶¶ 208-242). As noted below, such activities and payments are not fraudulent (and just as important, there are no allegations of what the supposed fraud was as required by Rule 9) and in fact are protected as payment of antecedent debts under Section 548(c). In addition, none of these allegations provide the necessary allegations of actual

knowledge of the Ponzi scheme or that no actual securities were being traded.  For example, the Trustee complains about the so called fraudulent side payments and guaranteed returns and that the receipt of these payments is proof that "each of the Defendants knew Madoff was operating a fraud." (¶ 222).  Similarly, the TAC alleges that the consistent returns were not plausible and the payments they received through supposedly fraudulent non-hedged transactions placed into their BLMIS accounts by BLMIS also was evidence of fraud and did not represent actual trades. (¶ 218). Again, how do these allegations present a plausible inference to make the conclusion that the Defendants had actual knowledge of the Ponzi scheme?  The Trustee also contends that the interaction between BLMIS and Avellino in calculating the returns due them, the so called "Schupt" process, caused Avellino to have actual knowledge of the fraud and that no actual securities transactions were being conducted. (¶¶ 225-242). What the allegations actually show is one party, Avellino, attempting to reconcile the contractual amounts promised him and the actions taken by BLMIS to fulfill those promises.  This is hardly sinister.

Lastly, the TAC alleges that various trading anomalies caused Avellino to have actual knowledge that BLMIS was a Ponzi scheme.  These included trading volumes outside the range of the total volume of the type of security traded and trading of securities outside of their price range.  As held in *Katz*, a customer has no duty to inquiry of his broker. Avellino was entitled to believe that the entries on his account statement were true and accurate.  What the Trustee is advocating is, once again, a duty to inquire.

It is also significant that the Trustee never alleges the date that BLMIS and Madoff begin their Ponzi scheme.  This is a crucial fact that must be pled.  If the Ponzi scheme began after the closing of A&B, the allegations as to the actions that occurred in 1992 and 1993 have no bearing or relevance to this case and whether or not Avellino had actual knowledge.  Simply put, the

18

TAC fails to make plausible factual allegations that the Defendants had actual knowledge of the Ponzi scheme and that no actual securities were being traded.

Taking the TAC in the best light for the Plaintiff, the Defendants were ignorant of facts of which they should have been aware. At best the TAC paints a picture of ignorance, not actual knowledge. Throughout the TAC, the Trustee alleges that the Defendants knew or should have known that Madoff and BLMIS were engaged in a fraud. However, at the same time the Trustee has alleged that Mr. Madoff and Mr. DiPascali went to great lengths to conceal their fraud, that Madoff and BLMIS engaged in creating false account statements and fictitious trades so as to fool its investors, and that this scheme continued for some twenty years, at a minimum. (¶¶ 102-112). The TAC's allegations are inconsistent and not plausible. At the allocutions of Mr. Madoff and Mr. DiPascali in their criminal proceedings, they admitted the steps they took to conceal the fraud. (See Section XIII herein). The Trustee cannot allege that Madoff and BLMIS masterminded a scheme lasting decades, and yet make conclusory allegations that the Defendants possessed some special power, expertise or knowledge to uncover what thousands of others including the government did not uncover. This is the very definition of implausible. *In re Merkin*, 817 F. Supp. 2d 346, 356 (S.D.N.Y. 2011) recognized that it "is now well-established that Madoff cleverly leveraged his considerable reputation in order to perpetrate his massive fraud, for many years, without detection by some of the most sophisticated entities in the financial world: the SEC, Wall Street banks, and the like. The list of victims that failed to detect Madoff's fraud is lengthy." *Id.* at 356. As the *Merkin* Court would "not recognize a § 10(b) claim against those who did business with Madoff, simply by imputing the suspicions of a few (albeit, wise) people who suspected Madoff's fraud before it was ever discovered," *Id.*, nor should this Court conclude that the facts alleged in the TAC state a plausible cause of action

based upon the facts pled. *Twombly* at 570.

The allegations contained in the TAC are far less telling than those alleged in the complaint in *In re Bernard L. Madoff Securities LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*"), leading this Court to find them inadequate to show that the Defendants had actual knowledge. In *Merkin II*, Merkin expressed concern to others that Madoff was running a Ponzi scheme, was told by others of the same concerns, and continually commented that Madoff was a Ponzi scheme. Merkin also knew that the volume of alleged trading of options was impossible and exceeded the actual daily volume. *Id*. at 129-130. Merkin was told that Madoff returns were too consistent and "just not possible". *Id*. at 129. These allegations are far more telling of a person with actual knowledge, but this Court found that such allegations did not rise to such level. *Merkin II* at 140 (allegations do not imply the level of certainty of substantial doubt associated with actual knowledge.) Thus, if the *Merkin II* complaint fails to adequately allege actual knowledge, the TAC herein is equally deficient.

## VII.    THE TRUSTEE CANNOT RECOVER TRANSFERS OF PRINCIPAL TO THE DEFENDANTS AS THE TRUSTEE HAS NOT ALLEGED THE REQUISITE LACK OF GOOD FAITH

In the *Good Faith Decision* and *Picard v. Katz*, *supra,* the District Court held that the definition of good faith as it relates to the protections afforded under § 548(c)  and § 550(b) requires the Trustee to plead that the Defendants acted with willful blindness to the truth and that "[they] intentionally [chose] to blind [themselves] to the red flags that suggest a high probability of fraud". *Good Faith Decision* at 23; *Katz* at 455. The TAC fails to allege such a standard which is akin to scienter. This comports with the holdings of other courts which have considered claims of liability for fraud arising from the Madoff Ponzi scheme which have held that scienter was not plead by the defendant's failure to discover the Madoff fraud. *Saltz v. First Frontier,*

*LP*, 2010 WL 5298225 at \*16 (S.D.N.Y. Dec. 23, 2010) (inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent given length of fraud perpetrated without discovery).  Nor does the receipt of compensation and maintenance of a profitable business relationship give rise to an inference of motive. *Stephenson v. Citco Group Limited*, 700 F.Supp. 2d 599, 620-21 (S.D.N.Y. 2010); *Newman v. Family Mgmt. Corp.*, 748 F.Supp. 2d 299, 310 (S.D.N.Y. 2010) (red flags were not "so 'extremely obvious' that the [investment adviser] . . . should have recognized them and taken steps to investigate or disclose the risks"); *SEC v. Cohmad Sec. Corp.*, 2010 WL 363844 at \*3 (S.D.N.Y. Feb. 2, 2010) (defendant selling Madoff investments from within Madoff's office building did not know or recklessly disregarded warning signs of fraud, notwithstanding Madoff's secrecy and irregular returns). As stated in *Newman*, an "inference of scienter … is simply not as cogent and compelling as the opposing inference of non-fraudulent intent". *Newman* at 311, *citing, Telllabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

