UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:                                                      :
                                                            :
BERNARD L. MADOFF INVESTMENT            :         Adv. Proc. No. 08-01789 (SMB)
SECURITIES LLC,                                    :         SIPA LIQUIDATION
                                                            :
                        Debtor.                     :
-----------------------------------------------------------------X
IRVING H. PICARD, Trustee for the Liquidation  :
of Bernard L. Madoff Investment Securities LLC,  :
                                                            :
                        Plaintiff,                   :
                                                            :         Adv. Proc. No. 10-05421 (SMB)
FRANK J. AVELLINO, et al.,                     :
                                                            :
                        Defendants.               :
-----------------------------------------------------------------X


**MEMORANDUM DECISION GRANTING IN PART
AND DENYING IN PART MOTION TO DISMISS**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
  *Trustee for the Liquidation of*
  *Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Jimmy Fokas, Esq.
        Kathryn M. Zunno, Esq.
        Elizabeth Urda, Esq.
        Joshua B. Rog, Esq.
                Of Counsel

HAILE, SHAW & PFAFFENBERGER, P.A.
*Attorneys for the Moving Defendants*
660 U.S. Highway One, Third Floor

        Gary A. Woodfield, Esq.
                Of Counsel

BROAD AND CASSEL
*Attorneys for the Adopting Defendants*
One Biscayne Tower
2 South Biscayne Blvd.
21st Floor
Miami, FL 33131

       Jonathan Etra, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Irving H. Picard, the trustee (the "Trustee") for the liquidation of the estate of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff, commenced

this adversary proceeding to avoid and recover preferential and fraudulent transfers from the

defendants and disallow and/or subordinate certain of the defendants' claims.  His "short and

plain statement" runs on for 145 pages.  All but one of the defendants moved to dismiss the

Trustee's amended complaint, dated November 24, 2014 ("Amended Complaint") (ECF Doc. #

86).  For the reasons that follow, all avoidance and related liability claims arising from initial

transfers that occurred prior to January 1, 2001, including subsequent transfer and general

partner claims, are dismissed, and the motion is otherwise denied.

## BACKGROUND

### A.    Nature of the Proceeding[1]

      The background information is derived from the well-pleaded factual allegations of the

Amended Complaint and other information that the Court may consider on a motion to dismiss

for failure to state a claim.  This adversary proceeding arose from the massive Ponzi scheme

---

[1]      Certain headings are derived from the Amended Complaint.  They are descriptive only and do not
necessarily imply the Court's views of the allegations.

masterminded by Bernard L. Madoff and executed through BLMIS. (¶ 1.) [2] On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities law, and the SEC commenced a fraud action against Madoff in the United States District Court for the Southern District of New York. (¶ 89.) Upon the application of the Securities Investor Protection Corporation ("SIPC"), the District Court entered an order appointing Irving Picard as Trustee for the liquidation of BLMIS and removing the case to this Court. (¶ 91.) On March 12, 2009, Madoff pleaded guilty to an 11-count criminal complaint. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (¶ 94.)

One important fact omitted from the Amended Complaint but subject to judicial notice concerns the date that BLMIS began operating. BLMIS, the SIPA debtor in this case, commenced operations on January 1, 2001. Prior to that date, Madoff operated his financial business as a sole proprietorship. *In re BLMIS*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014) ("*Inter-Account Transfer Decision*"), *aff'd sub nom. Diana Melton Trust v. Picard* (*In re BLMIS*), 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016). Although BLMIS did not exist as an operating entity prior to January 1, 2001, this decision generally refers to Madoff's business as BLMIS regardless of when the transactions described herein occurred and makes the distinction between his sole proprietorship and BLMIS, the SIPA debtor, when necessary.

---

[2]    The parenthetical notation "(¶ _.)" refers to the paragraphs in the Amended Complaint.

B.     **The Defendants**

1.     **The Individual Defendants**

At all relevant times, Frank J. Avellino ("Avellino") and Michael Bienes ("Bienes"), both

certified public accountants, were partners in Avellino & Bienes ("A&B").  Nancy Avellino

("Mrs. Avellino") is Avellino's wife.  (¶ 42.)  Dianne K. Bienes ("Mrs. Bienes") is Bienes' wife,

(¶ 48), and was also a partner in A&B.  (¶ 58.)  Thomas G. Avellino ("Thomas Avellino") is

Avellino's son.  (¶ 54.)

2.     **The Entity Defendants**

a.   **Avellino & Bienes**

A&B was a Florida general partnership formed to practice accounting.  The general

partners included Avellino, Bienes and later, Mrs. Bienes.  (¶ 58.)  By 1984, A&B ceased

operating as an accounting firm and focused exclusively on investing in BLMIS.  Avellino and

Bienes maintained at least six different IA accounts with BLMIS in A&B's name during its

existence, which ended with its liquidation in 1992. (¶ 59.)

b.   **Avellino Family Trust**

The Avellino Family Trust was a trust, and Avellino was the trustee.  The Avellino

Family Trust had an IA account with BLMIS in its name, and it and/or Avellino received

transfers from its IA account.  (¶ 60.)

c.   **Avellino & Bienes Pension Plan & Trust**

Avellino & Bienes Pension Plan & Trust ("A&B Pension Plan") was a pension plan

created by Avellino and Bienes, and were the trustees.  The A&B Pension Plan had an IA

account with BLMIS and received transfers from that account.   It was a predecessor of the

4

Avellino & Bienes Profit Sharing Plan and the Mayfair Pension Plan, which were profit sharing

and/or pension plans established for the benefit of Avellino, Bienes, Mrs. Bienes and, later, Mrs.

Avellino.  (¶ 61.)

### d.  The Post-1992 Entities

The following table, derived from Exhibit F to the Amended Complaint, lists the general

partnerships[3] (the "Post-1992 Entities") formed for the purposes of investing with BLMIS

following the liquidation of A&B in 1992:

| Post-1992 Feeder Entity | ¶ | General Partners | IA Account |
|---|---|---|---|
| Grosvenor Partners, Ltd. ("Grosvenor Partners") | ¶ 62 | Avellino, Bienes, Mrs. Avellino, Mrs. Bienes and Mayfair Ventures | 1ZB046 |
| Mayfair Ventures, GP ("Mayfair Ventures") | ¶ 63 | Avellino, Bienes, Mrs. Avellino and Mrs. Bienes | 1ZB032 |
| Aster Associates ("Aster") | ¶ 64 | Avellino, Mrs. Avellino, Thomas Avellino, and subsequent transferee defendants identified in Exhibit F | 1ZB509 |
| St. James Associates ("St. James") | ¶ 65 | Bienes and Mrs. Bienes | 1ZB510 |
| Strattham Partners ("Strattham") | ¶ 66 | Thomas Avellino and Ascent, Inc. | 1ZB262 |
| Kenn Jordan Associates ("KJA") | ¶ 67 | Avellino | 1ZA879 |

---

[3]      The Amended Complaint alleges, in the alternative, that Grosvenor Partners, Ltd. was a limited partnership.
(¶ 62.)

### 3.    Subsequent Transferee Defendants

Exhibits D and E to the Amended Complaint identify the subsequent transfers and defendants that are the subject of Count Nine.  All of the Defendants, except for A&B, the Avellino Family Trust, A&B Pension Plan, Mayfair Ventures and St. James, are identified as defendants under Count Nine and, according to Exhibit D, all of the Count Nine defendants received subsequent transfers after January 1, 2001.  These defendants overlap to some extent with the initial transferees but will nevertheless sometimes collectively be referred to in this capacity as the "Subsequent Transferees."

## C.    The Transfers

### 1.    The Initial Transfers

Exhibit B to the Amended Complaint provides a detailed itemization of the various BLMIS accounts, including all of the withdrawals.  In many cases, the account activity ceased prior to January 1, 2001.  This category includes the accounts in the names of A&B (1A0045, 1A0047, 1A0048,[4] 1A0049, 1A0050 and 1A0053), Avellino Family Trust (1A100126), Avellino Group (1A100127), A&B Pension Plan (1A0046), Frank J. Avellino, Trustee (1A0051), Diane Bienes (1B0018) and Mayfair Bookkeeping Serving Mayfair Pension Plan (1ZB249).[5]  This

---

[4]    Exhibit B reflects two offsetting transactions in 1A0048 on July 31, 2001, nine years after the previous transaction.  It appears that a $25,000 wire transfer was deposited or withdrawn, and the wire was then cancelled. (Amended Complaint, Ex. B at p. 21 of 36.)

[5]    The Amended Complaint implies that Mayfair Bookkeeping received transfers from BLMIS aggregating $7,594,076 between 1997 and 2005.  (¶ 221.)  According to Exhibit B, however, the Mayfair Bookkeeping account (1ZB249) received a single cash deposit on January 27, 1995 in the sum of $2,742,892, and no funds were ever withdrawn.  (Amended Complaint, Ex. B at p. 33 of 36.)  In addition, Exhibit A, which represents a "total full history" of the initial transfers, (¶ 427), does not show any initial transfers from BLMIS to Mayfair Bookkeeping.

6

group of initial transferees is referred to collectively as the "Pre-2000 Initial Transferees."  The

Post-1992 Entities are the only defendants that received initial transfers after January 1, 2001.

### 2.    The Subsequent Transfers

Exhibits D and E to the Amended Complaint identify the subsequent transfers and the

Subsequent Transferees.  Those defendants that received subsequent transfers after January 1,

2001 include Avellino, Mrs. Avellino, the Frank J. Avellino Revocable Trust, the Nancy Carroll

Avellino Revocable Trust, the Avellino Family Foundation, Bienes, Mrs. Bienes, Thomas

Avellino, Grosvenor Partners, Aster, Strattham, KJA, Ascent, Mayfair Bookkeeping, Avellino &

Bienes Accounting Services, 27 Cliff, LLC, Rachel A. Rosenthal a/k/a Rachel Liersch, the

Rachel Anne Rosenthal Trust U/A dated June 29, 1990, the Rachel Anne Rosenthal Trust #3,

Heather C. Lowles, the Heather Carroll Lowles Trust, Tiffany Lowles, the Tiffany Joy Lowles

Trust U/A dated June 29, 1990, Melanie A. Lowles a/k/a Melanie Flowers, the Melanie Ann

Lowles Trust, the Taylor Ashley McEvoy Trust U/A dated June 24, 1992,  Madison Alyssa

McEvoy, the Madison Alyssa McEvoy Trust U/A dated June 29, 1990, the S.A. Grantor

Retained Annuity Trust and S.A, a minor.  These Subsequent Transferees are referred to

collectively as the "Post-2000 Subsequent Transferees."

### D.    The Madoff Ponzi Scheme

In or around 1960, Madoff began operating a brokerage firm called "Bernard L. Madoff"

from the offices of Alpern & Heller, his father-in-law Saul Alpern's accounting firm, where

Avellino worked as an accountant.  (¶¶ 102, 115.)  From the early 1970s through the early 1990s,

Madoff claimed to invest customer funds using a "convertible arbitrage investment strategy," (¶

103), but beginning in the 1990s, Madoff claimed to use the "split-strike conversion" investment

strategy (the "SSC Strategy").  According to Madoff, the SSC Strategy would produce steady

7

returns without the volatility in the stock market or other high return investment strategies.  (¶ 104.)  Madoff, however, never actually invested customer funds using the SSC Strategy, (¶ 106), and instead, operated BLMIS's investment advisory ("IA") business as a Ponzi scheme.  The money received from IA customers was used primarily to make distributions to other IA customers.  (¶ 108.)

### E.    Avellino, Later Joined by Bienes, Operated the First Madoff Feeder Fund

Madoff moved his business out of Alpern & Heller's offices in 1961,  (¶ 115), and around that time, the firm, now known was Alpern & Avellino, began operating BLMIS's first "feeder fund" by pooling customers' capital and providing it to Madoff to make discretionary investments in securities.  After Alpern's retirement, the firm was renamed A&B, and Avellino and Bienes operated the firm and the feeder fund as general partners.  (¶ 116.)

For decades, Avellino and Bienes raised hundreds of millions of dollars through A&B for investment in BLMIS, and earned tens of millions of dollars in profits from their pooling and investment activities.  (¶ 117.)  With the help of their wives, they attracted new customers to the feeder fund by promising guaranteed annual rates of return ranging from 13% to 18% of the original investments.  Avellino and Bienes called these investments "loans" and issued letters to investors specifying the rate of return for each "loan" in order to avoid scrutiny from securities regulators.  (¶ 118.)  Madoff, in turn, guaranteed significant annual returns to Avellino, Bienes, their wives, and A&B in order to continue the flow of customer funds into BLMIS.  A&B retained the spread between the returns it was receiving from BLMIS and the returns it had guaranteed to its own investors.  By 1984, Avellino and Bienes ceased operating the accounting business in order to focus exclusively on recruiting investors for the feeder fund.  (¶ 119.)

A&B investors included other entities that pooled customer funds for investment in A&B and, ultimately, BLMIS (collectively, the "A&B Business Associates"). (¶ 120.)  The entities were operated by friends of Avellino and Bienes.  (¶ 121.)  Avellino, Bienes, Mrs. Avellino and Mrs. Bienes also invested their personal funds with BLMIS.  (¶ 124.)  In addition, Avellino, Bienes, Mrs. Avellino, and Mrs. Bienes each benefitted from the A&B Pension Plan's account. (¶ 125.)

