FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>    Plaintiff,<br><br>v.<br><br>FRANK J. AVELLINO, *et al.*,<br><br>    Defendants. | Adv. Pro. No. 10-05421 (CGM) |

**MEMORANDUM DECISION GRANTING SUMMARY JUDGMENT IN FAVOR OF THE TRUSTEE**

**A P P E A R A N C E S :**

BAKER HOSTETLER, LLP
Attorneys for the Irving H. Picard, Trustee
45 Rockefeller Plaza
New York, NY 10111
BY: Regina Griffin (via Zoom)

NASON YEAGER GERSON HARRIS & FUMERO, P.A.
Attorneys for the Defendants

3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
BY: Gary A. Woodfield (via Zoom)

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Irving H. Picard ("Trustee"), Trustee for the Substantively Consolidated SIPA[1] Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS[2]") and Bernard L. Madoff ("Madoff"), brings this adversary proceeding against Frank Avellino and numerous other defendants to recover fictious profits received by the defendants for its investment in the infamous Ponzi scheme of BLMIS. The Trustee seeks summary judgment under count one and thirteen of his complaint. Under count one,[3] the Trustee has moved for summary judgment against Mayfair Ventures, Grosvenor Partners, Aster Associates, and St. James Associates (collectively, the "Entity Defendants"). Under count thirteen, the Trustee seeks summary judgment against the general partners ("General Partner Defendants") of the Entity Defendants. The Trustee seeks to hold the General Partner Defendants liable for the debts of the partnership.

The Court heard oral argument on June 15, 2022. For the reasons set forth in this memorandum decision, the Court finds the transfers were, in fact, transfers of BLMIS' customer property, and that the Entity Defendants and General Partner Defendants (collectively "Defendants") are liable for these monies.

---

[1] SIPA means the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.*
[2] The term BLMIS is used only with reference to the LLC and not the sole proprietorship, which sometimes used the similar name of Bernard L. Madoff Investment Securities.
[3] Count one alleges that each of the transfers made during the two-year period prior to the filing date "constitutes a fraudulent transfer avoidable by the [SIPA] Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA."

### I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference dated July 10, 1984, and the Amended Standing Order of Reference dated January 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (see Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision. The Defendants argue that this Court lacks the authority to enter a final order in these cases. Opp'n at 40, ECF No. 247.

This Court disagrees. The Court does have the authority to enter a final order because the Defendants filed customer claims in this case. *See* Compl., Ex. P, ECF No. 1. Thus, Defendants have impliedly consented to a final adjudication. *Picard v. Bam L.P.*, (*In re BLMIS*), 612 B.R. 257, 260 (S.D.N.Y. 2020) (citing *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *In re BLMIS LLC* ("*Epstein II*"), No. 1:21-cv-02334, 2022 WL 493734, at * 11 (S.D.N.Y. Feb. 17, 2022) ("A Bankruptcy Court cannot finally adjudicate an avoidance action absent consent."). To the extent that it does not, the Court asks the District Court to construe this decision as proposed findings of fact and conclusions of law, pursuant to the Amended Standing Order of Reference dated January 31, 2012.

### II. Background

For a background of these SIPA cases and the BLMIS Ponzi scheme, please refer to the background section of *Picard v. Avellino* (*In re BLMIS*), 557 B.R. 89, 94–95 (Bankr. S.D.N.Y. 2016).

Undisputed Facts[4]