Courts have similarly rejected, in the Madoff context, any argument that an economic motive sufficient to establish scienter may be found absent some unusual benefit. *Saltz* 2010 WL 5298225 at \*6 (rejecting allegations that Madoff sub-feeder fund had motive to commit fraud based on quarterly fees because there was no allegation that the fees were exorbitant or at all in excess of industry standard); *MLSMK Inv. Co. v. JP Morgan Chase & Co.,* 737 F.Supp. 2d 137, 143 (S.D.N.Y. 2010) (rejecting as too generalized allegations that defendant bank was earning substantial fees and had access to large cash deposits from BLMIS Ponzi scheme); *Stephenson*, 700 F. Supp. 2d at 620-21 (finding that "mere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient

A435.001-1/00313554 v3

motive for purposes of pleading scienter"). Therefore, there is no basis for any finding the Defendants lacked good faith as the TAC fails to allege facts to show the lack of good faith standard as established in the *Good Faith Decision* and *Katz* and all transfers of principal to the Defendants are not subject to avoidance.

## VIII.  THE TRUSTEE CANNOT SEEK TO AVOID ANY TRANSFER WHICH CONSTITUTED COMPENSATION TO THE DEFENDANTS FOR SERVICES RENDERED

As noted above, the Trustee has alleged that certain Defendants received "fraudulent side payments" and contractually promised guaranteed rates of return from BLMIS. But the Trustee has not alleged why these payments or contractually promised rates of return were fraudulent. Under New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Lerner v. Fleet Bank, NA.*, 459 F.3d 273, 291 (2d Cir. 2006) (*citing Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157 (1st Dep't 2003)). A claim sounding in fraud is required to comport with the requirements of Fed.R.Civ.P. 9(b). *See e.g.*, *Campbell v. Mark Hotel Sponsor, LLC*, 2010 WL 3466020, at *4 (S.D.N.Y. Sept. 3, 2010). As required by Rule 9(b), the TAC must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993). The Trustee has failed to meet this pleading requirement as to the so-called fraudulent side payment and the promised guaranteed return.

In addition, any payments of compensation for placing investors with BLMIS or contractual payments promised and made to Defendants for services rendered are protected by

A435.001-1/00313554 v3

§ 548(c) as payment of an antecedent debt for value and in good faith.  This case is similar to the case of *In re Churchill Mortgage Investment Corp.*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000) *aff'd*, *Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) where the court held that commissions paid to brokers, who in turn provided funds to a company engaged in a Ponzi scheme, could not be set aside because they provided fair value to the debtor.  As the Court noted in *Churchill*, the determination of equivalent or fair value is dependent on "the specific transaction the trustee seeks to avoid . . . rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." *Churchill*, 256 B.R. at 678. Thus, the Trustee is required to plead facts which would show that the amounts BLMIS paid to the Defendants were not fair consideration for the services the Defendants provided to BLMIS. The Trustee has not pleaded any such facts.  The TAC only alleges that the payments were improper as part of the BLMIS Ponzi scheme, but alleges no facts showing that, putting aside BLMIS's fraud in its underlying investment business, there was anything fraudulent about an investment firm such as BLMIS making payments to the Defendants for finding investors for BLMIS and receiving continuing payment for services rendered. In *Churchill*, the court focused on the actual transactions at issue, and not the fact that a Ponzi scheme existed and stated that "[T]he Trustee's theory ignores the actual transaction between Debtor and Broker and the undisputed equivalence in value between the commissions and the Broker's services, and instead focuses on *collateral conduct of the Debtors' management (the overall operation of the Ponzi scheme), which is extraneous to any particular transaction between Debtor and Broker.*" (emphasis added)." *Churchill*, 256 B.R. at 681; *See also*, *In re Financial Federated Title & Trust, Inc*. 309 F.3d 1325 (11th Cir. 2002); *In re Carrozella & Richardson*, 286 B.R. 450 (Bankr. D. Ct. 2002); *In re First Commercial Management Group, Inc*., 279 B.R. 230 (Bankr. N.D. Ill. 2002).  These payments

are no different than payments to a debtor's vendors for services rendered, e.g., the debtor's landlord. Consequently, the Trustee must plead facts to show that the compensation paid to the Defendants was not payment of an antecedent debt for value and in good faith.[12] The Trustee has failed to plead such facts here and the TAC should be dismissed.

## IX.  THE TRANSFERS WHICH THE TRUSTEE SEEKS TO AVOID UNDER NEW YORK DEBTOR AND CREDITOR LAW FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In addition to being subject to dismissal due to the application of § 546(e), Counts Three through Seven and Count Nine of the TAC, which seek to avoid transfers pursuant to 11 U.S.C. § 544(b) and New York's fraudulent conveyance statutes, should be dismissed for independent reasons. Because this is a SIPA proceeding, not a bankruptcy proceeding, the Trustee can only act under the bankruptcy code to the extent it does not conflict with SIPA. Under New York Civil Practice Law and Rules § 213, the Statute of Limitation for actual fraud is the greater of six years, or two years from when the defrauded person could have discovered the fraud with reasonable diligence. Where the statute of limitations has expired prior to the petition date, it bars an action under 544(b). *In re Bernstein,* 259 B.R. 555 (Bankr. D.N.J. 2001). It is not logical to presume that there is not a single creditor of the debtor, who with reasonable inquiry could have discovered the fraud with reasonable diligence over a period of thirty years. Furthermore, the debtor is required to plead the information regarding the exact creditor who triggers 544(b). *See e.g., In re Petters Co., Inc.*, 495 B.R. 687, 899-900 (Bankr. D. Minn. 2013) (generalized statement that creditor exists under 544(b) not sufficient in light of *Iqbal & Twombly*). The Trustee cannot plead on the one hand that the Defendants knew or should have known of the Ponzi scheme, yet on the other hand allege that it could not have discovered it by reasonable

---

[12] In addition, the payments are also settlement payments under 546(e) and entitled to the protection of that provision as the payments were transfers made by a broker which is a settlement payment in connection with a securities contract.