## F.    The SEC Enforcement Proceedings

### a.  Phony Account Statements

In June 1992, the SEC commenced an investigation of A&B, Avellino and Bienes to determine whether they were selling unregistered securities to the public and acting as unregistered investment advisors.  (¶ 126.)  Avellino and Bienes told the SEC that A&B owed its investors over $400 million, all of which was invested with BLMIS.  (¶ 130.)  The IA accounts, however, held $49.6 million less than the amount owed to A&B's investors, (¶ 131), and A&B's bank account held far less than what was needed to cover the shortfall.  (¶ 134.)  Avellino and Bienes testified before the SEC that they had engaged in a meticulous review and reconciliation of their IA account statements and were aware of the shortfall.  (¶ 133.)  In addition, Avellino testified that A&B always maintained a cushion in excess of the $400 million owed to investors, which was partly composed of additional investments in Treasuries.  (¶¶ 136-38.)

Avellino and Bienes knew their representations to the SEC were false.  Prior to their testimony before the SEC, BLMIS created a fake IA account to make up for the shortfall and corresponding account statements, books and records, and other associated documents for at least the three-year period between 1989 to 1992.  (¶ 142.)  BLMIS filled the fake IA account's statements with dozens of fictitious and backdated transactions showing realized and unrealized

9

gains from securities transactions allegedly occurring in 1991 and 1992.  (¶ 146.)  Because the

fake IA account was not created until 1992, Avellino and Bienes did not and could not have

received monthly statements for the account from 1989 to 1992.  (¶ 150.)  When the statements

were sent to the SEC, Avellino and Bienes knew they reflected transactions that had never

occurred. (¶ 151.)

Avellino also worked with Madoff to alter A&B's historical account statements.

Avellino, with Bienes' knowledge and consent, returned old account statements to BLMIS for

the purpose of concealing the alterations from the SEC and the receiver appointed by the court to

liquidate A&B (the "Receiver").[6]  (¶ 154.)  In July 30, 1992, Avellino faxed the December 1989

statements for several A&B accounts to BLMIS so that Madoff and BLMIS employees could

alter them to conform to the false information they and Madoff had provided to the SEC.  (¶¶

156-57.)  Avellino and Bienes also provided BLMIS with internal A&B documents, including

bank records and general accounting ledgers tracking A&B's IA account balances, to ensure that

the altered statements were consistent with A&B's internal records, which had also been

produced to the SEC.  (¶ 158.)

With Avellino's and Bienes' knowledge, BLMIS created a new set of statements for

A&B's IA accounts for production to the SEC and the Receiver.  (¶ 159.)  In some instances,

BLMIS created false transactions to cover up the shortfall between what A&B owed investors

and the value of A&B's accounts as reflected in the account statements.  (¶¶ 160-163.)  BLMIS

created "sub-accounts" housing fictitious, backdated transactions generating cash in order to

---

[6]        The Amended Complaint alleges that the Receiver was appointed by order of the District Court on
November 18, 1992, (¶ 171), but also alleges that the Receiver was involved in the SEC's investigation of A&B in
July 1992, prior to the appointment by the District Court.  The Court notes the discrepancy but concludes that it is
immaterial.

cancel out negative cash balances in some A&B accounts to support Avellino's and Bienes'

testimony touting the accounts' positive cash balances.  (¶ 164.)  Other statements were altered

in order to cover up inconsistencies with Madoff's representations and to prevent additional

questions from the SEC.  (¶165.)

The Receiver sought to audit A&B's books and records for an eight-year period, from

1984 to 1992.  Avellino and Bienes could only produce limited accounting records and

documents for a much shorter period, from 1989 to 1992, the period covered by the altered

account statements.  Avellino told the Receiver that A&B did not keep detailed financial records,

and directed the auditor to conduct its audit using documents provided by Madoff.  (¶ 167.)

Finally, on July 17, 1992, BLMIS, Avellino and Bienes made efforts to "paper" the

creation of the A&B accounts, which had been in existence for years.  Avellino, Bienes and Mrs.

Bienes executed partnership account agreements, trading authorizations, customer agreements,

margin agreements, option agreements and other account opening documents.  (¶ 168.)

### b.  The SEC Injunction Against Avellino, Bienes, and A&B

On November 17, 1992, the SEC filed a complaint against Avellino, Bienes and A&B for

preliminary and permanent injunctive relief for the unlawful sale of securities and operation of

an investment advisory company.  (¶ 170.)  The District Court granted a preliminary injunction

on November 18, 1992 and appointed the Receiver to oversee the liquidation of A&B.  (¶ 171.)

The District Court ordered the return of all funds to A&B investors by November 24, 1992.

Madoff obtained loans in order to provide sufficient funds for the payout to A&B investors, and

redemptions were made to A&B investors in late November 1992.  (¶ 172.)  On September 7,

1993, the District Court permanently enjoined Avellino, Bienes and A&B from selling

unregistered securities and operating an unregistered investment advisory company.  (¶ 173.)

### c.  Efforts to Circumvent the Injunction

Despite the permanent injunction, Avellino and Bienes attempted to find people willing

to act as "front men" for new BLMIS investment vehicles.  (¶ 175.)  They arranged with Michael

Sullivan and Greg Powell to create the partnerships S&P and P&S.  Avellino and Bienes agreed

to refer investors to these partnerships, which would, in turn, invest those funds with BLMIS.

The partnerships agreed to pay Avellino and Bienes 10% of the annual returns received on

account of the referrals.  (¶ 176.)  Through this arrangement, Avellino and Bienes received

$112,500 from 2000 to 2002 and $599,190 from 2003 to 2007.   (¶ 177.)

Following the liquidation of A&B, the Individual Defendants also created a web of inter-

connected entities, each of which lacked employees, corporate form, or any independent business

purpose.  These entities included Grosvenor Partners, Mayfair Ventures, Aster, St. James, and

Strattham (previously defined, with KJA, as the "Post-1992 Entities").  Avellino and Bienes

opened six IA accounts (the "Post-1992 IA Accounts")[7] with BLMIS in the names of the Post-

1992 Entities, (¶ 179), to avoid regulatory scrutiny, conceal the Individual Defendants' continued

involvement with BLMIS, and shield fictitious profits and other transfers they received from

BLMIS.  (¶ 180.)  The Post-1992 Entities and their accounts shared common addresses and

overlapping control persons.  (¶ 181.)  The Individual Defendants commingled funds among

their personal bank accounts, the Post-1992 Entities' bank accounts and their BLMIS accounts to

---

[7]        The Post-1992 IA Accounts included Grosvenor Partners Ltd c/o Frank Avellino (1ZB046); Mayfair
Ventures c/o Frank Avellino (1ZB032); Aster Associates Frank Avellino, Nancy Carroll Avellino General Partners
(1ZB509); St James Associates Michael Bienes, Diane [sic] Bienes General Partners (1ZB510); Strattham c/o
Thomas G Avellino (1ZB262); and Kenn Jordan Associates c/o Frank Avellino (1ZA879).

ensure a steady stream of profits for themselves, maintain minimum levels of liquidity for the

Post-1992 Entities and avoid angering Madoff by making too many withdrawals.  (¶¶ 182, 292-306.)

**G.    Avellino and Bienes Negotiated with Madoff to Receive Guaranteed Rates of Return and Side Payments for Funds Former A&B Investors Reinvested with BLMIS**

In 1992 or 1993, Madoff agreed to provide Avellino, Bienes and certain A&B Business

Associates with financial incentives to encourage former A&B investors to reinvest with BLMIS

following the liquidation of A&B because he did not want Avellino and Bienes to reveal what

they knew about his scheme to regulators.  (¶ 208.)  With Bienes' knowledge, Avellino met with

Madoff in the winter of 1993.  In return for encouraging former A&B investors to open direct IA

accounts with BLMIS, Avellino negotiated a guaranteed annual return of 17% on the  Post-1992

IA Accounts and side payments of 2% of the cash the investors of A&B and the A&B Business

Associates reinvested with BLMIS as of March 31, 1993 — approximately $372 million — less

$36 million in personal funds Avellino and Bienes and their families reinvested in BLMIS

through Grosvenor Partners and Mayfair Ventures.  A portion of the amount went to the A&B

Business Associates as side payments for the $72 million that had been reinvested by their

former investors.  (¶¶ 209-10.)  There were later adjustments to the base figure and to the

percentage used to calculate the side payments.  (¶¶ 212-214.)

BLMIS did not actually make the side payments in cash.  Instead, it credited the IA

accounts with highly profitable, non-hedged options transactions.  BLMIS would purportedly

purchase an option through an IA account and later sell it for a profit, thereby increasing the

balance in the account.  In reality, these option transactions were never executed, (¶ 216), and

BLMIS' delivery of the side payments through specific, on-demand gains was impossible under

any strategy.  (¶ 217.)  The Individual Defendants received at least $59 million, directly or

indirectly, in side payments through 2007, which were recorded in the Post-1992 IA Accounts as

fictitious gains that the Individual Defendants were free to withdraw.  (¶ 219.)  The following

table, taken from ¶ 221 of the Amended Complaint, shows how the side payments were allocated

to each IA account:

| Allocation of Side Payments ($) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Mayfair Ventures | Grosv'r | Mayfair Book.[8] | Aster | St. James | Strat. | KJA | Total |
| 1994 | 2,297,700 | 1,357,575 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 486,500 | 164,400 | 0 | 0 | 0 | 0 | 0 | 650,900 |
| 1996 | 0 | 5,577,228 | 0 | 0 | 0 | 0 | 0 | 5,577,228 |
| 1997 | 428,670 | 1,948,500 | 2,922,750 | 0 | 0 | 0 | 0 | 5,299,920 |
| 1998 | 500,220 | 6,272,600 | 1,198,940 | 0 | 0 | 0 | 0 | 7,971,760 |
| 1999 | 1,005,875 | 2,011,750 | 2,518,120 | 0 | 0 | 0 | 0 | 5,535,745 |
| 2000 | 5,372,000 | 1,074,400 | 537,200 | 0 | 0 | 0 | 0 | 6,983,600 |
| 2001 | 8,172,800 | 0 | 0 | 0 | 0 | 0 | 0 | 8,172,800 |
| 2002 | 2,164,320 | 1,743,480 | 0 | 0 | 0 | 0 | 0 | 3,907,800 |
| 2003 | 3,202,760 | 0 | 0 | 0 | 0 | 0 | 0 | 3,202,760 |
| 2004 | 1,785,810 | 66,516 | 270,402 | 41,934 | 41,934 | 26,028 | 20,244 | 2,252,868 |
| 2005 | 108,640 | 2,266,242 | 146,664 | 353,080 | 282,464 | 179,256 | 57,306 | 3,393,382 |
| 2006 | 1,679,230 | 0 | 0 | 0 | 0 | 0 | 0 | 1,679,230 |
| 2007 | 1,685,480 | 0 | 0 | 0 | 0 | 0 | 0 | 1,685,480 |
| Total | 28,890,005 | 22,482,691 | 7,594,076 | 395,014 | 324,398 | 205,284 | 77,280 | 59,968,748 |

The side payments often inflated annual rates of return in some years to greater than 80%.

Avellino and Bienes scrutinized their monthly statements from BLMIS and knew that these rates

of return were impossible and the product of fraud.  (¶ 223.)

---

[8]        As noted in footnote 5, the suggestion that BLMIS deposited funds into Mayfair Bookkeeping's IA account
after January 1995 is contradicted by the Exhibits attached to the Amended Complaint.

H.      The "Schupt" Process

BLMIS employees tracked the accounts to ensure that they received the guaranteed rate of return through a process referred to internally at BLMIS as calculating the "Shupt" or "Schupt," and the payments made pursuant to the process were referred to as "Schupt payments."[9] (¶ 225-26.)  The payment was made through the fictitious purchase and sale of options that resulted in gains equaling the amount of the Schupt payment.  (¶ 227.)  The Schupt process was regularly applied to IA accounts controlled by the Individual Defendants from 1994 through 2007.  (¶¶ 229-36.)

On at least an annual basis, Avellino, on Bienes' behalf and with his knowledge, performed calculations on their IA accounts to determine if the rate of return matched what Madoff had promised.  If the return was less than what was promised, Avellino, with Bienes' knowledge, communicated this to Madoff and Frank DiPascali.  Madoff and DiPascali would then manufacture fictitious trades in order to make up the difference.  Avellino, with Bienes' knowledge, would also identify the accounts that should receive the Schupt payments.  (¶ 238.)

For example, in May 1996, Avellino sent a spreadsheet to DiPascali containing his calculation of guaranteed returns from 1993 to 1995.  Avellino stated that he discovered "a difference of $434,000 in my favor."  (¶ 239.)  In December 1998, Avellino wrote to DiPascali

> Yes it's that time of year again.  Just a note to touch base about the accounts.
> Please make necessary trades in *all* of the accounts: (1) Grosvenor Partners, Ltd.
> (2) Mayfair Ventures and (3) Mayfair Ventures Pension Plan.  I believe the total
> base of the three accounts will be enough to even-up the balance due.  My

---

[9]      The Trustee speculates that the BLMIS employees meant to use the word "schtup," a derogatory Yiddish term.  (¶ 226.)  "Shtup" is a verb that literally means to push, press or shove, but is also slang for sexual intercourse. LEO ROSTEN, THE NEW JOYS OF YIDDISH 370 (2001).  In addition, it used to mean "bribe," which seems closer to what the Trustee implies was intended.  *See Glossary of Yiddish Words and Phrases* (http://kehillatisrael.net/docs/yiddish/yiddish.htm#s) (last visited July 18, 2016)

calculations show that BLM was *short* (for 12/31/97) approx. *$2,500,000*.  Please
send me a copy of the calcs you have for 1997 and 1998.