In 1958, Frank Avellino ("Avellino") began working as an accountant for Madoff's father-in-law, Saul Alpern ("Alpern"). Trustee's Stmt. ¶ 43. In 1960, Madoff began operating his business from Alpern's accounting firm, Alpern & Heller. *Id.* ¶ 44. In 1968, David Bienes ("Bienes")[5] joined Alpern's firm as an accountant. *Id.* ¶ 45. In the early 1960's, Alpern formed his own group of investors to provide money to Madoff. *Id.* ¶ 47. In an interview on PBS's Frontline, Bienes stated that Madoff's early customers were "[Alpern's] clients, family, friends. *Id.* ¶ 48.[6] In the 1960s, Alpern told Bienes that investing with Madoff will yield him 20% returns. *Id.* ¶ 49.[7] Avellino & Bienes ("A&B") was formed in 1975. *Id.* ¶ 46. In 1975, Alpern retired and transferred the management of his business accounts to A&B. *Id.* ¶ 53. A&B continued to collect moneys from investors to send to Madoff. *Id.* ¶ 54. Bienes acknowledged that in the 1970's, A&B was Madoff's sole feeder fund. *Id.* ¶ 57.[8] A&B's compensation for feeding other investors' funds to BLMIS's investment advisory business ("IA Business") was to retain the difference between the rate of returns Madoff guaranteed them in advance and the lower rates of return they promised their investors. *Id.* ¶ 64.

---

[4] The following facts are undisputed for purposes of this summary judgment motion. The Court will cite to the Trustee's Statement of Material Facts, ECF No. 253, for ease of reference as it incorporates the Defendants' reply. The paragraphs relied on by the Court refer to admissible evidence in the record.

[5] Bienes has passed away. Diana Bienes is being sued individually and also in her capacity as a personal representative of Bienes' estate

[6] The admissibility of the Bienes PBS interview will be discussed *infra*, III, § E. At the November 2019 deposition, Avelino stated that money was collected "from friends, clients, old timers." Griffin Decl., Ex. 21, 40:2–13.

[7] Bienes corroborated this statement in a September 2015 deposition. Griffin Supp. Decl., Ex. 67, 174:24–175:8.

[8] Bienes corroborated this statement in a September 2015 deposition. Griffin Supp. Decl., Ex. 67, 178:18– 25.

The Trustee argues that A&B knew of Madoff's Ponzi scheme and helped create it. Avellino and Bienes[9] argue that they never knew Madoff was running a Ponzi scheme. Def's Stmt. ¶ 56. Avellino and Bienes admitted that over 35 years, A&B never had a down year. *Id.* ¶ 65–66. In 1992, the SEC began investigating A&B as unlawfully operating an "unregistered investment company" and "engaged in the unlawful sale of unregistered securities." *Id.* ¶ 72. As part of the SEC investigation, Avellino and Bienes testified that they believed Madoff employed a viable hedged investment strategy for the A&B Accounts. *Id.* ¶ 77. Avellino and Bienes testified that they believed that their A&B accounts contained $440 million. *Id.* ¶ 76. The Trustee's expert, Bruce Dubinksy ("Dubinsky"),[10] analyzed the original transactions appearing on the A&B customer statements and concluded that such statements did not reflect any purported investment strategy. *Id.* ¶ 80. In his own criminal proceeding, Frank DiPascali ("DiPascali"),[11] testified that he redid the A&B customer statements prior to sending them to the SEC investigators. *Id.* ¶ 82. One of the changes DiPascali made to A&B customer statements involved retroactively inserting $86 million in fake US Treasuries to A&B Business account 1-00125-3. *Id.* ¶ 88.

The Defendants dispute most of the Trustee's characterization of the SEC investigation into A&B. For purposes of this motion, the Court need not concern itself with A&B's potential involvement in assisting Madoff's Ponzi scheme. At issue in this case are only counts one and

---

[9] The Court must distinguish between Avellino and Bienes and their firm, A&B. A&B, the firm, has been dismissed pursuant to Judge Bernstein's written decision in 2016. *In re Bernard L. Madoff Investment Securities LLC*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016). Avellino and Bienes, as individuals remain parties to this litigation.

[10] Dubinksy is a forensic account with 30 years of practical experience as a CPA and an expert in forensic accounting, fraud examinations, computer forensics, accounting, taxation, business valuations, bankruptcy accounting and investment advisory services. Dubinsky Decl., Attach A ¶ 447, ECF No. 245.