A435.001-1/00313554 v3

diligence, such that the limitations period has run.  Such a conclusion does not comport with

basic jurisprudence that all legal claims are to be disposed of within a time certainty or with

notions of due process of law.  Bankruptcy courts, as courts of equity, have broad authority to

modify creditor-debtor relationships. This is the express purpose of statutes of limitations and

statutes of repose, to bring finality to claims.  This is not consistent with SIPA's mandate to

quickly and efficiently administer the estate for the benefit of the customers.

X.    **ANY ALLEGED KNOWLEDGE OF AVELLINO CANNOT BE IMPUTED TO MRS. AVELLINO AND ACTUAL KNOWLEDGE OF AVELLINO CANNOT BE IMPUTED TO THE PARTNERSHIP, TO ANOTHER GENERAL PARTNER OR A LIMITED PARTNER**

Even more tenuous are the Trustee's attempts to impose liability against Mrs. Avellino by

imputing any knowledge and bad faith which her husband is alleged to have had onto her. There

is simply no basis for such automatic imputation. The first allegation of imputation is apparently

based solely on the marriage relationship and the Trustee's assumption that Mrs. Avellino

automatically profited from her husband's alleged misconduct (¶¶ 2-3).  It could be presumed

that virtually every married person would benefit from her spouse's profitability. There is,

nonetheless, no imputation of intent solely as a result of the marital relationship. *See, e.g., In re

Gauthier*, 349 Fed. Appx. 943, at *3-4 (5th Cir. 2009). In fact, it has even been noted that "the

Bankruptcy Code does not allow attribution of intent from one spouse to the other." *In re

Perrone*, 2003 WL 24027465, at *3 (Bankr. M.D. La. Dec. 8, 2003), *citing Matter of Reed*, 700

F.2d 986 (5th Cir. 1983) (denying a motion to deny the wife's discharge despite granting the

motion to deny the husband's discharge).   Denials of discharge, like actions based upon

fraudulent transfers, are based upon the debtor's transfer of property "with intent to hinder,

delay, or defraud a creditor" 11 U.S.C. § 727(a)(2)(A).

Imputation of intent has been permitted in certain circumstances in reference to

dischargeability and fraudulent transfers. *See, e.g.*, *In re Marketxt Holdings Corp*., 361 B.R. 369, 396 (Bankr. S.D.N.Y. 2007). However, when imputation has been employed, it has been in situations in which one party was the agent of the other, or effectively controlled the other. *See*, e.g., *In re Marketxt Holdings Corp*., which explained that, in reference to the transferor's intent in conjunction with a § 548 claim, intent can be "imputed to the transferor <u>only</u> where the transferee is in a position to control 'the debtor's disposition of his property.'" *Id*. at 396. (emphasis added).

In the pending proceedings, there is even less support for such imputation based on the rulings of the District Court. It has specifically been held that a transferee is protected by the "safe harbor" provision of § 546(e) unless he had "actual" knowledge of the Ponzi scheme or that there were no actual securities transactions occurring. *Cohmad, supra*. Furthermore, the Trustee's ability to recover transfers, as he is attempting to do in this case, has been restricted further by the interpretation imposed specifically for BLMIS cases. Here the Trustee must not only plead the transferee's lack of good faith, but such good faith must be premised on a subjective standard rather than an objective one. *Good Faith Decision* at 24. The idea of imputing knowledge is therefore directly contrary to the explicit, emphatic requirement that the defendant have "actual knowledge of the Ponzi scheme" and that the Trustee plead the absence of subjective good faith. By definition, "actual knowledge" and "subjective bad faith" cannot be imputed. *See, e.g.*, *Levinson v. PSCC Services, Inc.*, 2010 WL 5477250, at *6 (D. Conn. Dec. 29, 2010) (distinguishing between "actual awareness" and imputed knowledge in a fraudulent concealment context; indicating that actual awareness is required and imputed knowledge would be insufficient). New York, too, requires that "actual" intent be specifically pled. *See, e.g., In re Sharp Intern. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). In fact, *New York Debtor & Creditor Law* §

26

A435.001-1/00313554 v3

276 (McKinney), even differentiates between actual and presumed intent and indicates that only those conveyances incurred with "actual intent, as distinguished from intent presumed in law" are considered fraudulent.

The TAC's other allegations that attempt to impute liability on Mrs. Avellino are at Paragraphs 399-400.  None of these allegations even attempt to assert that Avellino was the agent of his wife, or that either of them controlled the other.  Nor, despite beating totally around the proverbial bush, are there allegations of control between her and any of the entities – just ownership as "either general or limited partners."  Rather, the Trustee's allegations harken back to times when wives were considered chattel of their husbands such that any knowledge of the husbands would automatically be considered those of their wives.  The most the Trustee could plead regarding Mrs. Avellino is that her husband controlled the entities and accounts and directed where the payments went while her husband was on notice of the Ponzi scheme.

*In re Adler*, 372 B.R. 572 (Bankr. E.D.N.Y. 2007) is worth noting as, in that case, the trustee did not rely merely on imputation but also pled that the debtor's wife had herself acted with intent to defraud creditors by taking funds from her husband.  However, because the trustee had not pled any facts to support the "badges of fraud," but has only pled generally and alleged that funds had been transferred to his wife's account and used to pay her expenses, the court dismissed the case brought under DCL 276.  *Id*. at 581.  The debtor's wife in that case, like Mrs. Avellino, was alleged to have benefited from the transfers to her.  Such a benefit was not enough without actual fraud. Therefore, the Court should dismiss all claims against Mrs. Avellino as the Trustee has failed to plead that she had actual knowledge of the Madoff fraud, or any facts which would allow Avellino's knowledge to be imputed onto her.

A435.001-1/00313554 v3

In addition, there is a limitation to the extent to which the knowledge of an agent may be imputed to its principal.  Where actual knowledge is required for a cause of action then such knowledge cannot be imputed.  *See e.g. Harte v. United Benefit Life Ins. Co.*, 66 Cal.2d 148 (1967) (knowledge imputed by the law of agency is irrelevant when actual knowledge is required); *Jehly v. Brown*, 327 P.3d 351 (Colo. Ct. Appeals 2014) (plaintiff cannot rely upon or request imputation of the knowledge of an agent to establish actual knowledge, or conscious awareness, on the part of the principal); *Roberts Real Estate, Inc. v. New York State Dep't of State, Div. of Licensing Servs.*, 80 N.Y.2d 116 (1992) (knowledge of agent is not sufficient to meet statutory requirement of necessity of actual knowledge for revocation of license); *Lihosit v. I & W, Inc.*, 913 P.2d 262 (N.M. Ct. App. 1996) (Restatement (Second) of Agency provides that where knowledge is required to impose tort liability, actual knowledge cannot be imputed from an agent).  Also when the question of a party's good faith is at issue, imputed knowledge will not suffice to show lack of such good faith. *Snook v. Netherby*, 124 Cal. App. 2d 797 (Cal. Dist. Ct. App. 1954) (The term 'bad faith' necessarily requires actual rather than imputed knowledge); *Harte v. United Benefit Life Ins. Co.,* 66 Cal.2d 148 (1967) (uncommunicated knowledge of agent is not imputed to principal for purpose of determining whether he acted in good faith since principal's good faith must be determined on basis of facts of which he had actual knowledge).