(¶ 240 (emphasis in original).)  As a result of Avellino's letter, fictitious trades totaling

approximately $7.9 million were reflected on the December 1998 account statements for the IA

accounts identified—the amount necessary to make the side payments and meet the guaranteed

rate of return.  (¶ 241.)

### H.    Red Flags

Avellino, Bienes and Thomas Avellino carefully reviewed account documentation from

BLMIS, and knew of or deliberately disregarded certain impossibilities revealed in the

documentation.

### 1.    Impossible Returns

Avellino, Bienes and Thomas Avellino were aware of or willfully blind to the fact that

their accounts were receiving returns that were impossibly and implausibly consistent.  (¶¶ 251,

255, 262, 267.)  The Post-1992 IA Accounts received guaranteed annual rates of return of 17%

from 1993 to 2001, 14% in 2002, and 11% from 2003 through 2008, and the side payments

increased returns to higher than 80% for certain accounts in some years.  (¶¶ 244-47.)  The

accounts received these returns even when financial markets plunged.  (¶ 248.)  The accounts

also experienced positive returns far more consistently than the S&P 100 Index.  (¶ 249.)

Avellino and Bienes had actual knowledge of the rates because they used those figures to

calculate the rates of return to A&B's investors.  Avellino and Bienes knew that it was not

possible for Madoff to guarantee annual rates of return for decades.  (¶ 268.)  Avellino and

Bienes admitted during the SEC investigation that A&B's IA accounts had never experienced

16

losses.  (¶¶ 269-70.)  Avellino and Bienes knew that implausibly steady returns suggested fraud at BLMIS and that no securities were actually being traded.  (¶ 271.)

### 2.    Trading Impossibilities

Avellino, Bienes and Thomas Avellino were aware of or willfully blind to trading impossibilities revealed in account documentation.  Account statements and trade confirmations for the Post-1992 IA Accounts showed hundreds of instances of purchases and sales of options that were quantitatively impossible on a particular day because they would have exceeded the total trading volume of those options on the market that day.  (¶¶ 252-54.)  The account statements and trade confirmations also showed stock and option transactions that occurred at prices outside the daily range.  (¶¶ 256-260.)  Avellino and Bienes had the ability to look up price information on securities on any given day, and such effort was required in order to calculate the equity in the pre-1992 IA accounts, a task which they represented to the SEC they performed daily.  (¶ 261.)

From November 1978 through July 1992, the A&B account documentation reflected numerous impossibilities in BLMIS' apparent execution of its convertible arbitrage investment strategy.  (¶ 275.)  For example, of the hundreds of convertible securities trades in the A&B accounts during that period, over 90% of the trades were 30 times greater than the total reported trading volume for the day, and 10% of the trades were 50 times greater than the total reported trading volume.  In one instance, BLMIS reported trades of a particular security that was 500 times greater than the total trading volume of the security for that day.  (¶¶ 276-78.)  Further, approximately 44% of trades were made on days when there was no reported trading volume at all in the particular security.  (¶ 277.)  Finally, of the approximately 1,000 securities with unique

prices traded between 1978 and 1992, 75% of them were reported by BLMIS at prices outside the reported daily range of market prices for those securities.  (¶ 279.)

### 3.    Back-Dated Trades

From December 1978 to November 1986, Avellino and Bienes received statements for the A&B accounts that reported numerous backdated trades.  (¶¶ 281-82.)  For example, the September 1979 BLMIS statement for one A&B account (1A0045) showed six transactions that purportedly occurred two months earlier in July 1979.  These transactions did not appear on the July or August 1979 statements for the account.  The October 1979 statement for another A&B account (1A0048) showed fourteen transactions that occurred between August and September 1979.  These transactions also did not appear on the account statements for those months.  (¶ 283.)  It is industry practice for investment advisors to record executed trades on customer account statements in the months in which they occurred.  (¶ 284.)  If a trade had actually occurred and settled on its stated date, then it would have appeared on that respective month's statement.  (¶ 285.)

### 4.    Strip Mall Auditor

Finally, Avellino and Bienes knew or were willfully blind to the fact that BLMIS' auditor was incapable of providing large-scale domestic and international auditing services to BLMIS.  (¶ 288.)  BLMIS, which reputedly ran the world's largest hedge fund, was audited by Friehling & Horowitz, a three-person accounting firm located in a strip mall in Rockland County, New York.  Of the three employees at the firm, one was an administrative assistant and one was semi-retired and living in Florida.  (¶ 287.)  As of November 1985, Avellino knew of Jerome Horowitz (one half of what became Friehling & Horowitz) because Avellino signed an audit confirmation identifying him as BLMIS' auditor.  (¶ 289.)  All accounting firms that conduct

18

audit work must enroll in the peer review program offered by the American Institute of Certified Public Accountants (the "AICPA").  Firms that are part of the program are listed on the AICPA's website.  As CPAs who performed audit work, Avellino and Bienes were aware of the AICPA's peer review program.  Friehling & Horowitz had avoided peer review since 1993 by representing that it did not perform audit work and, therefore, was not listed on AICPA's website.  (¶ 290.) Avellino and Bienes looked the other way because they knew BLMIS was a fraud and because Friehling & Horowitz was unlikely to notice or inquire.  (¶ 291.)

## G.    Bienes Lied in a Television Interview and Bienes, Avellino, Mrs. Bienes, and Thomas Avellino Asserted Their Fifth Amendment Rights

On February 9, 2009, Bienes gave a videotaped interview to a television journalist for the Public Broadcasting Service's *Frontline* program.  Bienes stated that he never had any "inkling" of the BLMIS fraud and that he never verified that stock transactions occurred because the gains from these transactions were small and "nothing ever jumped out at [him]."  (¶¶ 309-10.)  At the time, Bienes knew that account statements from BLMIS included backdated trades and that the statements generated for the fake IA account in 1992 showed transactions that resulted in massive gains, including a single trade in January 1991 that purportedly generated $18,019,575.  (¶¶ 311-312.)  Bienes also stated that he only received "9 and half, 10 [percent] maybe" after he reinvested with BLMIS following A&B's liquidation.  (¶ 313.)  At the time, Bienes knew that Madoff had promised and delivered an 11-17% rate of return.  He also knew that he and Avellino received side payments, which provided additional returns.  (¶ 314.)

Bienes then stated, "I walked away from the whole thing…. I had no clients.  I brought no one to him.  I never mentioned his name."  (¶ 315.)  Bienes also stated that he did not know if S&P and P&S clients had invested through A&B, even though he received a percentage of the

management fees that former A&B clients paid to P&S and S&P. (¶ 316.) When confronted with the fact that almost all of the A&B investors reinvested with Madoff, Bienes, who received side payments specifically calculated from the amount of money reinvested with BLMIS, stated, "I don't know if almost all of them did, because I didn't track it. I didn't care." (¶ 317.) Bienes also stated that he did not know if Avellino was investing customer funds with BLMIS through the Post-1992 Entities or steering investors to S&P or P&S. (¶ 318.)

Bienes admitted that he believed it was "a little strange" that BLMIS used a small auditing firm because "auditing is a very labor-intensive business." (¶ 321.) Bienes also admitted that he had not had a "down year." (¶ 322.) When asked about the implausibility of BLMIS' annual returns, Bienes stated, "Bernie was the well. I just turned the spigot, sent him the fax, the money came." (¶ 323.) Bienes also stated that BLMIS was "like a money machine." (¶ 324.) He stated that neither he nor Avellino conducted any inquiry into Madoff because they feared threatening their relationship with him. Specifically, Bienes said, "I was gonna walk in and say, 'Bernie, let me see your books?' He'd show me the door. He was my income. He was my life. How could I do such a thing?" (¶ 325.) Finally, when asked if he had been "willing to blind [himself]" to how the money was obtained, Bienes answered that he had. (¶ 326.) When the Trustee sought to examine them months later, Bienes, Mrs. Bienes, Avellino and Thomas Avellino asserted the Fifth Amendment right against self-incrimination and refused to answer questions about Madoff or BLMIS. (¶ 328.)

## K.    This Adversary Proceeding

The Trustee commenced this adversary proceeding on December 10, 2010, and filed the Amended Complaint on November 24, 2011. The Amended Complaint asserts thirteen counts summarized in the following table:

| Summary of Counts | | | |
|---|---|---|---|
| Count | ¶¶ | Defendant(s) | Description |
| 1 | 484-89 | The Individual Defendants, and the Post-1992 Entities, excluding KJA | Avoid and recover two-year actual fraudulent transfers under 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a) and 551 |
| 2 | 490-98 | The Individual Defendants and the Post-1992 Entities, excluding KJA | Avoid and recover two-year constructive fraudulent transfers under 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a) and 551 |
| 3 | 499-504 | The Individual Defendants and the Post-1992 Entities | Avoid and recover six-year actual fraudulent transfer under New York Debtor and Creditor Law §§ 276, 276-a and/or 279, and 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), 551, |
| 4 | 505-10 | The Individual Defendants and the Post-1992 Entities | Avoid and recover six-year constructive fraudulent transfers under New York Debtor and Creditor Law §§ 273, 278 and/or 279, and 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), and 551 |
| 5 | 511-16 | The Individual Defendants and the Post-1992 Entities | Avoid and recover six-year constructive fraudulent transfers under New York Debtor and Creditor Law §§ 274, 278 and/or 279, and 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a) and 551 |
| 6 | 517-22 | The Individual Defendants and the Post-1992 Entities | Avoid and recover six-year constructive fraudulent transfers under New York Debtor and Creditor Law §§ 275, 278 and/or 279, and 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), and 551 |
| 7 | 523-29 | The Individual Defendants and the Entity Defendants | Avoid and recover undiscovered actual fraudulent transfer under New York Debtor and Creditor Law §§ 276, 276-a, 278 and/or 279, and 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a) and 551 |
| 8 | 530-40 | Strattham | Avoid and recover 90-day preferential transfer under 11 U.S.C. §§ 105(a), 502(d), 547(b), 550(a) and 551 |
| 9 | 541-47 | All defendants, other than A&B, Avellino Family Trust, A&B Pension Plan, Mayfair Ventures, and St. James | Recover subsequent transfers under New York Debtor and Creditor Law §§ 276-a and 278, 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3) |

| 10 | 548-53 | Strattham, KJA and Mayfair Bookkeeping | Objection to and disallowance of customer claims under 11 U.S.C. §§ 502(a) and 502(b)(1) and SIPA § 78fff-2 |
| 11 | 554-59 | Strattham, KJA and Mayfair Bookkeeping | Equitable disallowance of claims against BLMIS |
| 12 | 560-66 | Strattham, KJA and Mayfair Bookkeeping | Equitable subordination of customer claims under 11 U.S.C. §§ 105(a) and 510(c) |
| 13 | 567-70 | The Individual Defendants, Mayfair Ventures, and Subsequent Transferee Defendants who were partners in the Post-1992 Entities | Impose general partner liability for judgments against the Entity Defendants |

The motion to dismiss the Amended Complaint was filed by some but not all of the defendants on January 28, 2015. The original movants are identified in Exhibit A to the *Defendants' Memorandum of Law in Support of Their Motion to Dismiss*, dated Jan. 28, 2015 ("*Defendants Memo*") (ECF Doc. # 89) and the *Notice of Defendants' Motion to Dismiss Amended Complaint*, dated Jan. 28, 2015 ("*Notice of Motion*") (ECF Doc. # 88). Thereafter, the defendants Bienes, Mrs. Bienes, St. James Associates, Dianne K. Bienes as Trustee for Diane K. Bienes Grantor Retained Annuity Trust dated 10/31/1997, Diane K. Bienes Grantor Retained Annuity Trust dated 10/31/1997, Dianne K. Bienes as Trustee for T.C.D. Trust, T.C.D. Trust, Michael Bienes as Trustee for Glenn J. Dydo Irrevocable Trust U/A August 12,1988, and Glenn J. Dydo Irrevocable Trust U/A August 12, 1988 (collectively, the "Adopting Defendants") joined in the motion and adopted the Moving Defendants' legal argument raised in the *Memo in Support*. (*Defendants' Notice of Adoption of Co-Defendants Memorandum of Law in Support of Their Motion to Dismiss Trustee's Amended Complaint*, dated Jan. 28, 2015 ("*Notice of*

22

*Adoption*") (ECF Doc. # 90).)[10]  Together, the original movants and those that joined in the

motion (collectively, the "Defendants") include all but one of the defendants named in the

Amended Complaint.[11]

In the main, the Defendants contend that the Amended Complaint fails to adequately

allege that they had actual knowledge that no securities transactions were being conducted by

Madoff or BLMIS or that Madoff's business was a Ponzi scheme.  Consequently, the transfers

made more than two years before to the Filing Date are protected by the safe harbor in section 11

U.S.C. § 546(e).  They also contend that the Amended Complaint fails to adequately allege the

Defendants' willful blindness, and, therefore, the transfers made within two years prior to the

Filing Date are protected by the "good faith" defense under 11 U.S.C. § 548(c).  Moreover, they

argue that Avellino's knowledge cannot be imputed to Mrs. Avellino, the non-individual

Defendants, or to their general or limited partners.  In addition, they assert a number of

additional arguments that are addressed below.