[11] DiPascali was a BLMIS employee since 1975 and Madoff's right-hand man. Trustee's Stmt. ¶ 24. DiPascali pled guilty to a ten-count criminal action for his role in the Ponzi scheme. *Id.*

thirteen of the Trustee's complaint. The Court will now turn to count one against the Entity Defendants.

Mayfair Ventures

Mayfair Ventures was a general partnership formed under the laws of the state of Florida. *Id.* ¶ 372. Defendants Avellino, Nancy Avellino, Bienes, and Dianne Bienes were general partners of Mayfair Ventures. *Id.* ¶ 373. The Trustee's expert, Matthew Greenblatt ("Greenblatt"),[12] determined that on February 11, 1993, Account No. 1ZB032 (the "Mayfair Ventures Account") was opened with a cash deposit of $26,000,000, which represented principal. *Id.* ¶ 404. On March 28, 1995, there was an additional cash deposit of $2,000,000, leading to a principal of $28,000,000. *Id.* ¶ 405. There were twenty-nine cash withdrawals from the Mayfair Ventures Account totaling $27,850,000. *Id.* ¶ 406. Greenblatt's evidence demonstrates that between February 11, 1993 and December 11, 2008, $32,350,000 was withdrawn from the account.[13] Between December 11, 2006 and the SIPA filing date of December 11, 2008 ("Two-Year Period"), $2,500,000 in fictious profits was withdrawn from the Mayfair Ventures Account. *Id.* ¶ 410.

Grosvenor Partners

Greenblatt determined that Account No. 1ZB046 ("Grosvenor Partners Account") was opened on February 26, 1993, with a deposit of $1,740,000, representing principal. *Id.* ¶ 412. Defendants Avellino and Mayfair Ventures were general partners of Grosvenor Partners. *Id.* ¶ 377–378. Over time, the Grosvenor Partners Account made deposits of $43,351,600 of principal. *Id.* ¶ 417. The Grosvenor Partners Account eventually withdrew $101,603,000—

---

[12] Greenblatt is a forensic accountant and certified fraud examiner. Trustee's Stmt. ¶ 42.
[13] $4,350,000 representing fictious profits. Trustee's Stmt. ¶ 409, Greenblatt Decl., Attach B, ECF No. 242.

$58,251,400 in fictious profits. *Id.* ¶ 420. Within the Two-Year Period, $2,500,000 of fictious profits was withdrawn from the Grosvenor Partners Account. *Id.* ¶ 421.

Aster Associates

Aster Associates was a general partnership that opened Account No. 1ZB509 ("Aster Associates Account") on June 30, 2004. *Id.* ¶ 423. Defendants Avellino, Nancy Avellino, Rachel A. Rosenthal Trust U/A dated June 29, 1990 and Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992 were general partners of Aster Associates. *Id.* ¶ 382–387. Within the Two-Year Period, $3,500,000 in fictious profits was withdrawn from Aster Associates Account. *Id.* ¶ 428.

St. James Associates

St. James Associates was a general partnership formed under the laws of the state of Florida. *Id.* ¶ 390. Defendants Bienes and Dianne Bienes were general partners of St. James Associates. *Id.* ¶ 391. St. James Associates opened Account No. 1ZB510 ("St. James Account") on June 30, 2004. *Id.* ¶ 430. Between June 30, 2004 and December 11, 2008, $18,450,000 was withdrawn from BLMIS, which consisted of $1,000,000 in principal and an additional $17,450,000 in fictious profits. *Id.* ¶ 435. Within the Two-Year Period, $8,700,000 in fictious profits was withdrawn from the St. James Account. *Id.* ¶ 436.

### III. Discussion

**A. Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, as applied by Rule 7056(c) of the Federal Rules of Bankruptcy Procedure: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The materiality of facts must be determined with reference to

the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *In re CIS Corp.*, 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997).

A movant has the initial burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). The nonmoving party should oppose the motion for summary judgment with evidence that is admissible at trial. *See* Fed. R. Civ. P. 56(e)(1); *Crawford v. Dep't of Investigation*, 324 F. App'x 139, 143 (2d Cir. 2009) (affirming award of summary judgment in favor of defendant, where plaintiff presented testimony from uncorroborated source, as well as "speculation, hearsay and other inadmissible rumor, and conclusory allegations").