Thus for purposes of pleading the actual knowledge of the Defendants and the other Defendants where their knowledge is allegedly imputed, in respect of the safe harbor under 546(e) whether the Defendants had actual knowledge cannot be pled based on imputation.  As it relates to the good faith element of 548(c) and 550(b), the knowledge of an agent cannot be imputed to a principal in determining such subjective good faith.  The Trustee bears the burden in both cases of pleadings such knowledge and knowledge by imputation is not sufficient.

Florida law affirms this principal. Under Florida law although the actions of a general partner can, under certain circumstances bind the partnership, this is distinct to the issue of whether the knowledge of a partner is imputed to the partnership or to his or her fellow partners. Imputation is the theory that someone knows of something when in fact they don't. It is a legal fiction. It is true that a general partner is an agent of the partnership, and his actions bind the partnership so as to expose the partnership to liability. But the nature of vicarious liability to a principal for acts of his agent, is distinct from the concept of imputing knowledge from one person to another. For example, *Fla. Stat. § 620.1402* states that the actions of the general partner bind the partnership assuming that action is done in the ordinary course of business. Importantly, the actions of the partner bind the partnership, but the statute does not say that it binds the other partners, general or limited. In fact, the Florida Revised Uniform Limited Partnership precludes such imputation of knowledge. *Fla. Stat. § 620.1103* defines how a person acquires actual knowledge or notice. It provides a "person knows a fact if the person has <u>actual knowledge</u> of the fact." *Fla. Stat. § 620.1103* (emphasis supplied). Therefore, under Florida law knowledge cannot be imputed from one partner to a partnership (as the term "person" includes a partnership) or to another person, i.e., another partner either general or limited. The terms are fundamentally inapposite and cannot be reconciled. Imputation is an equitable theory that compels that another party be charged with notice of a fact in order to avoid inequity. The statutory prohibitions of the Florida Revised Uniform Partnership Act preclude such imputation. This is significant, for as a matter of the law the Entity Defendants and certain Individual Defendants, as initial or subsequent transferees, cannot be imputed with the knowledge of a third person; they must come to actually know it. The Florida Revised Uniform Partnership Act has a similar provision at *Fla. Stat. § 620.8102*. Therefore, the Trustee cannot rely on imputation in its

29

pleadings to allege that the Defendants had actual knowledge of Madoff's Ponzi scheme or that

no actual securities transaction took place in order to defeat the safe harbor of 546(e).  Further, as

it relates to the payment of antecedent debt under 548(c) and the defense of good faith or the

element of good faith under 550(b), there also can be no imputation to the Defendants of facts

showing a lack of good faith to defeat those defenses.

## XI.   THE TRUSTEE'S AMENDED COMPLAINT FAILS TO STATE SUFFICIENT FACTS TO PIERCE THE CORPORATE VEIL OF THE ENTITY DEFENDANTS

The Defendants have moved to dismiss the TAC as to any action based on the grounds of

lack of standing (See Memorandum Section III), but address the specific merits of the pleading

of such action herein, in the alternative. The Trustee seeks to pierce the corporate veil of the

Entity Defendants and impose liability on the Individual Defendants for the alleged fraudulent

transfers to the Entity Defendants.

In the leading Florida case[13], *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114

(Fla. 1984), the Florida Supreme Court imposed a strict standard in order to pierce the corporate

veil. The general rule is that the corporate veil will not be pierced absent a showing of improper

conduct. *Steinhardt v. Banks,* 511 So.2d 336 (Fla. 4th DCA 1987). Under this standard, it must

be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud

upon them. *Id.* Three factors must be proven by a preponderance of the evidence: (1) the

shareholder dominated and controlled the corporation to such an extent that the corporation's

independent existence, was in fact non-existent and the shareholders were in fact alter egos of the

corporation; (2) the corporate form must have been used fraudulently or for an improper purpose;

---

[13] For federal bankruptcy purposes, state law determines the basis for piercing the corporate veil in a transfer avoidance action. *See e.g. In re Friedlander Capital Mgmt. Corp.,* 411 B.R. 434, 441 (Bankr. S.D. Fla. 2009).  The state of incorporation of the corporate entities is the law to be applied. *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995) (under New York choice of law principles, law of state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders). Thus, Florida law applies.

A435.001-1/00313554 v3

and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998).

The TAC fails to plead the requisite elements in order to allow the piercing of the corporate veil. The allegations in the TAC state conclusory allegations that the principals dominated and controlled the Entity Defendants, comingled funds among and between them and failed to follow corporate formalities, but fails to allege that they were used to mislead or perpetrate a fraud on the creditors of the Entity Defendants, which is an essential element of the claim.

## XII.   COUNT TWELVE FOR EQUITABLE SUBORDINATION SHOULD BE DISMISSED

In order to have a cause of action for equitable subordination, the Trustee must adequately plead inequitable conduct resulting in an unfair advantage over the other creditors to the bankrupt estate. *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd,* 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) ("Equitable subordination is an extraordinary remedy that is to be used sparingly." (*citing In re Fabricators, Inc.,* 926 F.2d 1458, 1464 (5th Cir. 1991)); *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425, 433 (S.D.N.Y. 2007) (stating three-prong test applicable to equitable subordination claims); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007) (finding that equitable disallowance is a potential, though extreme, remedy). The TAC has not done so, and thus Count Eleven must be dismissed.

The TAC further fails to adequately allege facts that show the Defendants, namely KJA, Stratham and Mayfair Bookkeeping, engaged in any wrongful conduct; it does not point to any allegations of wrongful conduct with respect to other creditors of BLMIS, or allege any specific

harm that BLMIS creditors suffered on account of the Defendants' allegedly inequitable conduct, or allege any unfair advantage gained by the Defendants with respect to the other BLMIS creditors. Moreover, as explained above, the TAC does not contain sufficient allegations of actual knowledge of the BLMIS Ponzi scheme or that no actual securities transactions were being conducted, nor even of willful blindness of such fraud on the part of these defendants.