---

[10]       Although joining in the motion, Dianne K. Bienes, as trustee for Diane [*sic*] K. Bienes Grantor Retained
Annuity Trust dated 10/31/1997, Diane [*sic*] K. Bienes Grantor Retained Annuity Trust dated 10/31/1997, Dianne
K. Bienes as trustee for T.C.D. Trust, the T.C.D. Trust, Michael Bienes as trustee for Glenn J. Dydo Irrevocable
Trust U/A August 12, 1988, and the Glenn J. Dydo Irrevocable Trust U/A August 12, 1988 are not named as
defendants in the Amended Complaint.

[11]       Neither the *Notice of Motion* nor the *Notice of Adoption* lists the minor with initials S.A. The Amended
Complaint alleges that S.A. received a subsequent transfer in 2007, (Amended Complaint, Ex. D at p. 32 of 32), and
is a defendant on Count Nine.  (*Id.*, Ex. E.)

## DISCUSSION

### A.    Jurisdiction and Standing

The Defendants make several arguments addressed to the Trustee's standing and the

Court's jurisdiction.  One in particular is critical to the disposition of this motion and the

Trustee's claims, and it is discussed immediately below.

### 1.    The Formation of BLMIS

As noted, prior to 2001, Madoff operated his business as a sole proprietorship; BLMIS,

the SIPA debtor, a limited liability company, Began operations on January 1, 2001.  The

Defendants contend that the Trustee cannot recover transfers made by the sole proprietorship.

(*Defendants Memo* at 2-4; *Defendants' Reply Memorandum of Law in Support of Defendants'*

*Motion to Dismiss Trustee's Amended Complaint*, filed June 23, 2015, at 2-4 ("*Defendants*

*Reply*") (ECF Doc. # 101); *Letter from Gary A. Woodfield*, *Esq. to the Court,* dated Aug. 12,

2015 (ECF Doc. # 104).)  In response, the Trustee argues that BLMIS' change in form in 2001

from a sole proprietorship to a limited liability company is irrelevant to the issue of standing

because (a) BLMIS was always a member of SIPC, and (b) this Court previously stated the

change in corporate form is irrelevant.  (*Memorandum of Law in Opposition to Defendants'*

*Motion to Dismiss the Trustee's Amended Complaint*, dated May 21, 2015 ("*Trustee's Memo*") at

43-44 (citing and quoting from *Inter-Account Transfer Decision*, 522 B.R. at 60) (ECF Doc #

99).)  Furthermore, the substantive consolidation of the Madoff and BLMIS estates authorized

the Trustee to avoid and recover transfers by the sole proprietorship as well as the SIPA debtor.

(*Letter from Jimmy Fokas*, *Esq. to the Court,* dated Aug. 12, 2015, at 1, 4-6 (ECF Doc. # 102).)

Finally, the SIPA debtor is a successor to the Madoff sole proprietorship, and the order of the

District Court that placed the limited liability company into a SIPA liquidation included its

predecessor. (*Id.* at 2-4.)

The "debtor" in a SIPA liquidation proceedings is "a member of SIPC with respect to

whom an application for a protective decree has been filed under section 78eee(a)(3) of this

title." SIPA § 78lll(5). SIPC filed an application for a protective decree against "Bernard L.

Madoff Investment Securities LLC," and the District Court's order identifies the Defendant as

"Bernard L. Madoff Investment Securities LLC." [12]  The predecessor business, which was not a

defendant or even mentioned in the District Court's Order, was conducted in the name of

Bernard L. Madoff. (Uniform Application for Broker-Dealer Registration (Form BD), dated Jan.

12, 2001, at 9.)[13]  The SIPA debtor was BLMIS, the limited liability company, and not Madoff's

sole proprietorship, an entity that had no legal existence separate from Madoff. *See United*

*States v. Fox*, 721 F.2d 32, 36 (2d Cir. 1983); *Mattel, Inc. v. Adventure Apparel*, No. 00 CIV.

4085 (RWS), 2001 WL 1035140, at *5 n.2 (S.D.N.Y. Sept. 7, 2001).[14]

The distinction is an important one. The customer property invested with BLMIS never

became property of Madoff or BLMIS under applicable non-bankruptcy law, and an ordinary

bankruptcy trustee could not recover it. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213

(2d Cir. 2014); *Grayson Consulting, Inc. v. Wachovia Secs., LLC* (*In re Derivium Cap. LLC*),

---

[12]     The District Court's Order, dated Dec. 15, 2008, is docketed as ECF Doc. # 1 in adversary proceeding no.
08-01789.

[13]     A copy of Form BD filed by BLMIS is annexed as Exhibit B to the *Declaration of Kevin H. Bell,* dated
June 6, 2014 Ex. B (ECF Case No. 08-01789 Doc. # 6928).)

[14]     BLMIS succeeded to all of the assets and liabilities of Madoff's predecessor broker-dealer business, *see
Inter-Account Transfer Decision*, 522 B.R. at 60, as well as its SEC registration number. The assets did not include
fraudulent transfer claims. Fraudulent transfer claims belong to the creditors under non-bankruptcy law, and the
transferred property does not become property of the estate until it is recovered. *See* 11 U.S.C. § 541(a)(3).

716 F.3d 355, 361 (4th Cir. 2011) (assignee of bankruptcy trustee lacks standing to recover

transfers of non-debtor property).  SIPA § 78fff–2(c)(3)[15] "circumvents this problem through a

statutorily created legal fiction that confers standing on a SIPA trustee by treating customer

property as though it were 'property of the debtor' in an ordinary liquidation."  *Fairfield*

*Greenwich,* 762 F.3d at 213; *accord In re BLMIS*, 531 B.R. 439, 448-49 (Bankr. S.D.N.Y. 2015);

*Picard v. Chais* (*In re BLMIS*), 445 B.R. 206, 238 (Bankr. S.D.N.Y. 2011).  In other words, the

Trustee can recover the transfers of customer property by BLMIS, but Madoff's bankruptcy

trustee cannot recover the transfers of customer property made by Madoff individually.

The substantive consolidation of the BLMIS and Madoff estates did not empower

Madoff's chapter 7 trustee to exercise the powers of a SIPA trustee, nor could it.  Following the

commencement of the SIPA proceeding, several creditors commenced an involuntary case

against Madoff, and the Court ordered relief on May 7, 2009.  Alan Nisselson, Esq. was

appointed the chapter 7 trustee for the Madoff estate.  Pursuant to a consent order among the

Trustee, Mr. Nisselson and SIPC, the BLMIS estate and the Madoff chapter 7 estate were

substantively consolidated.  (*See Consent Order Substantively Consolidating the Estate of*

*Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC*

*and Expressly Preserving All Rights, Claims and Powers of Both Estates*, dated June 9, 2009

---

[15]     SIPA § 78fff–2(c)(3) provides:

Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs
(A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor
which, except for such transfer, would have been customer property if and to the extent that such
transfer is voidable or void under the provisions of Title 11.  Such recovered property shall be
treated as customer property.  For purposes of such recovery, the property so transferred shall be
deemed to have been the property of the debtor and, if such transfer was made to a customer or for
his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the
contrary notwithstanding.

("*Substantive Consolidation Order*") (ECF Case No. 08-01789 Doc. # 252).)  Notwithstanding

the substantive consolidation, each trustee remained trustee of his respective estate with the

powers and duties that attended his office.[16]  The SIPA trustee would continue to have the duties

and powers of a SIPA trustee.  (*Id.* at ¶¶ 6, 7.)  His powers included the ability to avoid and

recover transfers of customer property under SIPA § 78fff–2(c)(3).  Conversely, the powers of

the Madoff trustee were limited to those exercised by an ordinary bankruptcy trustee:

> Notwithstanding the substantive consolidation of the Madoff estate into the
> BLMIS SIPA Proceeding, the Chapter 7 Trustee shall remain Chapter 7 trustee of
> the Madoff estate and shall continue to have all powers, rights, claims and
> interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the
> Bankruptcy Code in consultation with the SIPA Trustee and SIPC.

(*Id.* at ¶ 4.)

Finally, the *Inter-Account Transfer Decision* did not rule that the Trustee had the power

to avoid and recover transfers of customer property made by Madoff's sole proprietorship.  The

*Inter-Account Transfer Decision* addressed the proper method for calculating the net equity in a

customer account that had received an inter-account "transfer" from another BLMIS customer

account.  It did not concern avoidance claims and expressly rejected the argument that an inter-

account transfer was a "transfer" within the meaning of the Bankruptcy Code subject to the

statute of limitations on avoidance claims.  *Inter-Account Transfer Decision*, 522 B.R. at 53-54.

The Court approved the Trustee's methodology which first recomputed the net equity in the

transferor account at the time of the "transfer" under the Net Investment Method approved in *In

re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012), and then credited the

transferee account with the amount of the transfer up to the net equity in the transferor account.

---

[16]    It appears that Mr. Picard succeeded Mr. Nisselson as the trustee of Madoff's individual estate.

One of the objections to the inter-account method argued that it could not be applied to any inter-account transfers that occurred before January 1, 2001 when Madoff operated the business as a sole proprietorship.  The Court disagreed.  The argument was based, in part, on the erroneous assumption that the sole proprietorship was not a member of SIPC; Madoff was a member of SIPC since 1970.  *Inter-Account Transfer Decision,* 522 B.R. at 60.  Furthermore, the change in the form of the business was irrelevant to the amount of net equity in the pre-BLMIS accounts that were transferred to BLMIS.  "Fictitious profits created by Madoff, the individual, are still fictitious profits in an account maintained by BLMIS. Madoff's incorporation did not transmute those fictitious profits into principal."  *Id.*

While the pre-2001 inter-account transfers are relevant to the computation of net equity, and in the fraudulent transfer context to whether the defendant withdrew principal or fictitious profits, it does not follow that the Trustee can recover the *actual* withdrawals of cash by customers of the sole proprietorship.  Only the Madoff trustee can recover actual transfers by the sole proprietorship, but the customer property withdrawn prior to January 1, 2001 was not property of the Madoff sole proprietorship and cannot be avoided by the Madoff trustee or one exercising his powers pursuant to the *Substantive Consolidation Order*.

### 2.    The Defendants' Other Arguments

The Defendants other jurisdictional and standing arguments lack merit.  For example, they argue that their investments in BLMIS never became customer property because they invested with BLMIS in its capacity as an investment advisor rather than as a broker-dealer, and BLMIS purported to hold the Defendants' investments in their names rather than in the name of

BLMIS.  (*Defendants Memo* at 33-37.)[17]  SIPA authorizes the trustee to avoid and recover

transfers of customer property.  SIPA § 78fff–2(c)(3).  "Customer property" includes "cash and

securities . . . at any time received, acquired, or held by or for the account of a debtor from or for

the securities accounts of a customer, and the proceeds of any such property transferred by the

debtor, including property unlawfully converted."  SIPA § 78*lll*(4).  The funds that the

Defendants voluntarily deposited with BLMIS became customer property subject to SIPA.

(*Trustee Memo* at 44 (citing *Rosenman Family, LLC v. Picard*, 420 B.R. 108, 111 (S.D.N.Y.

2009), *aff'd,* 395 Fed. App'x 766 (2d Cir. 2010)); SIPA § 78*lll*(2).)  Thus, even where the

Trustee is seeking to avoid and recover the Defendants' withdrawal of their own principal

deposits, he is still seeking to recover customer property.[18]  The Defendants place weight on the

fact that they did not give BLMIS specific instructions to purchase or sell any securities, but no

"specific authorization instruction is required to move a party into 'customer' status."  *Rosenman

Family*, 420 B.R. at 111.

Lastly, the Defendants maintain that the Trustee lacks the power to assert fraud claims.

The Trustee is not asserting fraud claims.  Instead, he is asserting statutory avoidance as well as

disallowance and subordination claims, which he has standing to do for the reasons previously

stated.

---

[17]     The Defendants also make certain arguments regarding standing in connection with the Trustee's assertion
of alter ego liability.  These arguments are dealt with below.

[18]     Furthermore, to the extent the Trustee is seeking to avoid and recover the payment of fictitious profits, he is
seeking to recover other customers' property.

B.    **Standards Governing the Motions**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. Courts do not decide

plausibility in a vacuum. Determining whether a claim is plausible is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

556 U.S. at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 556. "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement

to relief.''" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, the court

should begin by "identifying pleadings that, because they are no more than [legal] conclusions,

are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the

elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678.

Second, the court should assume the veracity of all "well-pleaded factual allegations," determine

whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

30

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007). A complaint is deemed to include any written instrument attached to it as an exhibit,

documents incorporated in it by reference, and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citations omitted); *accord

Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus.,

Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992). "A

document is integral to the complaint 'where the complaint relies heavily upon its terms and

effect.'" *Goel v. Bunge, Ltd.*, No. 15–3023–cv, 2016 WL 1696597, at *3 (2d Cir. Apr. 28, 2016)

(quoting *Chambers*, 282 F.3d at 153). However, "[l]imited quotation from or reference to

documents that may constitute relevant evidence in a case is not enough to incorporate those

documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004);

*accord Goel*, 2016 WL 1696597, at *3; *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir.

2008).

**C.     Counts One through Eight (Avoidance Claims)**

    **1.     Introduction**

Counts One and Two seek to avoid and recover the initial transfers by BLMIS to the

Defendants that occurred within two years of the Filing Date pursuant to section 548 of the

Bankruptcy Code, Counts Three through Six seek to avoid and recover the initial transfers by

BLMIS to the Defendants made within six years of the Filing Date under New York law, and

Count Seven seeks to avoid and recover all initial transfers by BLMIS to the Defendants under

New York law regardless of when they occurred. Finally, Count Eight seeks to avoid and

recover a preferential transfer made by BLMIS to Strattham.