**B. Whether the Transfers made to Entity Defendants are Fraudulent Transfers.**

The Trustee seeks to avoid and recover transfers of fictitious profits to the Entity Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property (ii) made within two years of the petition date (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 2011 WL 141967, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd* 748 F.3d 110 (2d Cir. 2014). Section 78fff-2(c)(3) of the Securities Investor Protection Act allows the Trustee to "invoke the fraudulent transfer provisions in the Bankruptcy Code to recover customer property." *Picard v. Gettinger*

(*In re BLMIS*), 976 F.3d 184, 199 (2d Cir. 2020). In this case, the Entity Defendants do not dispute the first two elements. Def's Opp. at 19, ECF No. 247. Instead, they argue that the Trustee cannot show "actual intent to hinder, delay, or defraud" a creditor. *Id.*

    i.   A Transfer of an Interest of the Debtor in Property

The Trustee must prove that the property he is seeking to recover was "customer property" prior to the transfer. All monies transferred from the 509 Account[14] or the 703 Account are "customer property" for purposes of these SIPA cases. *Picard v. BAM, L.P.* (*In re BLMIS*), 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) ("When the Defendants invested their money into the I[nvestment] A[dvisory] Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits. The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were 'customer property.'"); *see also Picard v. Nelson, (In re BLMIS)*, 610 B.R. 197, 233 (Bankr. S.D.N.Y. 2019) ("All of the transfers were made from the 509 Account held by BLMIS and consisted entirely of fictitious profits. Under SIPA, the customer deposits are deemed to have been BLMIS's property for the purposes of these adversary proceedings.").

In this case, it is undisputed that the Trustee seeks to recover customer property. Def's Opp. at 19, ECF No. 247 ("Defendants do not contest the first two elements . . . .").

    ii.   Made within Two Years of the Petition Date

The Trustee seeks to recover the fictitious profits that BLMIS transferred to the Entity Defendants within the two-year period between December 11, 2006 and December 11, 2008.

---

[14] BLMIS primarily used three bank accounts for the IA Business: JP Morgan Chase Bank, N.A. ("Chase") account #xxxxx1703 (the "703 Account"); Chase account #xxxxxxxxx1509 (the "509 Account"); and the Bankers Trust account #xx-xx0-599 (the "599 Account" or the "BT Account").

Page **9** of **17**

This element is uncontested. Def's Opp. at 19, ECF No. 247 ("Defendants do not contest the first two elements . . . .").

### iii. Actual Intent to Hinder, Delay, or Defraud

Intent to defraud is established as BLMIS operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015)) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent."); *Picard v. Cohmad Sec. Corp*., 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption' . . . ."). That BLMIS operated as a Ponzi scheme is well-established, and the Court relies on earlier findings of same and holds that the Trustee has met its burden of proof for summary judgment on this issue. *See Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 603 B.R. 682, 688–93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit.").

The Defendants argue that the Ponzi scheme presumption does not apply to them as they were never investors in the IA Business. The Defendants argue that their customer account statements establish a customer/broker dealer relationship which authorized Madoff to conduct trades on their behalf. The Defendants believe that the distinction between an investment advisory business and a broker/dealer relationship renders different treatment of their customer accounts under SIPA.

As a customer of a broker, the Defendants contend that:

> The statements and confirmations a broker provides its customers cannot be understated. Since in discretionary accounts there is no communication between the customer and broker prior to the execution of trades, the statements and confirmations are the only means by which customers became aware of the securities being traded in their accounts . . . Accordingly, controlling law, regulations and industry practice mandate that the transactions reflected on a customer's statements and confirmations evidence real trades of actual securities.