Further, the Trustee lacks standing to pursue this claim. In support of its equitable subordination claim, the Trustee asserts the conclusory allegation that Defendants' conduct harmed customers who were induced into investing in BLMIS "without knowledge of the actual facts regarding BLMIS's financial condition . . ." (¶ 562). Assuming as we must for purposes of this motion the truth of such allegation, only that subset of customers who lost money (the net losers, not the net winners), would have been so harmed. The Trustee does not have standing to bring such a claim even if such customers exist. A trustee lacks standing to assert claims for particularized injuries suffered by individual creditors. *Picard v. JP Morgan Chase & Co.,* 721 F.3[rd] 54, 70 (2d Cir. 2013).

The Trustee's equitable subordination claim should also be dismissed because it is precluded by both the *Wagoner* rule and the doctrine of unclean hands. *Wagoner* provides that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *supra.* 944 F. 2d at 118; *accord, Kirschner v. Grant Thornton LLP,* 2009 WL 1286326, at *10 (S.D.N.Y. Apr. 14, 2009), *aff'd,* 626 F.3d 673 (2d Cir. 2010) (dismissing trustee's claims against third parties where debtor "participated in, and benefitted from, the very wrong for which it seeks to recover"). "[B]ecause a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from

A435.001-1/00313554 v3

suing to recover for a wrong that he himself essentially took part in." *Kirschner, supra,* 2009 WL 1286326, at *5; *see also, Picard v. HSBC,* 454 B.R. 25, 37-38 (S.D.N.Y. 2011) *aff'd, In re Bernard L. Madoff Investment Securities LLC,* 721 F.3d 54 (2d Cir. 2013) (dismissing Trustee's claims at the pleading stage under the doctrine of *in pari delicto*).

The doctrine of unclean hands is to the same effect. Under that well-established rule, courts will not use their equitable powers to help a party whose own wrongful misconduct is related to the claim on which it seeks to recover. *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F. Supp. 969 (S.D.N.Y. 1992). *Granite Partners L.P. v. Bear Stearns & Co., Inc.,* 17 F. Supp. 2d 275 (S.D.N.Y. 1998), is instructive. There, the debtor investment fund and its brokers conducted reckless trading activity and failed to monitor the fund's investment accounts properly, among other misconduct. The trustee in that case sued the brokers, asserting equitable subordination claims. The District Court dismissed the claims, holding that they were unsustainable because the debtor's wrongful conduct was "intrinsically related to the claims for which the [plaintiff] seeks to recover . . ." *Id.* at 310-311.

So too here, the misconduct with which the Trustee charges the Defendants is inexorably linked to BLMIS's fraud. Because the Trustee's equitable subordination claim seeks a remedy against Defendants for the very same conduct in which the Trustee (through BLMIS) participated, the Trustee is precluded form asserting it.

## XIII. THE TRUSTEE LACKS STANDING TO BRING THESE CLAIMS AS IT MAY ONLY SEEK TO RECOVER PROPERTY OF THE DEBTOR AND NO SUCH PROPERTY EXISTS

Under Sections 544, 548 and 550, the Trustee may only seek to recover property which is property of the debtor. In this case, there is no property of the Debtor. The TAC alleges that BLMIS never executed any trades, never owned any of the securities it claimed to own, and that

A435.001-1/00313554 v3

in the Ponzi scheme perpetuated by Madoff, there was in fact no property owned by BLMIS (¶106 and 107).

Moreover, in addition to being a broker dealer, BLMIS was also an investment advisor and registered as same. The TAC alleges that Madoff operated the Investment Advisory Business as a Ponzi scheme. (¶ 108). Thus, the TAC does not allege that Defendants investments were made into accounts of BLMIS as a broker dealer, and thus created customer property for purposes of SIPA. In fact, the TAC alleges the exact opposite, and as admitted by Madoff himself in his allocution hearing, he committed the fraud through the investment advisory arm of BLMIS:[14] Mr. DiPascali testified similarly. Excerpts of the allocution are attached as Exhibit B. (*See* Trustee's Interim Report for the Period Ending March 31, 2011 dated May 16, 2011, pp. 25-27, attached as Exhibit C to the Declaration of Gary A. Woodfield in Support of Defendants' Motion to Dismiss the initial complaint). In *In re Bernard L. Madoff Securities, LLC*, 424 B.R. 122, 127–128, (Bankr. S.D.N.Y. 2010) the Court found this to be the case (Madoff IA Business perpetuated fraud and all funds were held in single Chase Account). In addition, customer funds were not segregated as required by SEC's Customer Protection Rule. *Id.* at f.n. 17.

Thus, taking away the conclusory allegations of the TAC and focusing on the facts, the Defendants are not subject to SIPA as they never transmitted cash or securities to a debtor under the meaning of SIPA. The Trustee has never alleged that the Chase Manhattan Account described by Madoff, was an account owned or controlled by a debtor, i.e. a member of SIPC. A fair and plausible reading of the TAC is that the Defendants invested with Madoff and BLMIS as their investment adviser, i.e. the Defendants invested with BLMIS to manage their

---

[14] In considering a Motion to Dismiss under Rule 12(b)(6), the Court may consider facts and matters of which are referenced in the TAC. *See* e.g., *Weston Funding LLC v. Consorcio G. Groups*, 451 F.Supp 585, 586 (S.D.N.Y. 2006). The allocution is a part of, and included in one of the Trustee's report to the Court, (Docket #4072) and is also referenced in Paragraphs 78 and 79 of the TAC, and attached as Exhibit C to the Declaration of Gary A. Woodfield in Support of Defendants' Motion to Dismiss the initial complaint.

34

money in exchange for a fee.  This is even more compelling given that until 2001, Madoff operated on a sole proprietorship; BLMIS was not formed until 2001. They did not invest with BLMIS with specific instructions to purchase specific securities, as a customer would do with a broker dealer.  Madoff had full and complete investment authority.  Madoff and BLMIS failed to meet their obligations as an investment adviser by failing to invest any of the funds.  Thus, if the investments were made with an investment adviser and no property was ever conveyed to a member of SIPC, than SIPA does not apply and the Court has no jurisdiction over the Defendants.