31

The Trustee's ability to avoid and recover transfers has been limited by several decisions

issued by the Second Circuit Court of Appeals, the United States District Court for the Southern

District of New York and this Court.  In light of the safe harbor granted under 11 U.S.C. §

546(e), the Trustee may only avoid and recover intentional fraudulent transfers under §

548(a)(1)(A) made within two years of the Filing Date, *Picard v. Ida Fishman Revocable Trust*

(*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *Picard v.*

*Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011), unless the transferee had actual knowledge of

Madoff's Ponzi scheme, or more generally, "actual knowledge that there were no actual

securities transactions being conducted."  *SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR),

2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").[19]  The safe harbor was

intended, among other things, to promote the reasonable expectations of legitimate investors.  If

an investor knew that BLMIS was not actually trading securities, he had no reasonable

expectation that he was signing a contract with BLMIS for the purpose of trading securities for

his account.  *Id*.  In that event, the Trustee can avoid and recover preferences and actual and

constructive fraudulent transfers to the full extent permitted under state and federal law.  *See id*.

at *6.

Although the safe harbor does not bar the Trustee's intentional fraudulent transfer claims

under 11 U.S.C. § 548(a)(1)(A), the transferee's knowledge is still relevant under 11 U.S.C. §

---

[19]     The movants argue that *Cohmad* was incorrectly decided and urge me to overrule the District Court's
decision.  (*Defendants Memo* at 4-7.)  The *Cohmad* decision was rendered in connection with the withdrawn reference
of the proceedings relating to the safe harbor in 11 U.S.C. § 546(e).  At the end of the decision, Judge Rakoff ruled
"that what remains of the adversary proceedings listed in Exhibit A of item number 119 on the docket of 12 Misc. 115
be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order."  *Cohmad,* 2013
WL 1609154, at *10.  This adversary proceeding was the first one listed on Exhibit A.  I decline the Defendants'
invitation to ignore the mandate and overrule *Cohmad*.

548(c).  Section 548(c) provides a defense to a fraudulent transfer claim brought under 11 U.S.C.

§ 548(a) to the extent the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).

Where, as here, the Trustee seeks to recover the transfer of principal in addition to fictitious

profits, he must plead the transferee's lack of subjective good faith, which, in this SIPA case,

means the transferee turned a blind eye to facts that suggested a high probability of fraud.  *Katz*,

462 B.R. at 454-56; *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 21 (S.D.N.Y. 2014) ("*Good*

*Faith Decision*"); *Picard v. Ceretti* (*In re BLMIS*), Adv. P. No. 09-01161 (SMB), 2015 WL

4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"), *leave to appeal denied*, 15 Civ.

7086 (JPO) (S.D.N.Y. Dec. 4, 2015); *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 138-39

(Bankr. S.D.N.Y. 2014) ("*Merkin*").  Lack of objective good faith is not enough "because the

securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and]

those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure

to so inquire."  *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462 B.R. at

455.

    In summary, in order to meet his pleading burden under Counts Two through Eight, the

Trustee must plead that the initial transferee had actual knowledge that BLMIS was not engaged

in the trading of securities.  If the Amended Complaint does not plead actual knowledge, the

Trustee can still recover intentional fraudulent transfers, including transfers of principal,

pursuant to 11 U.S.C. § 548(a)(1)(A) under Count One if he pleads that the initial transferee

willfully blinded itself to the fact that BLMIS was not engaged in the actual trading of securities.

If the Trustee does not plead actual knowledge or willful blindness, his recovery under 11 U.S.C.

§ 548(a)(1)(A) is limited to any fictitious profits transferred to the initial transferee.

2.    **Knowledge**

This Court outlined what it means to have actual knowledge of, or to be willfully blind to,

a fact in *Merkin* and *Kingate*.   "Knowledge" is "[a]n awareness or understanding of a fact or

circumstance; a state of mind in which a person has no substantial doubt about the existence of a

fact." BLACK'S LAW DICTIONARY 1003 (10th ed. 2014) ("BLACK"); *accord Merkin*, 515 B.R. at

139; *Kingate*, 2015 WL 4734749, at *13.   "Actual knowledge" is "direct and clear knowledge, as

distinguished from constructive knowledge." BLACK at 1004.   "Thus, 'actual knowledge'

implies a high level of certainty and absence of any substantial doubt regarding the existence of a

fact." *Merkin*, 515 B.R. at 139.

In contrast, "willful blindness" involves two elements: "(1) the defendant must

subjectively believe that there is a high probability that a fact exists and (2) the defendant must

take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*,

563 U.S. 754, 769 (2011).   If a person who is not under an independent duty to investigate

"nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high

probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith."

*Katz*, 462 B.R. at 455; *accord Merkin*, 515 B.R. at 139.   "Thus, willful blindness connotes strong

suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate

failure to acquire knowledge of its existence." *Merkin*, 515 B.R. at 140 (emphasis in original).

Although the Defendants initially disputed the allegations of willful blindness, the

attorney for the original moving defendants conceded at oral argument that the Trustee had

adequately alleged the defendants' willful blindness under the standard applied by the Court in

34

*Merkin*.[20]  "Statements made by an attorney during oral argument . . . constitute binding judicial admissions."  *General Ins. Co. v. Mezzacappa Bros., Inc.*, No. 01–CV–7394 (FB), 2003 WL 22244964, at * 5 (E.D.N.Y. Oct. 1, 2003), *aff'd*, 110 F. App'x 183 (2d Cir. 2004); *accord Gun Hill Road Serv. Station, Inc. v. ExxonMobil Oil Corp.*, No. 08 Civ. 7956 (PKC), 2013 WL 1804493, at *8 (S.D.N.Y. April 18, 2013); *see United States Trust Co. v. Shapiro*, 835 F.2d 1007, 1009 (2d Cir. 1987) (remanding case "to the District Court with instructions to hold [counsel] to his concession" made before the Court of Appeals).  Since the Adopting Defendants joined in the motion and did not contest the concession, I deem them to have acquiesced in the concession.  Accordingly, I limit the discussion to the question of actual knowledge.

The allegations relevant to Avellino's and Bienes's actual knowledge fall generally into the following categories: (1) the dishonest acts during the 1992 SEC investigation; (2) the circumvention of the SEC injunction through the creation of the Post-1992 Entities and corresponding IA Accounts and the diversion of former and new customers in exchange for referral fees; (3) the existence of red flags; and (4) the "Schupt" adjustments.

### a.    The SEC Investigation

The Trustee spends a great deal of time discussing the 1992 SEC investigation and the dishonest acts committed by Avellino, Bienes and Madoff in connection with that investigation. The Amended Complaint attempts to tie the knowledge of false statements delivered to the SEC

---

[20]    During the hearing, the following colloquy took place:

THE COURT:    Do you think the trustee has alleged enough to allege willful blindness?

MR. WOODFIELD [attorney for the original moving defendants]:  Well, I hate to ever make an admission, but if I compared it to Merkin, I believe that is the case.

(*Transcript of July 29, 2015 Hrg.* at 26:24-27:20 (ECF Doc. # 106).)

to knowledge of the fictitious trading that forms the basis of the Trustee's fraudulent transfer allegations. These allegations plainly support the inference that Avellino and Bienes knew that Madoff had created records of fictitious, back-dated trades to dupe the SEC. But while the fraud perpetrated on the SEC was reprehensible, it was also focused and specific. It does not support the inference that Avellino or Bienes knew that Madoff was also defrauding his customers or not engaged in the trading securities on their behalf.

The Amended Complaint does include one group of factual allegations that attempts to connect the SEC fraud to the fraudulent withdrawals that were part and parcel of the Ponzi scheme. It alleges that Madoff created Account 1A0053 (which the Amended Complaint dubs the "Phony A&B IA Account") two weeks prior to Avellino's and Bienes' testimony before the SEC, and recorded back-dated fictitious trades to increase the apparent value of the A&B accounts with BLMIS. (¶¶ 144-49.) Avellino and Bienes, who monitored their accounts to ensure they were receiving the guaranteed returns, (¶ 238), had to have known that Account 1A0053 was freshly minted and the transactions woven from whole cloth. Yet following its creation, A&B withdrew $249,031,484 from Account 1A0053, including $212,801,638 in fictitious profits. The last withdrawal occurred on December 15, 1992. (Amended Complaint, Ex. B-10, at p. 26 of 36.)

These allegations, however, are contradicted by other specific facts laid out in the Amended Complaint. Exhibit B, which reflects the Trustee's reconstruction of BLMIS' books and records, indicates that the Phony A&B IA Account was actually funded with transfers from other A&B-related accounts. (Amended Complaint, Ex. B, at p. 26 of 36.) In that case, the aggregate value of the A&B-related accounts would not change; the same amount of money would be spread among more accounts. Furthermore, if the Phony A&B IA Account was funded

36

with transfers from other A&B-related accounts, it is more plausible that A&B thought it was

withdrawing its own money when it was withdrawing funds from that account.

### b.    The Circumvention of the Injunction

The Amended Complaint alleges that following the commencement of the SEC lawsuit,

the appointment of the Receiver and the entry of the order directing A&B, Avellino and Bienes

to repay their investors and refrain from various acts that violated the federal securities laws,

Avellino, and possibly Bienes, took steps to circumvent the injunction.  First, they redirected

their former investors to other feeder funds that invested with Madoff and received commissions

based on the investments that they steered to Madoff.  Second, they set up the Post-1992 Entities,

commingled their assets, and created accounts in which those entities invested.  Again, this

alleges dishonesty and implies greed, but does not support the inference that Avellino or Bienes,

or both, knew that Madoff was not actually engaging in trades with the money they were

funneling to him.

### c.    Red Flags

The Amended Complaint identifies several red flags including, impossibly consistent

annual returns, trading impossibilities, impossible options trading volumes, transactions outside

the daily price range, back-dated trades, and the use of an incapable, strip mall auditor.  The

Court considered the Trustee's red flag theory of *actual knowledge* in *Picard v. Legacy Capital

Ltd.* (*In re BLMIS*), 548 B.R. 13 (Bankr. S.D.N.Y. 2016).  There, the Court observed that the

"red flag" theory of *scienter* had been rejected in Madoff-related federal securities law litigation

because it was based on hindsight and required clairvoyance.  *Id.* at 33.  Many of the red flags

were generally known to investors and the SEC, and in many cases, the red flags would become

visible, if at all, only after comparing the BLMIS-generated account statements with market

information.  *Id.*  Furthermore, while federal securities law litigation imposed a different standard of pleading, the requirement of pleading actual knowledge in the Madoff cases was equally rigorous.  *Id.* at 33-34.

For the same reasons, the red flags identified by the Trustee do not support a plausible inference that Avellino or Bienes had actual knowledge that Madoff was not trading securities. The consistency of Madoff's returns was a matter of general knowledge as was his strip mall auditor.  In addition, certain of the red flags cited by the Trustee, including impossible option trades and equity trades falling outside the daily price range, involved transactions that appeared in account statements spanning many years.  Neither Avellino nor Bienes could have discovered that Madoff's aggregate OEX option trades exceeded the total number of OEX option trades unless they knew the aggregate number of Madoff trades – not just the trades allocated to their accounts – and compared that number to the total amount of OEX option trades reported by the Chicago Board of Exchange.  The Amended Complaint does not allege that they made that comparison and discovered the anomalies as a result.

Similarly, they would not have known that prices reported in their trade confirmations or account statements fell outside the daily price ranges unless they compared the prices that Madoff reported with market information disclosing the daily trading prices.  Once again, the Trustee does not allege that they made this comparison or discovered Madoff's fictitious trades as a result.  Instead, the Trustee alleges that "[u]pon information and belief, Avellino and Bienes *had the ability* to look up price information of securities on any given day."  (¶ 261 (emphasis added).)  Their ability to look up pricing does not imply that they did, and the Trustee's allegation is another way of saying that they should have known or negligently failed to discover that the trades fell outside the daily prices.

### d.    The Schupt Process

The Schupt process, on the other hand, plausibly implies that at least Avellino knew that he was withdrawing or causing the withdrawal of funds from A&B-related accounts that included fictitious trades.  The Amended Complaint alleges that A&B received its guaranteed returns through the Schupt adjustment process.  BLMIS employees as well as Avellino, "with Bienes's knowledge," tracked the returns and side payments to which A&B was entitled, and Avellino communicated with BLMIS employees regarding how to allocate the Schupt payments among the A&B-related accounts.  Rather than simply credit the accounts with cash, "the money was paid to specific IA accounts through the fictitious purchase and sale of options engineered to deliver the predetermined dollar amount needed to pay the guaranteed rate of return and/or the fraudulent side payment."  (¶ 227.)  Avellino even instructed Madoff to "[p]lease make the necessary trades in *all* of the accounts." (¶ 240.)