Def's Opp. at 15, ECF No. 247. In reaching this conclusion, the Defendants rely on their expert, Stanley Fortgang ("Fortgang").[15] Fortgang's report states that the "trades confirmed to Avellino are legitimate transactions of 'actual' securities." Fortgang Decl., Attach A at Ex. 4. Fortgang states:

> When a customer receives a confirmation of a transaction in his account, it acts as definitive proof that a trade has occurred. Furthermore, when the transaction occurs via a market maker, not only is it definitive proof that the trade has occurred, but it is also proof that a real security has been passed from seller to buyer whether or not that security can be traced or identified in any custodial accounts or depositories. As a final step in the consummation of a transaction, it is the sole piece of information proving a trade has occurred.
>
> As such, receipt of a confirmation coming from a market maker, in the custom and practice of securities markets, gives the recipient all rights of full ownership of the security described in the confirmation whether or not that security can be located in any custodial account or depository…. All benefit accrues to the rightful owner from the moment the confirmation is generated.

*Id.* There is no genuine issue of material fact that the Defendants were customers of the IA Business. Their customer agreements are no different that the agreements executed by

---

[15] Fortgang's report states, "I have over twenty-five years in sales and trading at major institutions including First Boston, Goldman Sachs, Morgan Stanley and Jefferies. I have been involved as a market maker in tens of thousands of transactions including thousands of equity transactions for a variety of clients including large institutions, hedge funds, high net worth individuals and other broker dealers." Fortgang Decl., Ex. A, ECF No. 250.

other IA Business customers.[16] Specifically, the Defendants point to paragraphs seven and eight of their customer agreement which provides:

> 7. **BROKER AS AGENT**
> The customer understands that the Broker is acting as the Customer's agent, unless the Broker notifies the Customer, in writing before the settlement date for the transaction, that the Broker is acting for its own account or as agent for some other person.
>
> 8. **CONFIRMATION AND STATEMENTS**
> Confirmations of transactions for the Customer's Account(s) shall be binding upon the Customer if the Customer does not object, in writing, within ten days after receipt by Customer.

Griffin Decl., Ex. 4, ECF No. 239. The Defendants contend that this "Broker as Agent" provision conclusively establishes that they were not a part of the IA Business. Their argument fails. Their customer agreements are no different than the customer agreements in *Picard v. Bam, L.P.*, 624 B.R. 55, 60 (Bankr. S.D.N.Y. 2020) and *Picard v. Nelson*, 610 B.R. 197, 217 (Bankr. S.D.N.Y. 2019). Fortgang's expert testimony is not credible. Fortgang did not analyze any of the transactions in the Defendants' accounts. He opines that all trades in the Defendants' accounts are "valid" and "real." That is simply unbelievable. The Trustee conducted a deposition of Fortgang and asked what analysis Fortgang had done to reach his opinion, Fortgang replied: "There is no analysis to be done. If you receive a confirmation, then a trade was done." Griffin Supp. Decl., Ex. 60 at 117–18, ECF No. 256. Later, the following exchange occurred:

> **Trustee:**   Okay. And do you know whether BLMIS actually sold or bought the security?

---

[16] In *Picard v. Bam, L.P.*, 624 B.R. 55, 60 (Bankr. S.D.N.Y. 2020), this Court considered the same customer agreements that are present in this case. *See* Griffin Supp. Decl., Ex's 55–56, ECF No. 256.

> **Fortgang:** They actually bought or sold it by the fact that they issued a confirmation saying they bought or sold a security with Mr. Avellino or the entity.

Griffin Supp. Decl., Ex. 60 at 119:5–11. The Trustee argues that Fortgang's opinions are "unmoored from the facts of this case." The Court agrees. Fortgang's opinion, taken to its logical conclusion means that all of Defendants' trades at BLMIS were real—despite the overwhelming evidence that shows otherwise. The Trustee's proffered expert, Dubinksy, examined BLMIS books and records and determined that the Summary Judgment Defendants were customers of the IA Business and that their trades were fake like all other IA Business customers. Trustee's Stmt., ¶ 80–83.