The only basis upon which the Trustee can exercise its avoidance power is under the provisions of 15 U.S.C. § 78fff-2(c)(3). 15 U.S.C. § 78fff-2(c)(3) specifically limits the Trustee's right to "recover any property transferred by the debtor, which except for the transfer, would have been customer property." "Customer Property" is defined by SIPC at 15 U.S.C. § 78lll(4) and "includes cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."  However, the Trustee has not pled that the money paid to the Defendants was in fact "customer property" as it has not alleged that any of the funds paid by the Defendants to BLMIS were held in the accounts of a member of SIPC.  This pleading deficiency is probably because the Trustee wishes to avoid the inconvenient truth that it has no right to pursue this case as it may be impossible that the Trustee can ever prove that any funds were placed into any account of a SIPC member i.e., a debtor.

In addition, in the case of a Ponzi scheme, proving whose property is whose and how the property flowed is problematic and perhaps impossible.  For as admitted by the Trustee, BLMIS

A435.001-1/00313554 v3

created a Potemkin Village, which the Trustee admits it has yet to decipher.  Thus, if BLMIS

received money as an investment adviser and never executed any trades or purchased any

securities, there could be no account of a debtor from, or for securities accounts of, a customer.

The Trustee cannot plead with any legitimacy that it can prove that the money received, as to

each and every transfer made to the Defendants over a period of thirty years, if it can to any at

all, was Customer Property.  In the absence of pleading of facts that the funds received into the

Chase Manhattan Account were ever property of a debtor under SIPC, in the face of facts to the

contrary, this Court lacks jurisdiction.

Assuming the Trustee pleads the necessary predicate facts to confer jurisdiction, SIPA

provides that the provisions of the bankruptcy code only apply to the extent such provisions are

not inconsistent with the purposes of SIPA.  15 U.S.C. § 78fff(b) provides "To the extent

consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in

accordance with, and as though it were being conducted under chapters 1, 3, and 5 and

subchapters I and II of chapter 7 of title 11".  The ability to pay off net equity claims of

customers quickly is the most important feature of SIPA.  *Mishkin v. Peat, Marwick*, 744 F.

Supp. 531, 556 (S.D.N.Y. 1990).  Thus, it is clear from the text of the SIPA statute, the

legislative history and case law, that SIPA was never intended to confer upon the Trustee the

right to pursue claims against third parties based on fraud and that the Trustee may not sue for

such claims.  *Mishkin v. Peat, Marwick*, 744 F. Supp. 531, 556 (S.D.N.Y. 1990); *SIPC v.

Vigman*, 803 F.2d 1517 (9th Cir. 1986) (customer, not SIPA, retains any fraud claims against a

broker for fraudulent inducement); *Trefny v. Bears Stearns Securities Corp.,* 243 B.R. 300, 323

(Bankr. S.D. N.Y. 1999) (SIPA does not protect investors from risk that some deals will go bad

or that some securities issuers will behave badly).  As clearly articulated in the statute, the

purpose of SIPA is the prompt and expeditious payment of customer claims and the liquidation

of the failed brokerage company to ensure the stability of the financial markets.  SIPA did not

give the Trustee, broad and sweeping powers to seek claims of customers against third parties,

and such powers that are granted to avoid preferences and transfers cannot conflict with the

intent and purpose of SIPA to ensure a prompt and orderly liquidation of the brokerage company

and payment to customers of the statutory allowed amount, in addition to any property still

retained by the brokerage company, if any.

**XIV.  ANY TRANSFERS BY THE DEFENDANTS BETWEEN OR AMONG ACCOUNTS OWNED BY THE DEFENDANTS AT BLMIS OR CREDITS TO SUCH ACCOUNTS BY BLMIS WERE NOT TRANSFERS OF PROPERTY OF THE DEBTOR AND CANNOT BE CONSIDERED FRAUDULENT TRANSFERS OR PREFERENCES AVOIDABLE UNDER THE BANKRUPTCY CODE**

In the TAC, the Plaintiff alleges that certain of the Defendants' accounts were the

beneficiaries of subsequent transfers of avoidable transfers due to the fact the accounts were

established by the transfer(s) from the account(s) of other Defendant(s) within BLMIS to create

new accounts for the benefit of other Defendants, or that certain accounts were credited with

transactions by BLMIS to pay the Defendants the amount of the guaranteed return or so called

fraudulent side payments.   However, a transfer can only be avoided under the Trustee's

avoidance power if the challenged transfer consists of transfer of the property of the Debtor.  *See*

*e.g.* 11 U.S.C. § 548 "The trustee may avoid any transfer (including any transfer to or for the

benefit of an insider under an employment contract) of an <u>interest of the debtor in property</u>".  11

U.S.C. § 548 (emphasis supplied).  *In re Derivium Capital LLC*, 716 F.3d 355 (4th Cir. 2011).

The term "interest in a debtor in property" is not defined in the Bankruptcy Code.  "For purposes

of most bankruptcy proceedings, '[p]roperty interests are created and defined by state law.'

*Butner v. United States*, 440 U.S. 48, 55 (1979); *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336,

37

1341 (10th Cir. 1998) ("The existence and extent of [the debtor's interest in the property] is determined by state law"). "Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve" the extent to which that interest is property of the estate." *Rine & Rine Auctioneers, Inc. v. Myers (In re Rine & Rine Auctioneers, Inc.)*, 74 F.3d 854, 857 (8th Cir. 1996); *In re Ogden*, 314 F.3d 1190, 1197 (10th Cir. 2002).

In the instant case, SIPA defines whether customer property is the property of the debtor. It is not. *See e.g., In re Bernard L. Madoff Securities, LLC v. J. Ezra Merkin, et al.*, 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (in SIPA proceeding, property held by broker dealer for the account of a customer is not property of the broker debtor, thus turnover action is improper as property did not belong to debtor absent avoidance). The statutory framework under SIPA recognizes the incongruity that customer property held by the debtor in a SIPA proceeding is customer property, not debtor property. SIPA creates a legal fiction by turning customer property into debtor property under 15 U.S.C. § 78fff(c)(3) to allow the trustee to seek avoidance of fraudulent transfers. Absent this statutory provision of SIPA, customer property held by a member of SIPC is not property of the debtor. Thus, in *In re Madoff, supra*, the court found that turnover was not an appropriate remedy because the property in question, transferred customer property, was not property of the debtor.

When property is not property of the debtor, it is not subject to avoidance under any of the bankruptcy code provisions. It is fundamental that a fraudulent transfer is a fraudulent transfer only if the transfer is the debtor's property and depletes the estate and the amount available to pay creditors. *Derivium* at 361. For example, in *Derivium*, which ultimately turned out to be a Ponzi scheme, the customers transferred customer funds into accounts of a third party. The Court concluded that the transfers in question were not transfers of the property of the

debtor, but rather transfers by the customers of customer property, and that a transfer of property of the debtor was a prerequisite of the avoidance of any transfer and thus precluded the trustee from seeking avoidance of the transfers in question.