Assuming the truth of the allegations as I must, there is no plausible explanation for this method of paying commissions other than the one that the Trustee suggests.  The Defendants certainly haven't offered any.  BLMIS did not make direct cash payments or even deposit cash in the accounts to cover the commissions.  Instead, BLMIS assigned fictitious option trades that hit predetermined, targeted gains in the amounts needed to cover the Schupt payments and allocated those trades in accordance with Avellino's instructions.  Given Avellino's degree of involvement in directing BLMIS employees regarding the execution of the Schupt process, (*see* ¶¶ 238-40), it is plausible to infer that he was an active and knowing participant in the allocation of fictitious profits from imaginary options trades to the A&B-related account.  He knew, therefore, that

Madoff and BLMIS were not actually engaged in trading securities, at least to the extent of the Schupt process.[21]

### 3.    Imputation

The Defendants correctly acknowledge that "[t]he linchpin of the Trustee's claims is the actual knowledge of Frank Avellino." (*Defendants Reply* at 17 (footnote omitted).)  Avellino was a general partner in four of the six Post-1992 Entities (Grosvenor Partners (¶¶ 33(c), 62, 354, 357), Mayfair Ventures (¶¶ 33(d), 63, 347), Aster (¶¶ 33(e), 64, 365) and KJA since 1998 (¶¶ 33(f), 67, 383)).  Each partnership was formed under Florida law, and under Florida law, the knowledge of any partner regarding a matter concerning partnership affairs operates as knowledge of the partnership.  FLA. STAT. §§ 620.8102(6), 620.1103(8) (2015).  *Aetna Cas. Sur. Co. v. Buck*, 594 So. 2d 280, 282 n.2 (Fla. 1992) ("In Florida . . . under partnership law, the knowledge of any partner regarding a matter concerning partnership affairs operates as knowledge on the part of the partnership.").

The Amended Complaint plausibly alleges facts that support the imputation of Avellino's actual knowledge to the other two Post-1992 Entities, Strattham and St. James.  "A principal-agent relationship may be established by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act, even where the agent is acting as a volunteer." *Art Fin. Partners, LLC v. Christie's Inc.,* 870 N.Y.S.2d 331, 333 (N.Y. App. Div. 2009) (quotation marks and citation omitted); *accord Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 853 n.10 (Fla. 2003) (essential

---

[21]    On the other hand, the allegations as to Bienes' knowledge of and consent to Avellino's Schupt activities are entirely conclusory, and do not support the inference that Bienes' knew the Schupt payments were satisfied by crediting fictitious trades and fictitious profits to the A&B-related accounts.

elements of agency relationship are "(1) acknowledgement by the principal that the agent will act

for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the

actions of the agent"); *Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100, 115 (Bankr. S.D.N.Y.

2015). "The general rule is that knowledge acquired by an agent acting within the scope of his

agency is imputed to his principal and the latter is bound by such knowledge although the

information is never actually communicated to it." *Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d

828, 829 (N.Y. 1985); *accord Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 685

(11th Cir. 1990) ("Florida case law acknowledges the general principle of agency law that

knowledge of …an agent or employee is imputed to the principal when it is received…within the

scope of her employment, and when it is in reference to matters over which the employee's

authority extends."); RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. b ("If an agent has actual

knowledge of a fact, the principal is charged with the legal consequences of having actual

knowledge of the fact.").

The Amended Complaint alleges that Thomas Avellino formed Strattham for the sole

purpose of investing in BLMIS, (¶ 66), was the sole decision-maker for Strattham, actively

directed and controlled its daily activities, including its dealings with Madoff and BLMIS and

made all decisions relating to Strattham's investments with BLMIS. (¶ 392.) Nevertheless,

"Avellino acted as an agent for Strattham, assisting in the opening of Strattham's IA account and

negotiating with Madoff for Strattham to receive consistent guaranteed rates of return and

fraudulent side payments." (¶ 395; *accord* ¶ 200.) The Amended Complaint alleges, in this

regard, that Strattham received Schupt payments aggregating $205,284 in 2004 and 2005. (¶¶

221, 234, 235.) These allegations imply that Avellino acted on behalf of Strattham and exercised

control over the Strattham account, at least with respect to the Schupt Process and the allocation

of fictitious options, and Avellino's knowledge of the fictitious Schupt trades is imputed to Strattham.

St. James is similar to Strattham. Its general partners, Bienes and Mrs. Bienes, (¶ 373), created St. James for the sole purpose of investing with BLMIS, (¶ 65), but Avellino directed BLMIS to open the St. James account with funds transferred from Grosvenor Partners' IA account. (¶ 193.) The Bieneses dominated and controlled St. James affairs and made all of the decisions relating to St. James' investment with BLMIS. (¶ 374.) However, "[a]t certain times . . . , Avellino also acted as an agent for St. James, including in negotiations with Madoff for St. James to receive impossible guaranteed rates of return and fraudulent side payments," (¶ 377), and during 2004 and 2005, St. James received a total of $324,398 in side payments. (¶¶ 221, 234, 235.) For the reasons previously discussed, Avellino's knowledge relating to the Schupt Process and the allocation of fictitious options trades to the St. James is imputed to St. James.

The Defendants nonetheless contend that Avellino's actual knowledge cannot be imputed to the non-individual defendants for the purpose of satisfying the actual knowledge requirements of the case. (*Defendants Memo* at 28 (citing *Harte v. United Benefit Life Ins. Co.*, 424 P.2d 329 (Cal. 1967); *Jehly v. Brown*, 327 P.3d 351 (Colo. App. 2014); *Roberts Real Estate, Inc. v. New York State Dep't of State, Div. of Licensing Servs.*, 603 N.E.2d 242 (N.Y. 1992); *Lihosit v. I & W, Inc.*, 913 P.2d 262 (N.M. Ct. App. 1996).) Moreover, they maintain that imputed knowledge can never establish bad faith. (*Defendants Memo* at 28 (citing *Snook v. Netherby*, 269 P.2d 195 (Cal. Dist. Ct. App. 1954) and *Harte*).) As discussed, however, it is well-settled by statute and common law that the knowledge acquired by a general partner or an agent within the scope of his employment is imputed to the partnership or non-individual-principal, and a contrary rule makes no sense. A non-individual principal can only acquire knowledge through its agent. *See*

42

*Wardley Better Homes & Gardens v. Cannon*, 61 P.3d 1009, 1016 (Utah 2002) ("Knowledge can always be imputed to a corporation—even when used to determine a subjective mental state — because a corporation has no belief or intent independent of that of its officers and agents."). Under the Defendants' theory, a non-individual principal could never be liable on a cause of action that required proof of *scienter*.

Furthermore, the Defendants' authorities are distinguishable. *Harte*, *Jehly,* and *Snook* concerned the imputation of an agent's knowledge to an *individual* principal. A subsequent California appellate decision distinguished *Harte* and *Snook* on that basis, observing that those decisions did not address the imputation of the agent's knowledge to a corporate principal. *Syntex Corp. v. Lowsley-Williams & Cos.*, 79 Cal. Rptr. 2d 371, 386 (Cal. Ct. App. 1998); *accord Wardley* 61 P.3d at 1016 (knowledge cannot be imputed to an individual when determining his subjective mental state but can always be imputed to a corporate principal, which can acquire knowledge through agents). In *Roberts*, the New York Court of Appeals considered whether the license of a corporate real estate broker could be revoked or suspended under Real Property Law § 442-c based upon lower level employees' "actual knowledge" of a violation. The Court concluded that the statute's actual knowledge requirement had to be strictly construed. As a result, the general rules of imputation did not apply, and instead, actual knowledge would be imputed only if the registered broker or a corporate officer or director had actual knowledge of the pertinent violation. 603 N.E.2d at 245.

Finally, in *Lihoset v. I&W, Inc.,* the court ruled that the knowledge of a truck driver's work-related complaint acquired by an agent truck dispatcher could not be imputed to the corporate principal to support the motive element of a retaliatory discharge claim subsequently brought by the driver. 913 P.2d at 267. The same court reached the opposite conclusion one

43

year later in *Wielder v. Big J Enterp., Inc.*, 953 P.2d 1089 (N.M. Ct. App. 1997), another retaliatory discharge case. There, the agent with knowledge was intimately involved in the decision to terminate the employee. The court distinguished *Lihosit* on the basis that the agent in that case was not involved in the decision to discharge the employee. *Id.* at 1099. The two New Mexico cases can be harmonized by distinguishing between an agent that receives information outside the scope of his agency and has no duty to impart the information to his principal and an agent that acquires information within the scope of his employment, and therefore, is under a duty to impart that information to his principal. Here, Avellino was the agent of the Post-1992 Entities in connection with their BLMIS Accounts, and any knowledge he acquired and any actions he took in connection with those accounts bound those initial transferees.

In short, Avellino's knowledge is imputed to each of the Post-1992 Entities, the only Defendants that received initial transfers from BLMIS after 2000.

### 4.    Bankruptcy Code § 544(b)

Counts Three through Seven depend on the application of the New York Debtor & Creditor Law to recover fraudulent conveyances. Because Avellino had actual knowledge that BLMIS was not actually trading securities, at least in connection with the Schupt process, the safe harbor, 11 U.S.C. § 546(e), does not bar these claims. Nevertheless, 11 U.S.C. § 544(b)(1), which makes the New York fraudulent conveyance laws available to the Trustee, adds an additional element to the claims. It provides, with exceptions that are not relevant, that

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

44

Thus, the Trustee's state law fraudulent conveyance claims depend on the existence of a creditor

holding an allowed unsecured claim against BLMIS.

Aside from the safe harbor provided by 11 U.S.C. § 546(e), which does not apply

because of Avellino's actual knowledge, the Defendants make three challenges to the application

of § 544(b)(1): (1) the statute of limitations expired with respect to transfers sought through

Count Seven that occurred more than six years before the Filing Date; (2) the Trustee "failed to

plead information regarding the exact creditor that triggers 544(b)"; and (3) the Trustee cannot

plead on the one hand that the Defendants knew of the Ponzi scheme, but on the other hand,

contend that the Ponzi scheme could not have been discovered with reasonable diligence.

(*Defendants Memo* at 24-25.)

Regarding the Defendants' first point, Judge Lifland previously ruled that N.Y. C.P.L.R.

§§ 213(8) and 203(g) allow the Trustee to bring an intentional fraudulent conveyance claim

under N.Y. Debtor & Creditor Law § 276 within two years of the date the fraud was or should

have been discovered with reasonable diligence.  *Picard v. Madoff* (*In re BLMIS*), 458 B.R. 87,

109 (Bankr. S.D.N.Y. 2011).  Count Seven, the only avoidance count that reaches back beyond

the six year period, seeks to recover intentional fraudulent transfers.  The question of whether a

creditor exists who could not have discovered Madoff's fraud with reasonable diligence until it

was revealed to the public is inherently factual but gives little pause.  The Trustee has

commenced hundreds of cases against so-called innocent investors who admittedly acted in good

faith because they were unaware of Madoff's fraud.

There are, however, limits to how far back the Trustee can reach.  As discussed at length

earlier in this opinion, BLMIS could not have made a fraudulent transfer before January 1, 2001;

45

it did not operate or make any transfers of customer property prior to that date.  Furthermore,

Madoff's individual trustee cannot recover any transfers of customer property made by Madoff's

sole proprietorship.  Accordingly, the Trustee cannot recover any transfers made prior to January

1, 2001.

The Defendants' second challenge suggests that the Trustee must identify a specific

unsecured creditor holding an allowed claim.  (*Defendants Memo* at 24 (citing *In re Petters Co.*,

495 B.R. 887, 899-900 (Bankr. D. Minn. 2013).)  The Defendants' position and the *Petters*

decision are contrary to the law of this District.  "[T]o identify the category of creditors with

potentially viable claims ... is unquestionably enough to put defendants on notice of the creditors

who supply the basis for the right to sue, and will permit them to answer, seek relevant

discovery, and defend against these claims."  *Global Crossing Estate Rep. v. Winnick,* No. 04–

CIV–2558, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006) (Lynch, J); *accord Picard v.*

*Madoff*, 458 B.R. at 109; *Picard v. Chais*, 445 B.R. at 234; *Musicland Holding Corp. v. Best Buy*

*Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008); *In re RCM*

*Global Long Term Cap. Appreciation. Fund, Ltd.,* 200 B.R. 514, 523–24 (Bankr. S.D.N.Y.

1996).  The Amended Complaint alleges that "[a]t all times relevant to the Initial Transfers, the

fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one

unsecured creditor of BLMIS holding a matured or unmatured unsecured claim against BLMIS

that is allowable under section 502 of the Bankruptcy Code or not allowable only under section

502(e) of the Bankruptcy Code," (¶ 524), and "[a]t all times relevant to the Initial Transfers,

there have been one or more creditors holding matured or unmatured unsecured claims against

BLMIS that are allowable under section 502 of the Bankruptcy Code or not allowable only under

section 502(e) of the Bankruptcy Code."  (¶ 525.)  This Court previously ruled that these precise

46

allegations were sufficient to satisfy the requirements for pleading the existence of a qualifying

unsecured creditor under 11 U.S.C. § 544(b)(1).  *See Picard v. Madoff*, 458 B.R. at 109.

Moreover, given the well-publicized distributions of billions of dollars to former BLMIS

customers, documented in the Court's records, it is obvious that there were creditors on the

Filing Date that held allowed claims.

Finally, the Defendants imply a fatal inconsistency; the Trustee cannot plead that they

knew about the Ponzi scheme but at least one other creditor exists that could not have discovered

the fraudulent transfers at issue with reasonable diligence.  The allegations are not inconsistent.

Madoff's Ponzi scheme went undetected for years by many, including by the SEC, but this

doesn't mean that particular persons lacked knowledge.  Unlike the vast majority of creditors,

Avellino was a participant in the Schupt process which informed him that Madoff was not

trading the securities reflected as the compensation for steering investors to BLMIS.