The Defendants argue that Fortgang's conclusion, for purposes of summary judgment, must be accepted as true and that summary judgment should be denied. Not so. "Summary judgment is not *per se* precluded because there are conflicting experts." *In re Omnicrom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). "An expert may be entitled to his opinion, but he is not entitled to a conclusion that his view of the facts necessarily precludes summary judgment." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014).

Fortgang's opinions create no genuine issues of fact. Fortgang's conclusion that BLMIS trade confirmations evince "real" securities transactions undermines the Second Circuit's determination of net equity. *In re Bernard L. Madoff Inv. Securities LLC* (*"Net Equity Decision"*), 654 F.3d 229 (2d Cir. 2011). In the *Net Equity Decision*, the Second Circuit held that investors of BLMIS who received statements and trade confirmations should be treated as "customers with claims for securities" and that their "net equity"

should be based on the net investment method.[17] The net investment method credits "the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it." *Net Equity Decision*, 654 F.3d at 233. The Second Circuit stated that the last statement method[18]—which is essentially what Fortgang proposes— "would have the absurd effect of treating fictious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235.

### C. Prejudgment interest

The Trustee requests prejudgment interest at a rate of 4% from the SIPA Filing Date. *Picard v. BAM L.P. (In re BLMIS)*, 624 B.R. 55, 65 (Bankr. S.D.N.Y. 2020) (awarding prejudgment interest at a rate of 4%); *see also* Order, Adv. Pro. No. 10-04390, Dkt. No. 253 ("The interest shall not compound."). This request has been opposed.

Prejudgment interest is "normally" awarded in avoided transfer cases "to compensate for the value over time of the amount recovered." *In re Cassandra Grp.*, 338 B.R. 583, 599 (S.D.N.Y. 2006) ("To fully and fairly compensate Cassandra's creditors for their loss—not only of $300,000 that was fraudulently conveyed to the Defendants, but of the use of that money since the date of the demand—the Trustee should be permitted to recover prejudgment interest."); *see also Messer v. Magee (In re FKF 3, LLC)*, 2018 WL 5292131, at *13 (awarding prejudgment interest to compensate for "loss of interest, the diminished value of the damages award due to the passage of time, and Plaintiff's lost opportunity to make use of the lost funds"); *see also S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) ("Nor are we persuaded that it was inappropriate to order that prejudgment interest be paid for the entire period from the time of

---

[17] 654 F.3d at 235. The Second Circuit held that the net investment is more effective at measuring "net equity" than the last statement method. *Id.* at 238.

[18] The last statement method looks to the "market value of the securities reflected on [the] last BLMIS customer statements . . . ". *Id.* at 233.

defendants' unlawful gains to the entry of judgment. Even if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period . . . .").

The Trustee is charged with collecting fictitious profits from net winners so that net losers in BLMIS' Ponzi scheme can be adequately compensated for their losses. He has spent approximately ten years prosecuting this case and cannot be made whole without an award of prejudgment interest. He has spent time defending against arguments that have already been decided. The Court will award the Trustee prejudgment interest in the amount of 4% commencing on the filing date of December 10, 2010, through the date of an entry of judgment.

### D. Liability of General Partners

Under count thirteen, the Trustee seeks summary judgment against the general partners of the Entity Defendants. "In the bankruptcy context, general partners can be held personally liable under state law for avoidable transfers made to the partnership. A trustee is empowered under section 550(a) of the Code to recover avoided transfers from a partnership as initial transferee, or from the general partner of the partnership under applicable state partnership law." *Picard v. Merkin*, (*In re BLMIS*), 440 B.R. 243, 268–69 (Bankr. S.D.N.Y. 2010). The General Partner Defendants are liable for the debts of the Entity Defendants.