Consequently, each and every allegation in the TAC that intra account transfers by the Defendants from one Defendant to another Defendant, or credits to any Defendant's account by BLMIS in *lieu* of payment of amounts due the Defendant as compensation or for services rendered, constitute avoidable transfers should be stricken from the TAC and cannot form the basis for an avoidance action as there has been no transfer of property of the Debtor.  Put another way, the intra account transfers or credits to the accounts in no way reduced the amount of assets available to satisfy customer claims assuming those transfers were made the day before the petition date.  BLMIS would still have on hand the same amount of assets to satisfy customer claims as it did the day before the filing of the petition.  *Derivium* at 361 (purpose of avoidance provisions is to prevent debtor from making transfers that diminish the estate to the detriment of creditors).  In this case the estate was not diminished by those intra-account transfers or account credits.

This Court considered this issue in the context of determining the net equities of customers and determined that such intra-account transfers could not be considered additional principal value for such purposes because it conflicted with the Net Equity Decision and gave unpermissive reality to Madoff's fiction.  *Securities Investors Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 2014 WL 68779248 at *12 (Dec. 5, 2014 Bankr. S.D.N.Y.).  However, it is a different legal issue when the Trustee is seeking to recover transfers of non-existent fictitious property as fraudulent transfers. Simply put, the Trustee is trying to recover something that never existed and it should not be permitted to do so.  The District Court

A435.001-1/00313554 v3

also addressed this issue in *Securities Investors Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 499 B.R. 416 (2013) (the "*Antecedent Debt Decision*") in considering what payments from BLMIS to its customers constituted repayment of an antecedent debt and held that such intra-account transfers of amounts in excess of principal represented fictitious profits and did not constitute antecedent debt and increase the amount of antecedent debt protected by 11 U.S.C. § 548(c) as principal. *Antecedent Debt Decision* at 430. The Defendants do not argue with these holdings.  However, to the same extent that such transfers represent fictitious transfers that cannot be used to increase the amount of antecedent debt or a customer's net equity, they cannot constitute transfers of property of the debtor for fraudulent conveyance purposes subject to avoidance.  As this Court noted "[A] customer cannot transfer what he does not have". *Securities Investor Protection Corp.*, *supra* at *6.  They are a fiction and a nullity which the Trustee cannot seek to avoid as fraudulent transfers.

**CONCLUSION**

For these reasons, the TAC should be dismissed.

Respectfully submitted,

/s/ Gary A. Woodfield
Gary A. Woodfield
*Counsel for Defendants listed on attached Exhibit A*
Florida Bar No. 0563102
HAILE, SHAW & PFAFFENBERGER, P.A.
660 U.S. Highway One, Third Floor
North Palm Beach, FL 33408
Phone: (561) 627-8100
Fax: (561) 622-7603
Email:  gwoodfield@haileshaw.com

A435.001-1/00313554 v3

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of January, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties via transmission of Notice of Electronic filing generated by CM/ECF.

/s/ Gary A. Woodfield
Gary A. Woodfield
Florida Bar No. 0563102

41

## EXHIBIT A

LIST OF DEFENDANTS

FRANK AVELLINO

NANCY CARROLL AVELLINO

THOMAS AVELLINO

ASTER ASSOCIATES

STRATTHAM PARTNERS

ASCENT, INC.

KENN JORDAN ASSOCIATES

FRANK J. AVELLINO REVOCABLE TRUST NUMBER ONE AS AMENDED AND
RESTATED JANUARY 26, 1990

FRANK J. AVELLINO RETAINED ANNUITY TRUST U/A DATED JUNE 24, 1992

FRANK J. AVELLINO GRANTOR ANNUITY TRUST AGREEMENT NUMBER 2 U/A
DATED JUNE 24, 1992

FRANK J. AVELLINO REVOCABLE TRUST NUMBER ONE UNDER DECLARATION OF
TRUST NUMBER ONE DATED JUNE 10, 1988

FRANK J. AVELLINO TRUSTEE OF FRANK J. AVELLINO REVOCABLE TRUST
NUMBER 1 AS AMENDED AND RESTATED JANUARY 26, 1990

FRANK J. AVELLINO, TRUSTEE OF FRANK J. AVELLINO GRANTOR RETAINED
ANNUITY TRUST UNDER AGREEMENT DATED JUNE 24, 1992

FRANK J. AVELLINO, TRUSTEE OF FRANK J. AVELLINO REVOCABLE TRUST
NUMBER ONE UNDER DECLARATION OF TRUST NUMBER ONE DATED JUNE 10,
1988