### 5.    Other Defenses

#### a.    Value

Bankruptcy Code § 548(c) provides a defense to a fraudulent transfer action to the extent

the transferee received the transfer in good faith and for value.  The Defendants maintain that

they provided value for the commissions they received from BLMIS within the meaning of 11

U.S.C. § 548(c) by supplying BLMIS with investors.  Hence, the Trustee cannot avoid and

recover those commissions. Without deciding whether the Defendants gave value, the Amended

Complaint alleges that they did not receive the transfers in good faith.  The Post-1992 Entities

had actual knowledge that BLMIS was not engaged in trading securities in connection with the

Schupt process, and the Defendants concede that the Amended Complaint pleads their willful

47

blindness.  Accordingly, the Amended Complaint pleads facts plausibly implying that the §

548(c) defense is not available to the Defendants even if they did give value.

### b.    Failure to Plead Fraud

The Defendants maintain that the Amended Complaint fails to plead the elements of a

claim for fraud.  (*Defendants Memo* at 22.)  The Trustee is not asserting common law fraud

claims.

### c.    Alter Ego Liability

The Amended Complaint includes numerous allegations that the individual defendants

are liable on several bases, including under an alter ego theory, for the fraudulent transfers

received by the non-individual defendants.[22]  The following chart identifies the non-individual

transferee and its alleged alter ego:

| Entity | Alter Ego | Allegation in the Amended Complaint |
|---|---|---|
| A&B | Avellino, Bienes | ¶ 340 |
| A&B Pension Plan | Avellino, Bienes | ¶ 345 |
| Mayfair Ventures | Avellino, Bienes | ¶ 353 |
| Grosvenor Partners | Avellino, Bienes | ¶ 363 |
| Aster | Avellino | ¶ 371 |
| St. James | Bienes, Mrs. Bienes | ¶ 380 |
| KJA | Avellino | ¶ 389 |
| Strattham | Thomas Avellino | ¶ 398 |
| Avellino Family Trust[23] | Avellino | ¶ 411 |
| Frank Avellino Trusts | Avellino | ¶ 412 |
| Initial Transferees | Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, and Thomas Avellino | ¶ 449 |

---

[22]    The Amended Complaint includes many other allegations to the effect that the individual's knowledge is *imputed* to the entity under an alter ego theory without alleging that the individual is liable for the entity's fraudulent transfer debts.  (*E.g.*, ¶¶ 414-16, 419, 420.)

[23]    The Avellino Family Trust is one of the entities that comprise the "Frank Avellino Trusts" listed in the next footnote.  (¶ 35.)

| A&B, A&B Pension Plan, Avellino Family Trust, KJA, Mayfair Ventures, Grosvenor Partners, and Aster | Avellino | ¶ 450 |
|---|---|---|
| A&B, A&B Pension Plan, Mayfair Ventures, Grosvenor Partners, and St. James | Bienes | ¶ 451 |

Veil piercing is unnecessary to impose liability where partnership law already imposes liability on the general partner.  As discussed in connection with Count Thirteen, *infra*, the alleged alter egos of A&B, Mayfair Ventures, Grosvenor Partners, Aster, St. James, KJA and Strattham are also the general partners of those entities and are liable to the same extent as the respective partnerships.  The Court will, therefore, limit consideration of the question to the remaining entities identified by the Trustee, namely the A&B Pension Plan, the Avellino Family Trusts and the Frank Avellino Trusts[24] (collectively, the "Avellino Trusts").  The Defendants contend that the Trustee lacks standing to assert alter ego claims involving the Avellino Trusts because the claims belong to creditors and are barred by the doctrine of *in pari delicto*.  In addition, the Defendants contend that the Amended Complaint fails to state a claim for alter ego liability.

State law determines whether a claim belongs to creditors or the debtor, *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989), and whether corporate veil piercing applies in bankruptcy avoidance actions.  *Dzikowski v. Friedlander (In re Friedlander*

---

[24]    The "Frank Avellino Trusts" include the Avellino Family Trust, Frank J.  Avellino Revocable Trust Number One as amended and restated January 26, 1990, as amended, Frank J. Avellino Grantor Retained Annuity Trust under Agreement dated June 24, 1992,  Frank J. Avellino Grantor Retained Annuity Trust Agreement Number 2 under Agreement dated  June 24, 1992, Frank J. Avellino Revocable Trust Number One under the Declaration of Trust Number One dated June 10, 1988, as amended and Nancy Carroll Avellino Revocable  Trust under the Trust Agreement dated May 18, 1992.  (¶ 35.)

*Capital Mgmt. Corp.*), 411 B.R. 434, 441 (Bankr. S.D. Fla. 2009) (collecting cases).  Under New

York's choice of law rules, the state of incorporation determines whether the corporate veil can

be pierced.  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  The Amended Complaint

alleges that the defendant corporate and partnership transferees were formed under Florida law,

and although it does not allege where the trust defendants were formed, it does allege that they

have Florida addresses.  Finally, the parties have generally relied on Florida alter ego law in their

memoranda and have therefore impliedly consented to the application of Florida law.  *Cf. Chau

v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law

controls, and such implied consent . . . is sufficient to establish choice of law.") (quoting

*Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

 The Defendants' challenge to the Trustee's standing lacks merit.  Florida law treats veil

piercing as a remedy rather than an independent claim.  *Tara Prods., Inc. v. Hollywood Gadgets,

Inc.*, No. 09–CV–61436, 2010 WL 1531489, at *9 (S.D. Fla. Apr. 16, 2010) ("Alter ego is not a

separate cause of action for which relief can be granted; rather, in this case, alter ego serves as a

theory to impose liability on an individual for the acts of a corporate entity."); *In re Fiddler's

Creek, LLC*, No. 9:10–bk–03846–ALP, 2010 WL 6618876, at *2 (Bankr. S.D. Fla. Sept. 15,

2010) (piercing the corporate veil "is a means of imposing liability on the shareholder based on

an underlying cause of action for which the corporation is liable"); *Turner Murphy Co. v.

Specialty Constructors, Inc.*, 659 So. 2d 1242, 1245 (Fla. Dist. Ct. App. 1995) ("Piercing a

corporate veil is not itself a cause of action any more than the doctrine of *respondeat superior*

is.").  The remedy travels with the underlying claim, and the party with standing to assert the

claim can seek the remedy.  The Trustee has standing to seek his avoidance and other claims

asserted in the Amended Complaint.  If he prevails on his underlying claims he has standing to

pursue his alter ego remedies to the extent they are available under Florida law.

Even if the alter ego remedy was an independent claim, the Trustee would still have

standing to assert it.  As a rule, a chapter 7 trustee has standing to bring an alter ego claim if the

claim is general to all creditors of the estate and is allowed by state law.  *Baillie Lumber

Company, LP v. Thompson* (*In re Icarus Holding, LLC*), 391 F.3d 1315, 1321 (11th Cir. 2004);

*In re Xenerga*, Inc.*, 449 B.R. 594 (Bankr. M.D. Fla. 2011).  On the other hand, an individual

creditor has standing to assert the claim if it suffered a unique and personal harm.  *Icarus*, 391

F.3d at 1321; *Xenerga*, 449 B.R. at 599 ("Conversely, a trustee may not bring an alter ego claim

if the alleged injury is specific to one creditor and not to the debtor corporation and creditors

generally.")

Here, the Trustee has standing as the representative of the customer property estate

because it suffered a unique, personal injury.  As the Defendants suggest, their other creditors

were not personally harmed by their receipt of fraudulent transfers from BLMIS (*see Defendants

Reply* at 6-7) (noting that the Amended Complaint does not allege that the creditors of the

transferees were harmed); in fact, the transfers increased the amount of assets their creditors

could look to satisfy their claims.  Instead, the BLMIS customer estate was the sole victim of the

fraudulent transfers.  Thus, even if the alter ego claim was exclusively a creditor remedy under

Florida law (which it is not), the Trustee as representative of the BLMIS estate would have

standing to pierce the corporate veil, to the extent permitted by Florida law, of the non-individual

Defendants.  For these reasons, *In re BLMIS*, 721 F.3d 54 (2d Cir. 2013), *cert. denied sub nom.*

*Picard v. HSBC Bank PLC*, 134 S. Ct. 2895, 189 L. Ed. 2d 832 (2014) ("*HSBC*") is inapposite because the Trustee is not seeking to assert common law claims that belong to other creditors.[25]

The Court also rejects the Defendants' related argument that *in pari delicto* bars the alter ego claim. *In pari delicto* is both an affirmative defense and an equitable defense under Florida law that is applied flexibly in a manner that ensures its application does not defeat public policy. *Earth Trades, Inc. v. T&G Corp.*, 108 So.3d 580, 583-84 (Fla. 2013). The doctrine is based on the rule that the agent's knowledge and actions are imputed to his principal. *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010). Where the agent and principal are one, the principal's wrongful acts preclude the corporation from recovering for injury resulting from its own wrongful conduct. *See O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. Dist. Ct. App. 2007).

Neither the defense of *in pari delicto* nor the related standing rule of *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) bars the Trustee's fraudulent transfer actions because those claims are specifically conferred on the Trustee by the Bankruptcy Code and SIPA.[26] *See Fox v. Picard* (*In re BLMIS*), 848 F. Supp. 2d 469, 483-84 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 81 (2d Cir. 2014); *Kapila v. Bennett* (*In re Pearlman*), 472 B.R. 115, 122-23

---

[25]    The Defendants reliance on *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972) and its progeny similarly lacks merit. Those cases stand for the proposition that a bankruptcy trustee lacks standing to bring claims that belong to the creditors rather than the estate.

[26]    For this same reason, the Defendants' reliance on *Giddens v. D.H. Blair & Co.* (*In re A.R. Baron & Co.*), 280 B.R. 794 (Bankr. S.D.N.Y. 2003), (*see Defendants Memo* at 12), which they consider "analogous," is misplaced. There, the SIPA trustee brought claims against the defendants sounding in unjust enrichment, aiding and abetting breach of fiduciary duty and violation of antitrust laws. *Id.* at 796. The Bankruptcy Court concluded that the trustee lacked standing under the *Wagoner* Rule and declined to reach the question of *in pari delicto*. *Id.* at 802. Here, the Trustee is asserting statutory claims under SIPA and the Bankruptcy Code to recover customer property. These claims are not barred by *in pari delicto* or the *Wagoner* Rule.

(Bankr. M.D.  (Bankr. S.D. Fla. 2012); *World Capita Commc'ns, Inc. v. Island Capital Mgmt.,*

*LLC* (*In re Skyway Commc'ns Holding Corp.*), 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008).

Even if *in pari delicto* applied to the Trustee's fraudulent transfer claims, under Florida law, the

applicability of the defense in any specific circumstance depends on the facts and circumstances

and considerations of public policy.  These facts cannot be decided on a motion to dismiss.

    Although the Court concludes that the Trustee has standing to assert any veil piercing

claims otherwise available under Florida law, it declines to decide whether the Amended

Complaint states veil piercing claims against the Avellino Trusts.  According to Exhibit D to the

Amended Complaint, only the Frank J. Avellino Revocable Trust and the Nancy Avellino

Revocable Trust received subsequent transfers after 2000.[27]  (Amended Complaint, Ex. D, at pp.

1-2 of 32.)  The Amended Complaint alleges that "Avellino was the trustee, sole beneficiary,

equitable owner, settlor, and/or grantor of" the Avellino Trusts.  (¶ 35.)  The Trustee did not,

however, attach the trust agreements to the Amended Complaint or rely on their provisions in

drafting the Amended Complaint.

    "The question whether the 'alter ego theory' of piercing applies to trusts is a matter of

state law."  *Babitt v. Citibank, N.A.* (*In re Vebeliunas*), 332 F.3d 85, 90 (2d Cir. 2003).  The

parties have not discussed or briefed the question of whether Florida law would apply alter ego

liability to pierce the veil of a trust, and the Court's research indicates that Florida law is

unsettled.  In *Henkel v. Bros. Mill, Ltd.* (*In re Eddy*), No. 6:13–ap–00112–CCJ, 2015 WL

1585513 (Bankr. M.D. Fla. Apr. 3, 2015), the chapter 7 trustee brought an action seeking, *inter*

---

[27]    This bright line is based on the fact that the Trustee must avoid the initial transfer to recover the transferred
property or its value from a subsequent transferee.  11 U.S.C. § 550(a).  If the Trustee cannot avoid an initial transfer
that occurred prior to 2001, he cannot recover the subsequent transfer.

*alia,* a declaration that certain property of an irrevocable trust[28] was the property of the

individual debtor, and hence, the debtor's estate, because the trust was the debtor's alter ego.  *Id.*

at *4.  The court rejected the application of the alter ego doctrine.  While noting that several

other courts had accepted the doctrine's application to trusts, *see id.* n.30 (citing cases), the court

concluded that "[b]ecause the Florida Trust Code (and Florida courts) are so protective of the

sanctity of trusts, the Court doubts that the alter ego doctrine applies to irrevocable trusts and is

unwilling to extend the doctrine under the circumstances presented in this case."  *Id.*  The court

buttressed its conclusion pointing to provisions of the Florida Trust Code that limit a settlor's

creditors' recovery against an irrevocable trust only to the "maximum amount that can be

distributed to or for the settlor's benefit."  *Id.* (quoting FLA. STAT. § 736.0505(1)(b) (2015)).  An

Ohio District Court subsequently adopted *Henkel*'s reasoning and concluded that Florida law

would not extend the alter ego doctrine to irrevocable trusts.  *Bash v. Sydney Jackson Williams,*

*Jr. Irrevocable Trust,* No. 5:16 CV 257, 2016 WL 1592445, at *5 (N.D. Ohio Apr. 20, 2016).