### E. Other Issues

i.  Madoff's Plea Allocutions are Admissible

The Defendants argue that Madoff's plea allocations are unreliable and inadmissible. This objection has been overruled numerous times. *Picard v. Nelson, (In re BLMIS)*, 610 B.R. 197, 208–210 (Bankr. S.D.N.Y. 2019); *Picard v. JABA Associates L.P (In re BLMIS)*, No. 20 CV. 3836, 2021 WL 1112342, at *7 (S.D.N.Y. Mar. 24, 2021).

    ii.    Frank DiPascali's Plea Allocution is Admissible

The Defendants argue that DiPascali's criminal trial testimony is untrustworthy and should not be admitted. Once again, this objection has been overruled numerous times. *Picard v. JABA Assocs. LP*, 528 F. Supp. 3d 219, 233 (2021) (Dipascali "testified in person for 16 days under oath and was subjected to cross-examination."); *Picard v. Epstein* (*In re Bernard L. Madoff Investment Secs LLC*), No. 1:21-CV-02334, 2022 WL 493734, at *14 (S.D.N.Y. Feb. 17, 2022).

    iii.    Mr. Dubinsky's Expert Report is Admissible

The Defendants argues that Dubinsky's expert report is inadmissible. The Court disagrees. This Court and the District Court have repeatedly admitted Dubinsky's expert report to resolve prior trials and summary judgment motions. *See Picard v. Nelson, (In re BLMIS)*, 610 B.R. 197, 221–29 (Bankr. S.D.N.Y. 2019); *Picard v. JABA Associates L.P (In re BLMIS)*, No. 20 CV. 3836, 2021 WL 1112342, at *7 (S.D.N.Y. Mar. 24, 2021).

    iv.    Admissibility of Bienes' PBS Frontline Interview

Defendants dispute the admissibility of the PBS Frontline Interview as hearsay. The Trustee counters that the transcript of the PBS interview is not hearsay as it is being offered against Bienes—a party opponent.

"An opposing party's statement, offered as evidence against that party, is not hearsay and is admissible if it is relevant." *LeClair v. Raymond*, No 1:19-CV-28, 2022 WL 219609, at *8 (N.D.N.Y. Jan. 25, 2022) (citing Fed. R. Evid. 801(c)(2)); *see Brown v. Pagan*, No. 08-cv-8372, 2010 WL 1430702, at *1 (S.D.N.Y. Apr. 8, 2010) (holding that plaintiff's deposition transcript offered by defendants is "admissible as the admission of a party opponent."). Federal Rule of Civil Procedure 32(a)(3) also "permits a party to introduce, as part of his substantive proof, the

deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there." *Keawsri v. Ramen-Ya Inc.*, No.. 17-CV-2406, 2022 WL 2391692, at *1 (S.D.N.Y. July 1, 2022) (citation omitted).

Bienes was confronted with portions of the transcript at a deposition in September, 2015,[19] where Trustee's counsel and Bienes' counsel, were present. For purposes of this summary judgment motion, the Court will admit the portions of the PBS transcript that were corroborated by Avellino and Bienes in their depositions.

 v. Summary Judgment Defendants are not Entitled to 11 U.S.C. § 548(c)'s Good Faith Defense

The Summary Judgment Defendants argue that 11 U.S.C. § 548(c)'s "for value" defense allows them to keep their fictious profits. The Second Circuit has held that BLMIS customers cannot invoke the "for value" defense under 11 U.S.C. § 548(c) because it conflicts with the goals of SIPA. *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 188 (2d Cir. 2020) (rejecting the § 548(c) defense because that would allow the defendants to "retain funds that otherwise would be customer property" that should be "distributed to customers based on their net equity claims.").

## IV. Conclusion

For the foregoing reasons, summary judgment is granted in favor of the Trustee under counts one and thirteen. The Trustee shall submit proposed order(s) within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).

Dated: July 15, 2022
Poughkeepsie, New York

/s/ Cecelia G. Morris
_____
Hon. Cecelia G. Morris
U.S. Bankruptcy Judge

---

[19] Woodruff Dec. Ex. 28 at 174:24–175:8; 178:1–25; 179:1–180:8; ECF No 249 (Bienes stating that statements he made during the PBS interview were truthful).