FRANK J. AVELLINO, TRUSTEE OF HEATHER CARROLL LOWLES TRUST U/A
DATED JUNE 29, 1990

FRANK J. AVELLINO, TRUSTEE OF TIFFANY JOY LOWLES TRUST U/A DATED JUNE
29, 1990

FRANK J. AVELLINO, TRUSTEE OF MELANIE ANN LOWLES TRUST U/A DATED
JUNE 29, 1990

FRANK J. AVELLINO, TRUSTEE OF TAYLOR ASHLEY McEVOY TRUST U/A DATED
JUNE 24, 1992

FRANK J. AVELLINO, TRUSTEE OF MADISON ALYSSA McEVOY TRUST U/A DATED
JUNE 29, 1990

FRANK J. AVELLINO, TRUSTEE OF SAMUEL AVELLINO GRANTOR RETAINED
ANNUITY TRUST

FRANK J. AVELLINO, TRUSTEE OF NOBLE AVELLINO GRANTOR RETAINED
ANNUITY TRUST

FRANK J. AVELLINO, TRUSTEE OF STERLING AVELLINO GRANTOR RETAINED
ANNUITY TRUST

FRANK J. AVELLINO, TRUSTEE OF AVELLINO FAMILY TRUST

FRANK J. AVELLINO, TRUSTEE OF AVELLINO & BIENES PENSION PLAN AND
TRUST

NANCY CARROLL AVELLINO, TRUSTEE OF NANCY CARROLL AVELLINO
REVOCABLE TRUST UNDER TRUST AGREEMENT DATED MAY 18, 1992

NANCY CARROLL AVELLINO, TRUSTEE OF THE RACHEL ANNE ROSENTHAL
TRUST U/A DATED JUNE 29, 1990

NANCY CARROLL AVELLINO, TRUSTEE OF THE RACHEL ROSENTHAL TRUST #3

NANCY CARROLL AVELLINO, TRUSTEE OF RACHEL ROSENTHAL TRUST #2 U/A
DATED JUNE 24, 1992

NANCY CARROLL AVELLINO, TRUSTEE OF HEATHER CARROLL LOWLES TRUST
U/A DATED JUNE 29, 1990

NANCY CARROLL AVELLINO, TRUSTEE OF TIFFANY JOY LOWLES TRUST U/A
DATED JUNE 29, 1990

NANCY CARROLL AVELLINO, TRUSTEE OF MELANIE ANN LOWLES TRUST U/A
DATED JUNE 29, 1990

NANCY CARROLL AVELLINO, TRUSTEE OF TAYLOR ASHLEY McEVOY TRUST U/A
DATED JUNE 24, 1992

NANCY CARROLL AVELLINO, TRUSTEE OF MADISON ALYSSA McEVOY TRUST U/A
DATED JUNE 29, 1990

NANCY CARROLL AVELLINO REVOCABLE TRUST UNDER TRUST AGREEMENT
DATED MAY 18, 1992

27 CLIFF, LLC

THE AVELLINO FAMILY FOUNDATION, INC.

AVELLINO FAMILY TRUST

AVELLINO & BIENES

AVELLINO & BIENES PENSION PLAN AND TRUST

GROSVENOR PARTNERS, LTD.

MAYFAIR VENTURES, GP,

MAYFAIR BOOKKEEPING SERVICES, INC.

LORRAINE McEVOY

RACHEL LIERSCH (a/k/a Rachel Rosenthal)

THE RACHEL ANNE ROSENTHAL TRUST U/A DATED JUNE 29, 1990

THE RACHEL ROSENTHAL TRUST #2 U/A DATED JUNE 24, 1992

THE RACHEL ROSENTHAL TRUST #3

FRANK AVELLINO, TRUSTEE OF N.A. GRANTOR RETAINED ANNUITY TRUST

FRANK AVELLINO, TRUSTEE OF S.A. GRANTOR RETAINED ANNUITY TRUST

FRANK AVELLINO, TRUSTEE OF ST. A. GRANTOR RETAINED ANNUITY TRUST

MELANIE LOWLES FLOWERS

MELANIE ANN LOWLES TRUST U/A DATED JUNE 29, 1990

HEATHER C. LOWLES

HEATHER CARROLL LOWLES TRUST U/A DATED JUNE 29, 1990

TAYLOR ASHLEY McEVOY TRUST U/A DATED JUNE 24, 1992

TIFFANY JOY LOWLES TRUST U/A DATED JUNE 29, 1990

MADISON ALYSSA McEVOY TRUST U/A DATED JUNE 29, 1990

## EXHIBIT B

## EXCERPTS FROM THE ALLOCUTION HEARING

Madoff:

Your Honor, for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the <u>investment advisory side of my business</u>, Bernard L. Madoff Securities LLC. . . . The essence of my scheme was that I represented to clients and prospective clients who wished to <u>open investment advisory</u> and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years. Up until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised. <u>Instead, those funds were deposited in a bank account at Chase Manhattan Bank</u>. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, <u>I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds</u>.

\* \* \*

<u>Indeed, when the United States Securities and Exchange Commission asked me to testify as part of an investigation they were conducting about my investment advisory business, I knowingly gave false testimony under oath to the staff of the SEC on May 19, 2006 that I executed trades of common stock on behalf of my investment advisory clients and that I purchased and sold the equities that were part of my investment</u> strategy in European markets. In that session with the SEC, which took place here in Manhattan, New York, I also knowingly gave false testimony under oath that I had executed options contracts on behalf of my <u>investment advisory clients</u> and that my firm had custody of the assets managed on behalf of my <u>investment advisory clients</u>. To further cover up the fact that I had not executed trades on behalf of <u>my investment advisory clients</u>,

\* \* \*

Another way that I concealed my fraud was through the filing of false and misleading certified audit reports and financial statements with the SEC. I knew that these audit reports and financial statements were false and that they would also be sent to clients. These reports, which were prepared here in the Southern District of New York, among other things, falsely reflected my firm's liabilities as a result of my intentional failure to purchase securities <u>on behalf of my advisory clients</u>. Similarly, when I recently caused my firm in 2006 to register <u>as an investment adviser with the SEC</u>, I subsequently filed with the SEC a document called the form ADV uniform application for investment adviser registration. On this form I intentionally and falsely certified under penalty of perjury that Bernard L. Madoff Investment Securities had custody of <u>my advisory clients' securities</u>. That was not true, and I knew it when I completed and filed the form with the SEC, which I did from my office on the 17th floor of 885 Third Avenue, here in Manhattan. In more recent years, I used yet another method to conceal my fraud. I wired money between the United States and the United Kingdom to make it appear as though there were actual securities transactions executed <u>on behalf of my investment advisory clients</u>. Specifically, I had money transferred from the <u>U.S. bank account of my investment advisory business to the London bank account of Madoff Securities International Limited, a United Kingdom corporation that was an affiliate of my business in New York</u>. Madoff Securities International Limited was principally engaged in proprietary trading and was a legitimate, honestly run and operated business.

Nevertheless, <u>to support my false statement that I purchased and sold securities for my investment advisory clients in European markets, I caused money from the bank account of my fraudulent advisory business, located here in Manhattan, to be wire transferred to the London bank account of Madoff Securities International Limited</u>. There were also times in recent years when I had money, which had originated in the New York Chase Manhattan bank account <u>of my investment advisory business,</u> transferred from the London bank account of Madoff Securities International Limited to the Bank of New York operating bank account <u>of my firm's legitimate proprietary and market making business</u>. That Bank of New York account was located in New York. I did this as a way of ensuring that <u>the expenses associated with the operation of the fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses</u>. In connection with the purported trades, <u>I caused the fraudulent investment advisory side of my business to charge the investment advisory clients four cents per share as a commission</u>. At times in the last few years, these commissions were transferred from Chase Manhattan bank account of the fraudulent investment advisory side of my firm to the account at Bank of New York, which was the operating account for the legitimate side of Bernard L. Madoff Investment Securities, the proprietary trading and market making side of my firm. <u>I did this to ensure that the expenses associated with the operation of my fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making business,</u>

Mr. DiPascali testified similarly:

Most of the time the clients' money just simply <u>went into a bank account in New York that Bernie Madoff controlled</u>. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did follow things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in real time. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

*Id*. at 120, (emphasis added).