        The Amended Complaint does not allege whether the Avellino Trusts are revocable or

irrevocable trusts, but the names suggest that many or all are revocable trusts.  This distinction

may make a difference. Florida law authorizes what amounts to reverse veil piercing[29] against

the settlor in the case of a revocable trust:

        The property of a revocable trust is subject to the claims of the settlor's creditors
        during the settlor's lifetime to the extent the property would not otherwise be

---

[28]        In the case of an irrevocable trust, the settlor makes an outright transfer (a gift) to the trust.  The transferred assets no longer belong to the settlor and are not subject to the claims against the settlor.  *Henkel,* 2015 WL 1585513, at *4.

[29]        Reverse piercing of the corporate veil involves a party's attempt to hold a corporation liable for the debts of an individual shareholder.  *Friedlander,* 411 B.R. at 440-41.  In more traditional veil piercing, the party seeks to hold the shareholder liable for the debts of the corporation.  *Id.* at 440.  The Trustee is relying on traditional veil piercing to hold the settlors of the Avellino Trusts liable for the alleged fraudulent transfers to the Avellino Trusts.

exempt by law if owned directly by the settlor.
FLA. STAT. § 736.0505(1)(a). In addition, under Florida law, "[a] trustee is personally liable for torts committed in the course of administering a trust or for obligations arising from ownership or control of trust property only if the trustee is personally at fault." FLA. STAT. § 736.1013(2).[30]

The Avellino Trusts' fraudulent transfer liability arises from Avellino's control over their IA Accounts through his role as trustee, presumably rendering him personally liable for their fraudulent transfer debts. Given the parties' failure to raise or brief the difficult question of whether Florida law would allow the piercing of the trusts' veils, and if it did, whether it would impose liability on the settlor, the trustee and/or the beneficiaries, and since it appears unnecessary to pierce their veils to impose liability on Avellino, the Court declines to address it. It therefore denies this aspect of the Defendants' motion without prejudice.

In summary, and subject to the disposition of the other defenses raised by the Defendants and discussed below, the motion to dismiss Counts One through Seven is denied as to the Post-1992 Entities except that the fraudulent conveyance claims asserted in Count Seven are limited to transfers made by BLMIS, the SIPA debtor in this case. The motion to dismiss claims for initial transfers under Counts One through Seven is otherwise granted.

## D.    Count Eight – Preferential Transfers

The Amended Complaint alleges that Strattham received preferential transfers in the sum of $4,250,000 consisting entirely of fictitious profits. (¶¶ 530-40, Ex. B-16, at p. 34 of 36 (col. 9).) As Avellino's knowledge is imputed to Strattham, the safe harbor does not bar the claim.

---

[30]    The Amended Complaint also identifies other trust defendants that received post-2000 subsequent transfers and alleges that Avellino is the trustee of those trusts. (¶ 36.)

The Defendants do not point to any other pleading deficiency,[31] and the motion to dismiss Count

Eight is denied.

### E.    Count Nine - Subsequent Transfers

Count Nine asserts claims to recover the avoided Initial Transfers from the Subsequent

Transferees.  The Defendants seek dismissal of Count Nine, but do not challenge the sufficiency

of the allegations relating to the transfers themselves.  Instead, they lump the Subsequent

Transferees with the Initial Transferees and contend that the Amended Complaint fails to plead

their actual knowledge, (*Defendants Memo* at 16), or a basis for imputation.  (*Id.* at 29.)

The motion to dismiss Count Nine as against the Post-2000 Subsequent Transferees,

identified above, is denied.  Section 550(a)(2) of the Bankruptcy Code allows the Trustee to

recover an avoidable transfer from "any immediate or mediate transferee of" an initial transferee.

A trustee may not, however, recover the avoided transfer from a subsequent transferee that

"takes *for value*, including satisfaction or securing of a present or antecedent debt, *in good faith*,

and *without knowledge of the voidability* of the transfer avoided."  11 U.S.C. § 550(b)(1)

(emphasis added).  The District Court has concluded that a subjective test governs the good faith

defense under Bankruptcy Code § 550(b)(1), *Good Faith Decision*, 516 B.R. at 24 & n.4, placed

the burden of pleading the lack of good faith on the Trustee, *id.,* equated the lack of good faith

under 11 U.S.C. § 548(c) with willful blindness, *id.* at 21, and stated that the same standard

applies to § 550(b).  *Id.* at 22-23.

---

[31]    The Court has already rejected the Defendants' argument that the Trustee lacks standing to assert the
preference claim.

Given the Defendants' concession that the Amended Complaint pleads their willful

blindness, the Court concludes that it adequately pleads that Post-2000 Subsequent Transferees'

lack of good faith for purposes of 11 U.S.C. § 550(a)(2).  The claims against the remaining

Subsequent Transferees must be dismissed.  They received subsequent transfers prior to 2001.

Because BLMIS did not operate before then, these subsequent transfers could not have

originated from an avoidable initial transfer.

Finally, the Defendants contend that the Trustee cannot recover subsequent transfers

between or credits to BLMIS accounts because they were not transfers of property and did not

deplete the estate.  (*Defendants Memo* at 37-40.)  The Trustee is not seeking to recover inter-

account transfers or credits; he is seeking to recover actual withdrawals of cash from BLMIS.

## F.    Disallowance and Subordination Counts

Counts Ten, Eleven and Twelve seek to disallow or subordinate the claims filed by

Strattham, KJA and Mayfair Bookkeeping (the "Claimants") on equitable grounds.  The

inequitable conduct involves the knowing participation in the BLMIS fraudulent scheme and the

withdrawal of funds to the detriment of other BLMIS creditors.[32]  Strattham and KJA withdrew

$29,850,000 in Initial Transfers and the Claimants, including Mayfair Bookkeeping, (*see*

Amended Complaint, Ex. D, at p. 20 of 36), received $5,525,000 in Subsequent Transfers.  (¶

564.)  The Court has already concluded that Avellino's knowledge of BLMIS' fictitious trading

is imputed to Strattham and KJA.  Moreover, the Amended Complaint alleges that Avellino was,

---

[32]    These Counts may be superfluous because the same conduct forms the basis for the disallowance of the claims under 11 U.S.C. § 502(d).  In *Merkin*, however, the Court recognized that a claim of equitable subordination based on the same conduct as the avoidance claims is not subject to the safe harbor under 11 U.S.C. § 546(e) or the statute of limitations in 11 U.S.C. § 546(a)(1).  *Merkin*, 515 B.R. at 160, 161.  Thus, if the avoidance claims ultimately fail on these grounds, the equitable disallowance and equitable subordination claims may still be viable.

*inter alia*, the president of Mayfair Bookkeeping, (*see* ¶ 33(g)), and his knowledge of the scheme is imputed to that entity for the reasons stated earlier.  Furthermore, the Defendants concede that the Amended Complaint adequately pleads willful blindness.  At a minimum, they received the transfers in bad faith.

### 1.    Count Ten – SIPA Equitable Disallowance

Count Ten relies on equitable principles to disallow the claims filed by the Claimants under applicable provisions of SIPA, including section 78fff–2(b), that are incorporated in 11 U.S.C. § 502(b)(1).  It alleges that the Claimants acted with actual knowledge of BLMIS' fraudulent activity or willfully blinded themselves to it, and enabled BLMIS to perpetrate its fraudulent scheme.  Although the Defendants have sought to dismiss the entire Amended Complaint, they have not directed any specific argument at the deficiencies in Count Ten.

Accordingly, their motion to dismiss Count Ten is denied.[33]

### 2.    Count Eleven – General Equitable Disallowance

Count Eleven seeks to disallow the Claimants claims under general equitable principles unrelated to SIPA.  It alleges that the Claimants benefitted from their inequitable conduct at the expense of other, innocent customers.  (¶¶ 554-59.)  Conflating equitable disallowance (Count Eleven) with equitable subordination (Count Twelve), the Defendants concede that equitable disallowance is a "potential, though extreme remedy." (*Defendants Memo* at 31 (citing *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia  Commc'ns Corp.)*), 365 B.R. 24, 73

---

[33]    The Court discussed the relationship between 11 U.S.C. § 502(b)(1) and SIPA in *Merkin,* 515 B.R. at 153–56, and concluded that inequitable conduct barred the customer from receiving SIPC insurance, but "unless the customer lacked title to the property entrusted to the broker-dealer because of the customer's fraud or for another reason, there is no basis in equity to disallow his right to his property in a SIPA proceeding." *Id.* at 156.  The Defendants have not made this argument.

58

(Bankr. S.D.N.Y. 2007)).[34]  They contend, however, that the Amended Complaint fails to adequately plead that the Claimants engaged in inequitable conduct resulting in an unfair advantage over other BLMIS creditors.  (*Id.*)

For the reasons stated, the Court concludes that the Amended Complaint adequately alleges that the Claimants received their transfers with actual knowledge of Madoff's fictitious trading scheme and in bad faith.  Furthermore, the withdrawals prejudiced BLMIS creditors because but for the withdrawals, the funds would have been available for distribution to net losers.  *Merkin*, 515 B.R. at 160.  Accordingly, the motion to dismiss Count Eleven is denied.

### 3.    Count Twelve - Equitable Subordination

Count Twelve asserts an equitable subordination claim based on substantially the same conduct and injury to the net losers alleged in Count Eleven.  The Amended Complaint states a claim for equitable subordination for the same reasons that it adequately pleads a claim for equitable disallowance.

The Defendants also argue that the Trustee lacks standing to assert an equitable subordination claim and is barred by the doctrine of *in pari delicto*.  (*Defendants Memo* at 31-33.)  The Court rejected the same arguments in *Merkin*.  A claim of equitable subordination arises under 11 U.S.C. § 510(c) rather than under non-bankruptcy law, and the limitations on the causes of action that become property of the estate under 11 U.S.C. § 541(a), such as *in pari delicto*, do not apply.  *See Merkin*, 515 B.R. at 159.  Further, the Trustee has standing to assert

---

[34]    In *Merkin*, the Court held that a bankruptcy court does not have the power to disallow a claim under general principles of equity unless applicable non-bankruptcy law permits it to do so.  *Merkin*, 515 B.R. at 156–57.  The Defendants have not made this argument, and as noted, concede that equitable disallowance is a potential remedy.

the claim if he alleges that the inequitable conduct injured the creditor body as a whole;

conversely, a creditor seeking to assert an equitable subordination claim must allege a

particularized injury.  *See id.*  The Amended Complaint alleges that Strattham and KJA withdrew

nearly $30 million and Mayfair Bookkeeping received subsequent transfers with actual

knowledge and in bad faith.  The withdrawal of the funds injured net losers for the reasons

stated.

## G.    Count Thirteen - General Partner Liability

Exhibit F to the Amended Complaint identifies the following partnerships and their

general partners:

| Partnership | General Partners |
|---|---|
| A&B | Avellino, Bienes, Mrs. Bienes |
| Grosvenor | Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, Mayfair Ventures |
| Mayfair Ventures | Avellino, Bienes, Mrs. Avellino, Mrs. Bienes, |
| Aster | Avellino, Mrs. Avellino, Thomas Avellino, Rachel A. Rosenthal X Rachel Anne Rosenthal Trust U/A dated June 29, 1990, Rachel Rosenthal Trust Number 3, Heather C. Lowles, Heather Carroll Lowles Trust U/A dated June 29, 1990, Tiffany Joy Lowles Trust U/A dated June 29, 1990, Melanie Ann Lowles Trust U/A dated June 29, 1990, Taylor Ashley McEvoy Trust U/A dated June 24, 1992, Madison Alyssa McEvoy Trust U/A dated June 29, 1990, S.A. Grantor Retained Annuity Trust |
| St. James | Bienes, Mrs. Bienes |
| Strattham | Thomas Avellino, Ascent, Inc. |
| KJA | Avellino |

Count Thirteen seeks to impose liability on the general partners identified in Exhibit F if the corresponding partnerships cannot satisfy the judgments against them.

The Court previously concluded that the knowledge of the general partners in the partnership entities is imputed to the partnerships. The question of liability runs in the opposite direction. All of the defendant partnerships were formed under Florida law, and under Florida law, the general partners are jointly and severally liable for the debts of either a general partnership, FLA. STAT. § 620.8306(1),[35] or a limited partnership. FLA. STAT. § 620.1404(1) (2016).[36] The Defendants' motion does not mention Count Thirteen, except in the introduction, (*Defendants Memo* at 2), and they did not make any specific arguments supporting the dismissal of Count Thirteen. Thus, to the extent that the claims against the partnership transferees survive dismissal, Count Thirteen must also survive dismissal.

The Court has considered the parties' remaining arguments, and concludes that they have been rendered moot or lack merit. Settle order on notice.

Dated: New York, New York
       July 21, 2016

                                          /s/ *Stuart M. Bernstein*
                                          STUART M. BERNSTEIN
                                          United States Bankruptcy Judge

---

[35]    FLA. STAT. § 620.8306(1) provides with exceptions that are not relevant that "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by a claimant or provided by law."

[36]    FLA. STAT. § 620.1404(1) provides that with exceptions that are not relevant that "all general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law." The current provision became effective on January 1, 2006 with Florida's adoption of the Revised Uniform Limited Partnership Act. The enactment of § 620.1404(1) did not modify existing Florida law. *See Brinkley, McNerney, Morgan & Solomon v. Cmty. Acres Assocs., Ltd.*, 602 So. 2d 685, 686 (Fla. Dist. Ct. App. 1992) ("Partnership law provides that a general partner of a limited partnership is jointly liable for the debts and obligations of the partnership.") (citing FLA. STAT. §§ 620.63(2), 620.125(2)).